# 25-149-cr

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

RAUL RIVERA-PEREZ,

*Petitioner-Appellee,*

-vs-

R. STOVER, Warden,

*Respondent-Appellant.*

———————

ON APPEAL FROM THE UNITED STATES DISTRICT
COURT FOR THE DISTRICT OF CONNECTICUT

## OPPOSITION BRIEF FOR PETITIONER-APPELLEE
## RAUL RIVERA-PEREZ

TERENCE S. WARD
*Federal Defender, District of Connecticut*
10 Columbus Boulevard, 6th Floor
Hartford, CT 06106
(860) 493-6260

TO BE ARGUED BY: CHARLES F. WILLSON
*Assistant Federal Defender*

# TABLE OF CONTENTS

JURISDICTIONAL STATEMENT ........................................................................1

STATEMENT OF THE ISSUES...........................................................................2

STATEMENT OF THE CASE................................................................................2

SUMMARY OF THE ARGUMENT .....................................................................5

ARGUMENT .........................................................................................................6

I.      STANDARD OF REVIEW...........................................................................6

II.     CONSISTENT WITH THE FIRST STEP ACT'S PLAIN LANGUAGE, THIS COURT SHOULD AFFIRM THE DISTRICT COURT'S INTERPRETATION OF THE SECTION AT ISSUE..................6

CONCLUSION.....................................................................................................19

# TABLE OF AUTHORITIES

**Cases**

*Black v. Decker*,
103 F.4th 133 (2d Cir. 2024) ...................................................................6

*Bostock v. Clayton Cty., Georgia*,
590 U.S. 644 (2020)..................................................................................6

*Dyer v. Fulgam*, No. 1:21-CV-299-CLC-CHS, 2022 WL 1598249
(E.D. Tenn. May 20, 2022)................................................................ 10-11

*Goggans v. Jamison*,
No. 1:23-CV-03645-GHW, 2023 WL 7389136
(S.D.N.Y. Oct. 13, 2023)................................................................. 10, 13

*Guerriero v. Miami RRM*,
　　No. 24-10337, 2024 WL 2017730 (11th Cir. May 7, 2024) ........................10

*Knight First Amend. Inst. at Columbia Univ. v. United States*
　　*Citizenship & Immigr. Servs.*,
　　30 F.4th 318 (2d Cir. 2022) ....................................................... 6-7

*Lawrence + Mem'l Hosp. v. Burwell*,
　　812 F.3d 257 (2d Cir. 2016) ...................................................................6

*Lugo v. Hudson*,
　　785 F.3d 852 (2d Cir. 2015) ...................................................................6

*Oklahoma v. Castro-Huerta*,
　　597 U.S. 629 (2022) ...............................................................................7

*Rivera-Perez v. Stover*,
　　757 F. Supp. 3d 204 (D. Conn. 2024) .................................................. *passim*

*United States v. Aldeen*,
　　792 F.3d 247 (2d Cir. 2015) .................................................................17

*United States v. Brooks*,
　　889 F.3d 95 (2d Cir. 2018)....................................................................17

*United States v. Calabrese*,
　　No. 1:11-CR-00437, 2023 WL 1969753
　　(N.D. Ohio Feb. 13, 2023)................................................................ 10, 13

*United States v. Gayle*,
　　342 F. 3d 89 (2d Cir. 2003) ...................................................................6

*United States v. Johnson*,
　　529 U.S. 53 (2000)...............................................................................17

*In Re: Vitamin C Antitrust Litig.*,
　　8 F.4th 136, 142 (2d Cir. 2021) .............................................................6

**Statutes**

18 U.S.C. § 3583 ................................................................................17

18 U.S.C. § 3624 .......................................................................... *passim*

18 U.S.C. § 3632 .......................................................................... *passim*

21 U.S.C. § 841 ..................................................................................3

21 U.S.C. § 846 ..................................................................................3

28 U.S.C. § 1291 ................................................................................1

28 U.S.C. § 2241 ........................................................................ 1-3, 5, 6

28 U.S.C. § 2253 ................................................................................1

**Other Authorities**

28 C.F.R. § 523.44 (b) (Jan. 19, 2022)...........................................................9

FSA Time Credits, 87 FR 2705-01 ............................................................9

J.Brenner & S.Wylie, *Analyzing the First Step Act's Impact on Criminal Justice*, Brennan Center for Justice (Aug. 20, 2024) ....................15

*Durbin Delivers Opening Statement During Senate Judiciary Committee Hearing on the Fifth Anniversary of the Landmark First Step Act*, U.S. Sen. Committee on Judiciary (Jan. 17, 2024) ..................................................................................................16

Mica Moore, *Escaping From Release: Is Supervised Release Custodial Under 18 USC § 751(a)?*, 83 U. Chi. L. Rev. 2257 (2016) ........................................................................................................17

*iv*

Hon. Stefan R. Underhill, *Supervised Release Needs Rehabilitation*,
10 VA. J. CRIM. L. 1 (2024) ...............................................................17

U.S. Sent'g Comm'n, *Amendments to the Sentencing Guidelines*
(Final) (Apr. 30, 2025) ...............................................................17

R.Wilson, *A Critical Assessment of the First Step Act's Recidivism-Reduction Measures*, 128 DICK. L. REV. 461 (2024) ...................................15

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

RAUL RIVERA-PEREZ,
                    *Petitioner-Appellee,*

-vs-

R. STOVER, Warden,
                    *Respondent-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT
COURT FOR THE DISTRICT OF CONNECTICUT

## JURISDICTIONAL STATEMENT

In *Rivera-Perez v. Stover*, No. 3:23-cv-1348-SRU, the United States District Court for the District of Connecticut (Underhill, J.) had subject matter jurisdiction over Mr. Rivera-Perez's habeas petition under 28 U.S.C. § 2241, in part due to Mr. Perez-Rivera having been held in FCI Danbury at the time of filing. After the District Court granted the petition by a memorandum of decision filed November 18, 2024, the Government invoked this Court's jurisdiction under 28 U.S.C. §§ 1291 and 2253(a) by filing a notice of appeal on January 16, 2025.

1

## STATEMENT OF THE ISSUES

1.      Whether the First Step Act credits earned by an inmate while serving a prison sentence can be applied to reduce the term of supervised release the inmate will serve following release from the BOP?

## STATEMENT OF THE CASE

The Government seeks to have this Court effectively take back a reduction in Mr. Rivera-Perez's term of supervised release.  The origin of that reduction began with Mr. Rivera-Perez completing prison programming and earning credits in accords with the First Step Act ("FSA").  The BOP recognized Mr. Rivera-Perez's efforts, applying his credits so that he would leave the prison earlier than originally scheduled and enter into a halfway house.

### Procedural History

On October 13, 2023, Mr. Rivera- Perez sought relief for the credits that went unapplied by the BOP, bringing a *pro se* 2241 motion in the District of Connecticut, where he had served his time at FCI Danbury.  On November 18, 2024, over objection from the prison warden, the District Court (Underhill, J.) granted the 2241 motion and ordered any unused credits should apply to reduce any remaining term of supervised release.  *See Rivera-Perez v. Stover*, 757 F. Supp. 3d 204 (D. Conn. 2024), Gov't App. at 6.

2

The warden appealed. Mr. Rivera-Perez is now in the community, serving his term of supervised release, approaching 70 years old. He seeks the Court's affirmance of the District's memorandum and decision.

## Mr. Rivera-Perez's Prison Term Intersected With Prison Reform

At the time of his 2241 motion, Mr. Rivera-Perez was serving a 360-month prison sentence imposed by the United States District Court for the District of Puerto Rico in No. 3:97-cr-00245-FAB-1 for Conspiracy to Distribute Cocaine, in violation of 21 U.S.C. §§ 846, 841(a)(1).[1] The BOP had determined Rivera-Perez's projected release date, with consideration of his good conduct time under 18 U.S.C. § 3624(b), as December 3, 2025.

Mr. Rivera-Perez's prison term spanned a number of sentencing reforms. Most significant here, in 2018, Congress enacted the First Step Act. The FSA included changes promoting rehabilitation within the prison walls and recognizing that rehabilitation through the award of "credits."

> The FSA encourages federal inmates to participate in evidence-based recidivism reduction programs ("EBRRs") and other productive activities ("PAs") by providing time credits to an inmate who successfully participates in such programs. *See* 18 U.S.C. § 3632(d)(4)(A); 28 C.F.R. § 523.40(b); *Dailey*, 2023 WL 3456696, at *2. An inmate's initial risk and needs assessment is ordinarily completed within 28 days of his/her arrival at the

---

[1] He previously had been serving term of life, which was amended in connection with prior sentencing reform.

3

designated facility. *See* BOP Program Statement 5410.01, CN-2, § 5.[.] Inmates are reassessed at each regularly scheduled Program Review throughout the remainder of their incarceration. *See id.* Program Reviews occur approximately every 180 days unless an inmate is within one year of release, at which point those reviews occur every 90 days. *See* 28 C.F.R. § 524.11(a)(2). An inmate earns either ten or fifteen days of FSA time credits for every thirty days of successful participation in EBRRs or PAs. 18 U.S.C. § 3632(d)(4)(A). [.]

. . .

Application of FSA time credits enables an inmate to be transferred to prerelease custody or supervised release earlier than the completion date of his sentence. *See* 18 U.S.C. §§ 3624(g)(2) and (3); 18 U.S.C. § 3632(d)(4)(C); *see also Saleen v. Pullen*, 2023 WL 3603423, at *1 (D. Conn. Apr. 12, 2023) ("Prerelease custody can be in the form of either home confinement or transfer to a residential reentry center."). If the inmate has a term of supervised release imposed as part of their sentence, "the Director of the Bureau of Prisons may transfer the prisoner to begin any such term of supervised release at an earlier date, not to exceed 12 months." *See* 18 U.S.C. § 3624(g)(3) (emphasis added).

*Rivera-Perez*, 757 F. Supp. 3d at 207–08.

As an inmate, Rivera-Perez earned credits in accordance with the FSA. The BOP's FSA Time Credit Assessment showed that he had earned 780 FSA credits as of December 2, 2023. *Id.* Presumably by the BOP giving him the full 365 credits permitted by the Second Chance Act, "Rivera-Perez's release date was modified to December 3, 2024." *Id.* That left at least 415 FSA credits remaining. *Id.* The BOP transferred Mr. Rivera-Perez to prerelease custody at the halfway house on January

4

17, 2024, *i.e.*, 321 days prior to that adjusted release date. The number of FSA credits remaining is unresolved. *Rivera-Perez v. Stover*, 757 F. Supp. 3d at 214 n.8.

## SUMMARY OF THE ARGUMENT

This case presents the Court with the opportunity to ensure that the goals of the First Step Act ("FSA") are pursued, consistent with the plain reading of a key FSA provision. Mr. Raul Rivera-Perez amassed more than 700 FSA credits during his time in custody. He sought to enforce application of those credits by filing a 28 U.S.C. § 2241 motion with the District Court with jurisdiction over his prison. Although he released from the prison to a halfway house, he still had credits greater in number than his days that remained at the halfway house.

Mr. Raul Rivera-Perez's *pro se* motion pursuant to 28 U.S.C. 2241 resulted in an order from the District Court (Underhill, J.) that Mr. Rivera-Perez's remaining balance of FSA credits should be used to shorten his five-year term of supervised release. *See Rivera-Perez v. Stover*, 757 F. Supp. 3d 204 (D. Conn. 2024). The FSA marks another significant step in sentencing reform, with the goals of encouraging rehabilitation and reducing the costs to society caused by incarceration and tethering people to the criminal justice system for longer than previously thought necessary. The District Court's reading of the FSA is consistent with both the plain language

5

of the provision at issue and those broader goals.  Accordingly, this Court should affirm and reject the Government's pro-tether influence on the statutory analysis.

## ARGUMENT

### I.    STANDARD OF REVIEW

This Court "review[s] *de novo* a district court's grant or denial of a habeas petition brought under 28 U.S.C. § 2241." *Black v. Decker*, 103 F.4th 133, 142 (2d Cir. 2024).  The Court reviews "any factual findings for clear error." *Lugo v. Hudson*, 785 F.3d 852, 854 (2d Cir. 2015).  Decisions on legal issues are reviewed *de novo*. *See, e.g., United States v. Gayle*, 342 F.3d 89, 91 (2d Cir. 2003).  Accordingly, this Court "review[s] relevant questions of statutory interpretation *de novo*."  *In Re: Vitamin C Antitrust Litig.*, 8 F.4th 136, 142 (2d Cir. 2021).

### II.   CONSISTENT WITH THE FIRST STEP ACT'S PLAIN LANGUAGE, THIS COURT SHOULD AFFIRM THE DISTRICT COURT'S INTERPRETATION OF THE SECTION AT ISSUE.

Statutory interpretation "begin[s] … with the text of the statute." *Lawrence + Mem'l Hosp. v. Burwell*, 812 F.3d 257, 259 (2d Cir. 2016).  "[W]hen the meaning of the statute's terms is plain, [a court's] job is at an end." *Bostock v. Clayton Cty., Georgia*, 590 U.S. 644, 674 (2020). In determining the plain meaning of statutory text, "[i]t is not the province of the courts to add words to statutes that Congress has enacted." *Knight First Amend. Inst. at Columbia Univ. v. United States Citizenship*

6

*& Immigr. Servs.*, 30 F.4th 318, 331 (2d Cir. 2022).  A straightforward application of these principles defeats the government's narrowing of the statute at issue here.[2]

### A. The FSA's Plain Language Permits Application Of FSA Credits To The Term Of Supervised Release.

The key statute here reads as follows.

> **(C) Application of time credits <u>toward</u> prerelease custody <u>or</u> supervised release.**--<u>Time credits earned</u> under this paragraph by prisoners who successfully participate in recidivism reduction programs or productive activities <u>shall be applied toward time in prerelease custody or supervised release</u>. The Director of the Bureau of Prisons shall transfer eligible prisoners, as determined under section 3624(g), into prerelease custody or supervised release.

18 U.S.C.A. § 3632 (West) (emphasis added).[3]  Within that statute, the meaning of "toward" is at the center of the dispute.

The District Court took a straight-forward, plain language interpretive approach.

---

[2] "The people are entitled to rely on the law as written, without fearing that courts might disregard its plain terms based on some extratextual consideration." *Id.* This is true even if the plain language of the statute leads to an outcome not intended by the drafters of the statute.  *See id.* As the Supreme Court has repeatedly stated, "the text of a law controls over purported legislative intentions unmoored from any statutory text." *Oklahoma v. Castro-Huerta*, 597 U.S. 629, 642 (2022) (collecting cases).

[3] 18 U.S.C. 3624(g) discusses prisoner eligibility, including for "a prisoner being placed in supervised release."  18 U.S.C.A. § 3624(g)(D)(ii) (West).

> Applying credits toward something ordinarily means reducing that thing. For example, applying a store credit toward the cost of an item means that the cost of that item is reduced by the amount of the credit. Similarly, applying a credit toward one's account balance means that the balance will be reduced by the amount of the credit. The plain meaning of the phrase "applied toward time in . . . supervised release" thus clearly suggests that FSA credits are to be applied to reduce a term of supervised release.

*Rivera-Perez v. Stover*, 757 F. Supp. 3d 204, 211–12 (D. Conn. 2024).

In so doing, the Court rejected the warden's argument that "toward" "only allow[s] the BOP to accelerate the beginning of supervised release." *Id.* at 211 (quotations and brackets omitted). That isolationist approach to the text ignores the words around it. *See id.* ("the word 'toward' does not appear in isolation in section 3632(d)(4)(C)"). That reading also renders redundant and thus superfluous other provisions of the statute, an approach that is inconsistent with principles of statutory interpretation.

> The second sentence reads: "The Director of the Bureau of Prisons shall transfer eligible prisoners, as determined under section 3624(g), into prerelease custody or supervised release." 18 U.S.C. § 3632(d)(4)(C). . . . Reading the second sentence as merely confirming the meaning of the first, however, would render the second sentence entirely superfluous. *See Mackey v. Lanier Collection Agency & Serv., Inc.*, 486 U.S. 825, 837 (1988) ("As our cases have noted in the past, we are hesitant to adopt an interpretation of a congressional enactment which renders superfluous another portion of that same law.").

8

*Id.* at 212 (citation omitted) (noting conflicting interpretations in other districts, specifically within Court of Appeals for 11th Circuit).

The Appellant's reading also effectively inserts words into the statute, such as "transfer" or "early transfer" to supervised release. *Rivera-Perez* interprets the plain meaning absent those terms, which the BOP has inserted in interpreting the statute elsewhere. *Compare* FSA Time Credits, 87 FR 2705-01, ("By its own terms, the statute allows BOP to award time credits to individuals incarcerated in an RRC toward time in supervised release."), available at https://www.bop.gov/inmates/fsa/docs/bop_fsa_rule.pdf, *with* 28 C.F.R. § 523.44 (b) (Jan. 19, 2022) ("Where otherwise permitted by these regulations, the Bureau may apply FSA Time Credits toward prerelease custody or early transfer to supervised release under 18 U.S.C. 3624(g) only if an eligible inmate . . ."). Moreover, the obvious rebuttal is that those additional terms are not in the text.

Furthermore, the District Court's reading of "toward" is consistent with a common definition of the term when used as a preposition, synonymous with "to" and explaining a purpose for application. *See* "*Toward,*" *Dictionary.com* ("with a view to obtaining or having;" "as a help or contribution to").[4] The definition relied

---

[4] Available at https://www.dictionary.com/browse/toward, last visited Aug. 4, 2025.

upon by other courts seemingly reflects a physical, geographical or temporal relationship, which is not consistent with the plain language of the statute here, which focuses on earning and applying credits. *See*, *e.g.*, *United States v. Calabrese*, No. 1:11-CR-00437, 2023 WL 1969753, at *2 (N.D. Ohio Feb. 13, 2023) ("Use of the word 'toward' means that credits can be applied to bring 'time in prerelease custody or supervised release' closer to occurring because credits applied 'toward' something generally means to bring that something closer to happening. BLACK'S LAW DICTIONARY (11th ed. 2019) (defining 'toward,' in relevant part, as 'in the direction of; on a course or line leading to (some place or something)'); *Goggans v. Jamison*, No. 1:23-CV-03645-GHW, 2023 WL 7389136, at *2 (S.D.N.Y. Oct. 13, 2023) (quoting *Calabrese*); *Guerriero v. Miami RRM*, No. 24-10337, 2024 WL 2017730, at *2 (11th Cir. May 7, 2024) (quoting *Calabrese*).[5]

The District Court's interpretation is not alone.

> "[I]n interpreting a statute a court should always turn first to one, cardinal cannon before all others.... [C]ourts must presume that a legislature says in a statute what it means and means in a statute what it says there." *Connecticut Nat. Bank v. Germain*, 503 U.S. 249, 253–54 (1992) (noting "judicial inquiry complete" when statute's language is unambiguous). Here, the relevant statutory provision provides that "[t]ime credits earned under this paragraph by prisoners who successfully participate in recidivism reduction programs or productive activities shall be

---

[5] *Guerriero* does not discuss the use of "against" as an alternative. *Cf.* Gov't Br. At 14 (citing *Guerriero* in comparing "toward" and "against").

applied toward time in . . . supervised release." 18 U.S.C. § 3632(d)(4)(C). Therefore, the unambiguous, mandatory language of the statute provides that earned-time credits may be applied to a term of supervised release.

*Dyer v. Fulgam*, No. 1:21-CV-299-CLC-CHS, 2022 WL 1598249, at *3 (E.D. Tenn. May 20, 2022).

These interpretations enable each sentence to have meaning. *See id.*; *see also Rivera-Perez*, 757 F. Supp. 3d at 212. The first allows application of credits to reduce time in prerelease custody or on supervised release. *Id.* The second enables the BOP to make the resulting transfer of prisoners to the abbreviated terms of prerelease custody or supervised release. *Id.* ("The second sentence thus provides the mechanism to carry out the FSA's purpose of reducing an eligible inmate's time in incarceration. *See* 164 Cong. Rec. S7746 (daily ed. Dec. 18, 2018) (statement of Sen. Cornyn) ('[T]he incentive for prisoners is to go through the program, gain the earned credit so that they can be released.')").

The District Court recognizes that these provisions do not empower the BOP to effectuate the reduction of the supervised release period.

> Of course, as the Eleventh Circuit pointed out in *Guerriero*, "§ 3632(d)(4)(C) does not permit the BOP to apply a prisoner's FSA time credits to his period of supervised release." 2024 WL 2017730, at *1. That is only because the BOP has no role whatsoever in determining or crediting time in supervised release. Once a federal inmate is released from BOP custody to begin supervision by Probation, the BOP has no further authority

11

over that inmate. *See* 18 U.S.C. § 3624(e) ("A prisoner whose sentence includes a term of supervised release after imprisonment shall be released by the Bureau of Prisons to the supervision of a probation officer . . .. The term of supervised release commences on the day the person is released from imprisonment."); *see also United States v. Earl*, 729 F.3d 1064, 1068 (9th Cir. 2013) ("We therefore interpret the term 'released' in the context of the statute to require not only release from imprisonment, but also release from the BOP's legal custody at the expiration of the prisoner's prescribed sentence.").

*Rivera-Perez*, 757 F. Supp. 3d at 213. As the District Court continued, consistent with the foregoing interpretation, the directive to apply credits to supervised release is not linked to the BOP but, instead, more broadly authorized.

Consistent with that reality, the first sentence of section 3632(d)(4)(C), unlike the second, is not directed at the BOP, but rather uses passive voice: "Time credits . . . *shall be applied* toward time in prerelease custody or supervised release." 18 U.S.C. § 3632(d)(4)(C) (emphasis added).

*Id.*

That does not leave the BOP with no role in applying credits and promoting rehabilitation and early release from the prison setting. The BOP already had the authority to place inmates approaching the end of their prison terms "(not to exceed 12 months) under conditions that will afford that prisoner a reasonable opportunity to adjust to and prepare for the reentry of that prisoner into the community." 18 U.S.C. 3624(c)(1). Accordingly, the BOP separately has "discretion to determine whether a prisoner receives prerelease custody placement and how much time the

12

prisoner receives within the twelve-month maximum period. *See* 18 U.S.C. § 3621(b)." *Rivera-Perez*, 757 F. Supp. 3d at 209. This point undermines the concerns expressed in other courts that applying credits to reduce supervised release would somehow obviate the substitution of prison time with placement in prerelease custody. *See Calabrese*, 2023 WL 1969753, at *3 (reasoning that "reading 'toward time in prerelease custody or supervised release' to mean FSA credits shall reduce the overall terms of either prerelease custody or supervised release would write out any mechanism in the statute for FSA credits to reduce an eligible prisoner's time in custody in prison, which is the intended incentive behind the FSA time credits"); *Goggans*, 2023 WL 7389136, at *2 (quoting *Calabrese*). "[C]ontrary to the *Calabrese* court's concern that reading 'toward time in prerelease custody or supervised release' to mean FSA credits shall reduce the overall terms of either prerelease custody or supervise release would write out any mechanism in the statute for FSA credits to reduce an eligible prisoner's time in custody in prison, the second sentence of section 3632(d)(4)(C) not only provides exactly that mechanism for the BOP to reduce a term of imprisonment, but it uses mandatory language <u>requiring</u> release from prison." *Rivera-Perez*, 757 F. Supp. 3d at 212–13 (quotation and citation omitted).

13

Moreover, as the institution that determines credit and applies them to pre-release opportunities, the District Court looked to the BOP to assess the remaining credits. *Id.* at 215 ("The BOP is directed to calculate the number of Rivera-Perez's unused FSA time credits and inform the U.S. Probation Office for the Middle District of North Carolina of that calculation so that it can apply those credits toward Rivera-Perez's term of supervised release."). From there, the overseeing probation office could work on implementing the reduction to the term of supervised release.[6]

---

[6] The remaining number of credits is unclear.

> The BOP transferred Rivera-Perez to prerelease custody 321 days prior to his adjusted release date of December 3, 2024. But that fact does not automatically compel the conclusion that the BOP used 321 of Rivera-Perez' FSA credits to do so. The FSA does impose an obligation on the BOP to apply time credits to accelerate an inmate's transfer to prerelease custody. *See* 18 U.S.C. § 3632(d)(4)(C) ("The Director of the Bureau of Prisons shall transfer eligible prisoners, as determined under section 3624(g), into prerelease custody or supervised release."). But the BOP is also under an obligation, separate from that imposed by virtue of applying earned FSA time credits, to transfer an inmate to prerelease custody, when practicable, within the last twelve months of their term of imprisonment. *See id.* § 3624(c)(1) ("The [BOP] shall, to the extent practicable, ensure that a prisoner serving a term of imprisonment spends a portion of the final months of that term (not to exceed 12 months), under conditions that will afford that prisoner a reasonable opportunity to adjust to and prepare for the reentry of that prisoner into the community. Such conditions may include a community correctional facility."). The BOP therefore could also have transferred Rivera-Perez to prerelease custody on

14

Even were the plain language in doubt, this statute should be read broadly to effectuate its core purpose. The First Step Act of 2018 ("FSA") is the most impactful federal sentencing reform of the past 40 years. See R.Wilson, *A Critical Assessment of the First Step Act's Recidivism-Reduction Measures*, 128 DICK. L. REV. 461 (2024), https://insight.dickinsonlaw.psu.edu/dlr/vol128/iss2/3.

> Supported by a bipartisan slate of federal lawmakers, the First Step Act represented not just a legislative achievement but a systemic shift toward a belief in second chances. After passage, Sen. Dick Durbin (D-IL) said the law would "begin to relieve our overcrowded prisons, redirect funding to our most pressing crime prevention efforts, make our communities safer, and ensure the integrity of our justice system." How has the legislation fared in achieving its intended goals? While it has made significant progress in the six years since it was enacted, its effectiveness has been somewhat limited by ongoing legal debates about how it should be applied.

J.Brenner & S.Wylie, *Analyzing the First Step Act's Impact on Criminal Justice*, BRENNAN CENTER FOR JUSTICE (Aug. 20, 2024),

---

> January 17, 2024 pursuant to its authority under section 3624(c), in the process using *none* of Rivera-Perez's FSA credits. If that were the case, Rivera-Perez would still have 415 unused FSA time credits remaining. In either case, Rivera-Perez has demonstrated that he has some amount of unused FSA time credits remaining that should be applied to reduce his term of supervised release.

*Rivera-Perez*, 757 F. Supp. 3d at 214 n.8.

https://www.brennancenter.org/our-work/analysis-opinion/analyzing-first-step-acts-impact-criminal-justice.

> These reforms have been tremendously successful. Of the 29,944 incarcerated adults released under *First Step Act* reforms through January 2023, only 12.4 percent have been arrested for new crimes. By comparison, the overall Bureau of Prisons recidivism rate currently stands at around 43 percent. To date, there have been 3,980 retroactive sentence reductions and 4,639 compassionate release motions granted.

*Durbin Delivers Opening Statement During Senate Judiciary Committee Hearing on the Fifth Anniversary of the Landmark First Step Act*, U.S. Sen. Committee on Judiciary (Jan. 17, 2024) (discussing reforms, including credit system), https://www.judiciary.senate.gov/press/releases/durbin-delivers-opening-statement-during-senate-judiciary-committee-hearing-on-the-fifth-anniversary-of-the-landmark-first-step-act.

Against this backdrop, the Court should reject the narrowing, word-inserting interpretation advanced by Appellant. A system that encourages rehabilitation with concrete rewards, *i.e.*, earning credits, should likewise facilitate application of those rewards. Appellant's approach effectuates some of that by establishing the system in which credits are earned, but sets limits that serve only the BOP's self-promulgation interests by tethering people to the criminal justice system longer than necessary.

16

Those limits are inconsistent with the purposes of the FSA *and* the pro-rehabilitation purposes of supervised release, including that supervisory periods can be reduced by the courts in other contexts.[7] That the Court recognized the plain language as enabling a defendant to earn credits that could be applied to reduce supervised release is consistent with other statutory considerations in this area. Courts can terminate terms of supervised release after a defendant has served as little as one year of that term. Probation offices can effectuate those terminations through submitting paperwork to sentencing judges, regardless of whether the local U.S.

---

[7] Supervised release "fulfills rehabilitative ends, distinct from those served by incarceration." *United States v. Johnson*, 529 U.S. 53, 59 (2000); *see* Hon. Stefan R. Underhill, *Supervised Release Needs Rehabilitation*, 10 VA. J. CRIM. L. 1, 5–9 (2024) (describing supervised release's rehabilitative focus). As such, "supervised release is not an alternative to incarceration," like prerelease custody, but rather "a separate and additional period of monitoring concerned with facilitating the reintegration of the defendant into the community" after a full term of imprisonment. Mica Moore, *Escaping From Release: Is Supervised Release Custodial Under 18 USC § 751(a)?*, 83 U. CHI. L. REV. 2257, 2263 (2016); *see Haymond*, 588 U.S. at 652; U.S. SENT'G COMM'N, *Amendments to the Sentencing Guidelines (Final)* at 30, 60–61 (Apr. 30, 2025).

This interpretation is confirmed by the statute governing supervised release. Section 3583(e)(3) authorizes a district court to revoke a term of supervised release, "after considering the factors set forth in sections 3553(a)(1), (a)(2)(B), (a)(2)(C), (a)(2)(D), (a)(4), (a)(5), (a)(6), and (a)(7)." 18 U.S.C. § 3583(e). What is missing from that list is § 3553(a)(2)(A), *i.e.*, punishment. Thus, at its core, supervised release "is not, fundamentally, part of the punishment; rather, its focus is rehabilitation." *United States v. Aldeen*, 792 F.3d 247, 252 (2d Cir. 2015); *see United States v. Brooks*, 889 F.3d 95, 99 (2d Cir. 2018).

Attorney's Office agrees, and defendants can otherwise file motions for early termination absent action of the probation office. Reading the FSA as providing another avenue for reducing the length of supervised release terms is consistent with these tools, encouraging inmates to engage in pro-rehabilitation programming as early as possible and furthering the sentencing reform movement that enabled the FSA's passage.

Meanwhile, amongst these policy considerations and the battle over statutory interpretation, there is Mr. Rivera-Perez. Long ago, he committed a serious drug crime. He received a life sentence in prison that was reduced to a term of 360 months, followed by five years of supervised release. He did what the FSA told him to do, earning credits that reflected his progress and rehabilitation within the BOP. The *Rivera-Perez* Court read the statute in a manner that is consistent with the plain language, but also serves the FSA's purpose and encourages all Rivera-Perez's to do all they can to move forward and leave the criminal justice system behind them. The Court should affirm.

18

## CONCLUSION

The District Court applied the plain language of the First Step Act. Mr. Rivera-Perez should receive the benefit of the credits he earned. This Court should affirm.

Dated: August 4, 2025                    Respectfully submitted,

TERENCE S. WARD
FEDERAL DEFENDER
DISTRICT OF CONNECTICUT

/s/ Charles F. Willson/s/
First Assistant Federal Defender
*/s/ Robert H. Hendricks*
Research & Writing Attorney
*Attorneys for Petitioner-Appellee*
*Raul Rivera-Perez*

19

## **CERTIFICATIONS**

The undersigned counsel certifies that this brief complies with the type-volume limitations set forth by Local Rule 32.1(a)(4)(A), in that there are no more than 5000 words in this brief. The undersigned counsel further certifies that the foregoing has been served on counsel for all parties via the Court's CM/ECF system on the date reflected on the case docket.

/s/Charles F. Willson/s/
Asst. Federal Defender