# 25-149

*To Be Argued By:*
J. BRIAN MESKILL

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

### Docket No. 25-149

———

RAUL RIVERA-PEREZ,

*Petitioner-Appellee,*

-vs-

R. STOVER, WARDEN,

*Respondent-Appellant.*

———

ON APPEAL FROM THE UNITED STATES DISTRICT
COURT FOR THE DISTRICT OF CONNECTICUT

## REPLY BRIEF
## FOR RESPONDENT-APPELLANT

DAVID X. SULLIVAN
*United States Attorney*
*District of Connecticut*
157 Church Street, 25th Floor
New Haven, Connecticut 06510
(203) 821-3700

J. BRIAN MESKILL
JOHN W. LARSON
CONOR M. REARDON *(of counsel)*
*Assistant United States Attorneys*

## Table of Contents

Table of Authorities ............................................. ii

Preliminary Statement .........................................1

Argument ...........................................................2

I.  The text of § 3632(d)(4)(C) contemplates
    application of time credits to begin a term of
    supervised release early, not to reduce that
    term ...........................................................2

II. The larger statutory scheme confirms the
    government's reading of the text ................. 15

Conclusion  ....................................................... 21

i

# Table of Authorities

Pursuant to "Blue Book" rule 10.7, the government's citation of cases does not include "certiorari denied" dispositions that are more than two years old.

## Cases

*Advocate Christ Med. Ctr. v. Kennedy*,
 145 S. Ct. 1262 (2025) ................................... 20

*Ali v. Fed. Bureau of Prisons*,
 552 U.S. 214 (2008) ...................................... 12

*Dyer v. Fulgam*,
 No. 1:21-cv-299 (CLC) (CHS), 2022 WL
 1598249 (E.D. Tenn. May 20, 2022) ............ 5, 6

*Gonzalez v. Herrera*,
 --- F.4th ---, 2025 WL 2396495
 (9th Cir. Aug. 19, 2025) ..........................*passim*

*Guerriero v. Miami RRM*,
 No. 24-10337, 2024 WL 2017730
 (11th Cir. May 7, 2024) ................................... 3

*King v. Burwell*,
 576 U.S. 473 (2015) ......................................... 6

*Mont v. United States*,
 587 U.S. 514 (2019) ...................................... 19

*Orr v. City of Albuquerque*,
 417 F.3d 1144 (10th Cir. 2005) ........................ 7

ii

*Polselli v. Internal Revenue Serv.*,
598 U.S. 432 (2023) ........................................ 12

*Powerex Corp. v. Reliant Energy Servs., Inc.*,
551 U.S. 224 (2007) .......................................... 3

*Pulsifer v. United States*,
601 U.S. 124 (2024) ........................................ 14

*Rivera-Perez v. Stover*,
757 F. Supp. 3d 204 (D. Conn. 2024) ....... 13, 17

*Shah v. Peters*,
No. 3:23-cv-801 (RBM) (JLB), 2025 WL
1425550 (S.D. Cal. May 16, 2025) ............... 5, 6

*Stinson v. Martinez*,
No. 24-30793, 2025 WL 2017872
(5th Cir. July 18, 2025) (per curiam) ............... 5

*Tapia v. United States*,
564 U.S. 319 (2011) .......................................... 8

*Turkiye Halk Bankasi A.S. v. United States*,
598 U.S. 264 (2023) ........................................ 15

*United States v. Johnson*,
529 U.S. 53 (2000) .......................................... 19

*United States v. Malik*,
No. 24-7073, 2025 WL 973003
(4th Cir. Apr. 1, 2025) (per curiam) ................. 5

*Valladares v. Ray*,
  130 F.4th 74 (4th Cir. 2025)............................. 5

## Statutes

18 U.S.C. § 3583 .............................................. 17

18 U.S.C. § 3624 ........................................*passim*

18 U.S.C. § 3632...........................................*passim*

## Other Authorities

164 Cong. Rec. H10396-02, 2018 WL 6710307
  (Dec. 20, 2018) .................................................. 9

First Step Act of 2018, Pub. L. No. 115-391 ..... 10

iv

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

### Docket No. 25-149

_____

RAUL RIVERA-PEREZ,

*Petitioner-Appellee,*

-vs-

R. STOVER, WARDEN,

*Respondent-Appellant.*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT
COURT FOR THE DISTRICT OF CONNECTICUT

### REPLY BRIEF
### FOR THE RESPONDENT-APPELLANT

## Preliminary Statement

The First Step Act permits application of earned time credits so that a prisoner can begin prerelease custody or supervised release earlier than he otherwise would. It does not authorize reduction of a term of supervised release. As explained in the government's opening brief, that is the only reasonable interpretation of the plain text of the operative provision, 18 U.S.C.

§ 3632(d)(4)(C). It is also the only interpretation faithful to the larger statutory scheme of which § 3632(d)(4)(C) is a part. All available tools of statutory interpretation cut against the district court's decision.

Nothing in Rivera-Perez's response calls for a different result. He largely reiterates the district court's flawed reasoning. His arguments misconstrue the statutory text and are not attentive to the broader statutory scheme. This Court should reject them, reverse the district court's order, and remand with instructions to dismiss Rivera-Perez's petition as moot.

## Argument

### I. The text of § 3632(d)(4)(C) contemplates application of time credits to begin a term of supervised release early, not to reduce that term.

As established in the government's initial brief, § 3632(d)(4)(C) provides that earned time credits may be used to reduce a term of incarceration, not a term of supervised release. *See* Gov't Br. 12-20. Subparagraph (C) specifies application of credits "toward time in prerelease custody or supervised release." 18 U.S.C. § 3632(d)(4)(C). The phrase "toward time in" means that the credits can bring a prisoner closer to, *i.e.*, "toward," his time in prerelease custody or supervised release. *See* Gov't Br. 13-14; Black's Law Dictionary

2

(2019) (defining "toward" as "in the direction of; on a course or line leading to (some place or something)"); *see also Guerriero v. Miami RRM*, No. 24-10337, 2024 WL 2017730, at *2 (11th Cir. May 7, 2024). Congress's choice of words ("toward" supervised release, not "against" supervised release) reflects its determination that credits should bring supervised release closer, not reduce it. *See* Gov't Br. 14-15.

Moreover, as explained, *see* Gov't Br. 16-17, this construction aptly reflects that § 3632(d)(4)(C) accords parity of treatment to pre-release custody and supervised release. Credits are applied "toward time in prerelease custody *or* supervised release." 18 U.S.C. § 3632(d)(4)(C) (emphasis added). When it comes to prerelease custody, this wording plainly authorizes early transfer, as opposed to reduction of the overall term—and the same wording means the same thing when it comes to supervised release. Gov't Br. 16-17; *see Powerex Corp. v. Reliant Energy Servs., Inc.*, 551 U.S. 224, 232 (2007) ("[a] standard principle of statutory construction provides that identical words and phrases within the same statute should normally be given the same meaning," which is "doubly appropriate" for words and phrases "enacted at the same time").

3

Finally, the government's initial brief explained that the second sentence of § 3632(d)(4)(C) confirms this understanding of the first sentence. *See* Gov't Br. 18-20. That second sentence instructs that the "Bureau of Prisons shall transfer eligible prisoners, as determined under § 3624(g), into prerelease custody or supervised release." The provision thus directs application of time credits through the mechanism of "transfer," corroborating that credits operate to affect the timing of transfer to (not reduction of) prerelease custody or supervised release. *See id.* at 18. Moreover, the provision specifies determination of eligibility "under § 3624(g)," which in turn authorizes the Bureau to "transfer [a] prisoner to begin any such term of supervised release at an earlier date, . . . based on the application of time credits under section 3632." 18 U.S.C. § 3624(g)(3); *see* Gov't Br. 19. Section 3624(g) does not grant BOP (or anyone else) corresponding authority to apply credits to reduce the length of a supervised release term. *See* Gov't Br. 19.

Taken together, these considerations demonstrate that there is just one permissible construction of the statutory text: earned time credits may be used for early transfer to prerelease custody or supervised release, but not to reduce a term of supervised release. So it is unsurprising that, as explained in the government's initial brief, Gov't Br. 12 n.1—and as a district court recently reiter-

4

ated—"the vast majority of courts . . . have concluded that unapplied FSA credits cannot be applied to reduce a term of supervised release." *Shah v. Peters*, No. 3:23-cv-801 (RBM) (JLB), 2025 WL 1425550, at *4 (S.D. Cal. May 16, 2025), *notice of appeal filed*, No. 25-3504 (9th Cir. June 3, 2025); *see also Guerreiro*, 2024 WL 2017730, at *3 (collecting cases); *Valladares v. Ray*, 130 F.4th 74, 79 (4th Cir. 2025) ("Under the FSA, the time credits can be applied toward earlier placement in pre-release custody or supervised release. [18 U.S.C.] § 3632(d)(4)(C)."); *United States v. Malik*, No. 24-7073, 2025 WL 973003, at *1 (4th Cir. Apr. 1, 2025) (per curiam) (unpublished) ("Time credits earned under the FSA 2018 are to be applied to reduce an incarcerated person's prison term, not the person's term of supervised release. *See* 18 U.S.C. §§ 3632(d)(4)(C), 3624(g)(3)."); *Stinson v. Martinez*, No. 24-30793, 2025 WL 2017872, at *1 (5th Cir. July 18, 2025) (per curiam) (unpublished) ("The FSA further provides that [earned time credits] may only be applied towards an early start of supervised release or early transfer to pre-release custody.").

The sole contrary authority Rivera-Perez invokes, *Dyer v. Fulgam*, No. 1:21-cv-299 (CLC) (CHS), 2022 WL 1598249 (E.D. Tenn. May 20, 2022), *appeal dismissed as moot*, No. 22-5608 (6th Cir. June 8, 2023), became moot on appeal and was recently characterized as "an outlier that has been soundly rejected by an ever-growing number

5

of courts since its issuance." *Shah*, 2025 WL 1425550, at \*4. And while the Ninth Circuit recently cast its lot with *Dyer* and against the authority set out above, *see Gonzalez v. Herrera*, --- F.4th ---, 2025 WL 2396495 (9th Cir. Aug. 19, 2025), its reasoning (as explained below) is unpersuasive.

Rivera-Perez's arguments begin with the text. He stresses that applying a credit "toward" something can sometimes mean reducing that thing. *See* Appellee's Br. 7-10. (He offers the examples selected by the district court—applying credits toward "the cost of an item" or "one's account balance"—which load the interpretive dice by using quantities capable of reduction in magnitude but not temporal acceleration. *Id.* at 8.) As the government has explained, however, the question is not whether "toward" *can* be used that way, but whether Congress *did* use it that way in § 3632(d)(4)(C). Gov't Br. 17-18. Courts "construe statues, not isolated provisions," and certainly not isolated words. *King v. Burwell*, 576 U.S. 473, 486 (2015). Whatever "toward" might be capable of meaning under Rivera-Perez's "isolationist approach," Appellee's Br. 8, it cannot bear that construction when read with proper attention to its neighboring statutory text.

In *Gonzalez*, the Ninth Circuit went even further than Rivera-Perez or the district court, concluding that reading "toward" to mean "in the direction of" would produce "gobbledygook": "'Time

6

credits shall be applied [in the direction of] time in prerelease custody or supervised release.' How does one apply credits 'in the direction of' time—are we meant to wave them towards the future?" *Gonzalez*, 2025 WL 2396495, at \*5 (citation omitted). But there is nothing unnatural about saying that some "store of value," *id.* at \*5, can be applied "toward" some future time period in the sense of hastening its arrival. When an employer says that "[a]ccrued sick leave can be used toward early retirement," it means that accumulated days of leave bring retirement closer, not that they make retirement shorter (and also not that employees should wave their sick time toward the future). *Orr v. City of Albuquerque*, 417 F.3d 1144, 1147 (10th Cir. 2005).

Rivera-Perez goes on to assert that the government "effectively inserts words into the statute, such as 'transfer' or 'early transfer.'" Appellee's Br. 9; *see also Gonzalez*, 2025 WL 2396495, at \*5 (stating that such "excess conceptual baggage" is "not there"). As an initial matter, § 3632(d)(4)(C) does use the word "transfer," as does the subsection it cross-references, § 3624(g), and (as explained above) this language helps confirm the proper reading of the phrase "toward time in." *See also* Gov't Br. 18-19 ("This reference to 'transfer' in the second sentence is significant for two reasons."). Rivera-Perez's real point seems to be the suggestion that Congress could have written the

7

first sentence of § 3632(d)(4)(C) differently by including, in that sentence, a reference to "transfer" or "early transfer," instead of or in addition to "toward time in." But "armchair legislators" can generally come up with some alternative way Congress could have expressed itself, and identification of such an alternative does not undermine otherwise clear text. *Tapia v. United States*, 564 U.S. 319, 328 (2011). Here, as explained, the text—including the references in subparagraph (C)'s *second* sentence to "transfer" and § 3624(g)—is clear.

In *Gonzalez*, the court was persuaded by a different textual road not taken. It noted that 18 U.S.C. § 3624(b)(1) provides that "a prisoner who is serving a term of imprisonment of more than 1 year . . . may receive credit toward the service of the prisoner's sentence," thus shortening custodial time. *See Gonzalez*, 2025 WL 2396495, at \*6. Since "Congress knows how to write a law creating time credits that only apply to custodial time," the Ninth Circuit reasoned, its choice of different words in § 3632(d)(4)(C) "necessarily indicates that earned time credits do more"—namely, reduce a supervised release term. *Id.*

That is not a necessary implication of Congress's choice. To start, the different language in § 3632(d)(4)(C) makes clear that the provision authorizes not just an accelerated end to custodial time (through early entry on supervised release), but an accelerated shift in the type of custody

8

(through early entry on prerelease custody). *See also* 18 U.S.C. § 3624(g)(10) (waiving otherwise applicable time limits on period a prisoner can spend in prerelease custody). Had Congress simply ported over the language from § 3624(b)(1), this point would have been lost— that provision plainly authorizes credits toward satisfaction of "custodial *time*," but not toward a change in custodial *type*. *Gonzalez*, 2025 WL 2396495, at *6 (emphasis added). So while the different language of § 3632(d)(4)(C) may "indicate[] that earned time credits do more," *id.* at *6, that "more" relates to accelerated transition into a more desirable custodial status, not reduction of a supervised release term.

Indeed, the version of the First Step Act that first passed the House of Representatives authorized application of earned time credits *only* "toward time in pre-release custody," with no mention of supervised release. H.R. 5682, 115th Cong. (2018) ("Time credits earned under this paragraph by prisoners who successfully participate in recidivism reduction programs or productive activities and who have been determined to be a minimum risk or low risk for recidivating . . . shall be applied toward time in pre-release custody. The Director of the Bureau of Prisons shall transfer prisoners described in this subparagraph into prerelease custody . . . ."); 164 Cong. Rec. H10396-02, H10399, 2018 WL 6710307 (Dec. 20, 2018) (statement of Rep. Sheila Jackson Lee) ("The

9

House-passed FIRST STEP Act limited the use of earned credits to time in prerelease custody (halfway house or home confinement)."). The Act as passed appended "or supervised release" to the first sentence. First Step Act of 2018, Pub. L. No. 115-391, 132 Stat. 5194, 5198. So even if the language from § 3624(b)(1) would have served § 3632(d)(4)(C) equally well under the government's reading of the statute—and, as described above, it would not—the law's drafting history undermines the Ninth Circuit's reasoning by explaining why § 3632(d)(4)(C) reads as it does. Adding "or supervised release" was a natural edit to the earlier version.

The Ninth Circuit also found significance in another aspect of § 3624(b)(1): its use of "toward." *Gonzalez*, 2025 WL 2396495, at *7. Paragraph (b)(1) permits certain prisoners "serving a term of imprisonment" to "receive credit toward the service of the prisoner's sentence[] of up to 54 days for each year of the prisoner's sentence imposed by the court." The court reasoned it should "define 'toward' consistently between the sections." *Id.* at *8. The court deemed it "incomprehensible" that "toward" in § 3624(b)(1) should refer to bringing service of the sentence closer, as opposed to reducing it, in that "the prisoner must have already started the service of his or her sentence." *Id.* The same meaning must apply under § 3632(d)(4)(C). *Id.*

10

That reasoning is not persuasive. Since every prisoner covered by § 3624(b)(1) is already serving a sentence, the phrase "service of the prisoner's sentence" obviously refers to completion of that service. So a prisoner who has begun serving his sentence may receive an award of credits toward (*i.e.*, in the direction of) completed service, thus bringing closer the time at which "service of [his] sentence" is accomplished.

By contrast, good time credits do not reduce a prisoner's sentence, which remains whatever the judge imposed. They also do not "reduce" "service of the prisoner's sentence," since the noun "service" does not connote a quantity susceptible of reduction. To be sure, good time credits reduce the time required to complete service of a sentence. But, first, that is linguistically different from reducing "service of [a] sentence." And, second, that reduction is the consequence of applying credits toward (in the direction of) completed service, thus bringing it closer. Indeed, in that regard the scenario under paragraph (b)(1)—in which every prisoner receiving credits already holds the specified status (*i.e.*, serving a sentence)—tends to collapse the practical difference between acceleration and reduction: bringing the end of the status closer will always have the practical effect of reducing time on that status. That may render the provision an imperfect guide to § 3632(d)(4)(C), but at any rate paragraph (b)(1)

11

does not undermine the government's interpretation as reasoned by the Ninth Circuit.

Rivera-Perez next suggests that the government's reading of § 3632(d)(4)(C) makes the provision's second sentence superfluous. *See* Appellee's Br. 8, 11; *see also Gonzalez*, 2025 WL 2396495, at \*6-7. But that amounts to the contention that Congress may not use two sentences to complete one thought. As the government explained in its principal brief, the sentences are not redundant, but complementary, in that the second sentence provides clarification and completes the work of the first sentence. *See* Gov't Br. 19-20; *Polselli v. Internal Revenue Serv.*, 598 U.S. 432, 443 (2023); *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 226 (2008). That is, the first sentence prescribes application of credits toward time in prerelease custody or supervised release, and the second specifies the mechanism through which BOP will effectuate that prescription (*i.e.*, transfer in accordance with procedures set out in § 3624(g), including limitations on the timing of transfer).

Contrast this reading with the one advocated by Rivera-Perez and the district court. Under that interpretation, the first sentence requires application of credits to reduce a term of supervised release or (bizarrely) prerelease custody, without specifying who should effectuate such a reduction or how; the second sentence then brusquely changes tack by giving BOP instructions about

12

how to carry out a completely different operation, *i.e.*, early transfer based on earned credits. *See* Appellee's Br. 11 (citing *Rivera-Perez v. Stover*, 757 F. Supp. 3d 204, 212 (D. Conn. 2024)). These directives appear to be in conflict, or at least competition, in that they are each mandatory but compel different actions: on one hand, earned credits "shall be applied" to reduce time in prerelease custody or supervised release, but on the other, BOP "shall" accelerate transfer to one status or the other based on earned credits. 18 U.S.C. §§ 3624(g), 3632(d)(4)(C). The government's construction—a sentence requiring application of credits toward time in a prisoner's new status, followed by a sentence explicitly specifying BOP's role in effecting transfer to that new status—is by far the more natural.

Rivera-Perez does not really grapple with an important feature of the government's argument: if the first sentence of § 3632(d)(4)(C) requires reduction of time in supervised release, it must also require reduction of time in prerelease custody— which is senseless in that prerelease custody is a desirable status. Gov't Br. 16-17. The Ninth Circuit appeared to address this problem, but unconvincingly. The court suggested that reduction of prerelease custody time, as authorized in the first sentence, occurs when BOP's "transfer . . . [of] the prisoner into supervised release" causes "prerelease custody" to "end . . . early." *Gonzalez*, 2025 WL 2396495, at *9.

13

That is not a plausible understanding of § 3632(d)(4)(C). On this telling, the first sentence specifically directs a result (reduction in prerelease custody) that can occur, if at all, only as a necessary incident of an operation required by the second sentence (early transfer to supervised release). Put otherwise, for a prisoner in prerelease custody, early transfer to supervised release under the second sentence would inevitably entail an early end to prerelease custody (and, thus, its reduction). This reading assigns the first sentence's provision for reduction of prerelease custody no work not fully accomplished by the second sentence's provision for early transfer to supervised release. *See Pulsifer v. United States*, 601 U.S. 124, 143 (2024) (canon against surplusage). And it is particularly implausible given the First Step Act's drafting history, in which the House's first iteration authorized application of credits toward *only* prerelease custody. H.R. 5682, 115th Cong. (2018). If the Ninth Circuit's analysis is applied to that version, the bill required reduction in prerelease custody time (generally an undesirable result), but there was no mechanism to accomplish that reduction because the provision on early transfer to supervised release did not exist.

The overwhelming majority of courts have it right, and the district court had it wrong. The statutory text authorizes use of earned time cred-

14

its for early transfer to prerelease custody or supervised release, but not to reduce a term of supervised release.

## II. The larger statutory scheme confirms the government's reading of the text.

As demonstrated in the government's opening brief, its reading of the text finds confirmation in the larger statutory scheme. Gov't Br. 20-28; *see Turkiye Halk Bankasi A.S. v. United States*, 598 U.S. 264, 275 (2023) ("[T]he Court must read the words Congress enacted in their context and with a view to their place in the overall statutory scheme." (quotation marks omitted)).

*First*, the district court's interpretation of the statute makes a mess of the First Step Act's broader recidivism-reduction scheme. Gov't Br. 21-24. If § 3632(d)(4)(C) is construed to permit only reduction of time in prerelease custody or supervised release, the detailed provisions governing eligibility for early transfer are irrelevant. Gov't Br. 21-22. The district court tried to solve this problem by assigning credits double duty—reducing a term of incarceration *and* a term of supervised release—but, as explained above, at the expense of subparagraph (C)'s internal coherence. *See also* Gov't Br. 22 (explaining that the district court's "construction places into conflict the two sentences contained in" the provision).

Even more fundamentally, the district court's reading is radically out of step with Congress's

15

carefully prescribed framework for assessing a prisoner's eligibility and recidivism risk before early transfer to supervised release. *See id.* at 23; *see, e.g.*, 18 U.S.C. § 3624(g)(1)(D)(ii) (prisoner may not be transferred to supervised release early unless he "has been determined . . . to be a minimum or low risk to recidivate" in his last assessment). That reading would permit (rather, compel) early discharge from a term of supervision without *any* "official computation of time credits, time remaining in the term, and, perhaps most significantly, with no evaluation of the prisoner's risk of recidivism." Gov't Br. 23. Indeed, a prisoner with earned time credits who is ineligible for early transfer based on recidivism risk presumably would be entitled as a matter of course to have those credits applied to reduce his term of supervised release instead. *Id.* at 24. It is strange to accord that benefit to someone who poses a concerning recidivism risk—stranger still to do so in part *because* he poses a concerning recidivism risk. Given Congress's painstaking work in policing the boundaries of early transfer to supervised release, the unregulated system of term-reduction envisioned by the district court is incompatible with the statutory scheme.

*Second*, the government's initial brief established that its construction of § 3632(d)(4)(C)—but not the district court's—comports with the authority granted (and not granted) to BOP elsewhere in the statute. Gov't Br. 24. Section

16

3632(d)(4)(C) provides detailed instructions on how BOP should effectuate application of credits to accelerate placement in prerelease custody or supervised release—it directs "transfer" of "eligible prisoners" in accordance with § 3624(g)'s procedures and requirements. *Id.* at 24-25. But nothing in the statute empowers BOP or a Probation Office to modify a supervised release term; nor did the statute amend 18 U.S.C. § 3583(e), which empowers a district court to modify a supervised release term. Gov't Br. 25.

It is implausible that Congress—while providing a detailed directive on how BOP should implement application of credits toward reducing a term of incarceration—simply overlooked the issue of implementing application of credits toward reducing a term of supervised release. *Id.* at 25-26. It is still more implausible that Congress smuggled a major change in federal sentencing law (granting a Probation Office authority to modify supervised release) through so subtle a mechanism as "use[] [of the] passive voice." *Rivera-Perez*, 757 F. Supp. 3d at 213; *see* Gov't Br. 25-26. This case illustrates the issue, in that the district court had to effectuate its ruling by directing BOP to contact a non-party—a Probation Office in a different district—so it could award the credits as calculated by BOP. Gov't Br. 26-27.

Rivera-Perez offers little by way of response to these contentions. He suggests there is nothing strange about the district court's effectuation of

17

its ruling in that the court "looked to the BOP to assess the remaining credits" and, "[f]rom there, the overseeing probation office could work on implementing the reduction." Appellee's Br. 14. But that misses the point. The issue is not that the district court could not think of a workaround—court directs BOP, BOP calls Probation in North Carolina, Probation in North Carolina cuts off supervision early—but that it had to think of a workaround at all, rather than modifying the supervision term directly or ordering a party to do so. This eccentric feature of the court's remedy strongly indicates that the remedy is not available under the statute.

Finally, Rivera-Perez appeals to the notion that the First Step Act "should be read broadly to effectuate its core purpose." Appellee's Br. 15. But the First Step Act reflects pursuit of multiple ends, as Rivera-Perez's selected sources demonstrate: relieving prison overcrowding, "providing rehabilitation," "mak[ing] our communities safer," and "help[ing] [prisoners] prepare for a successful reentry" into society. J. Brenner & S. Wylie, *Analyzing the First Step Act's Impact on Criminal Justice*, Brennan Ctr. for Justice (Aug. 20, 2024), *available at* https://www.brennancenter.org/our-work/analysis-opinion/analyzing-first-step-acts-impact-criminal-justice; *Durbin Delivers Opening Statement During Senate Judiciary Committee Hearing on the Fifth Anniversary*

18

*of the Landmark First Step Act*, U.S. Sen. Committee on the Judiciary (Jan. 17, 2024), *available at* https://www.judiciary.senate.gov/press/releases/durbin-delivers-opening-statement-during-senate-judiciary-committee-hearing-on-the-fifth-anniversary-of-the-landmark-first-step-act; *see* Appellee's Br. 15-16 (invoking both sources).

The government's interpretation of the First Step Act advances those purposes. The law promotes rehabilitation in prison through the credits system and moves low-risk prisoners first out of prison and into less onerous custody, then (on an accelerated timetable) onto supervised release—a status that "fulfills rehabilitative ends[] distinct from those served by incarceration," *United States v. Johnson*, 529 U.S. 53, 59 (2000), and "facilitate[s] a transition to community life," *Mont v. United States*, 587 U.S. 514, 523 (2019) (quotation marks omitted); *see* Gov't Br. 27-28. Rivera-Perez's interpretation fails this test. Its elimination of time on supervised release—without even a threshold risk assessment—is an odd fit for a statute that aims at rehabilitation and successful reentry into society (the point of supervised release) while seeking to preserve community safety. *See* Appellee's Br. 15.

The court in *Gonzalez* seems to have suggested that a prisoner cannot obtain an early end to supervised release unless "found to be at a minimum or low risk level." 2025 WL 2396495, at *10. But that is wrong. As previously explained, while

19

§ 3624(g)(1)(D)(ii) requires determination of "a minimum or low risk" prior to "being *placed in* supervised release," neither that provision nor any other requires such an assessment prior to *reducing* (even eliminating) a term of supervised release. 18 U.S.C. § 3624(g)(1)(D)(ii) (emphasis added); *see* Gov't Br. 23-24. Nor does the first sentence of § 3632(d)(4)(C)—the purported source of authority to reduce a term—cross-reference § 3624(g)'s provisions. There are good reasons for these gaps: the statute does not authorize reduction of a supervised release term.

Rivera-Perez closes on a note sounded throughout his brief. On some level, he argues, the First Step Act reflects a goal that its provisions will help former prisoners to live entirely "[un]tether[ed]" from the criminal justice system. Appellee's Br. 16; *see id.* at 5-6, 15-16, 18. But that aspirational end state should not be mistaken for the Act's "core purpose," *id.* at 15, and in any event "no statute pursues a single policy at all costs." *Advocate Christ Med. Ctr. v. Kennedy*, 145 S. Ct. 1262, 1274 (2025) (quotation marks omitted). A court's task is to "determine *how* Congress chose to pursue" the Act's various (sometimes competing) objectives. *Id.* For all the reasons given, Congress did not choose to direct application of earned time credits to reduce a term of supervised release.

20

## Conclusion

The First Step Act does not authorize the application of earned time credits to reduce a term of supervised release. This Court should reverse the district court's order concluding otherwise and remand with instructions to dismiss the habeas petition as moot.

Dated: August 25, 2025

Respectfully submitted,

DAVID X. SULLIVAN
UNITED STATES ATTORNEY
DISTRICT OF CONNECTICUT

J. BRIAN MESKILL
ASSISTANT U.S. ATTORNEY

John W. Larson
Conor M. Reardon (of counsel)
Assistant United States Attorneys

21

### Federal Rule of Appellate Procedure 32(g) Certification

This is to certify that the foregoing brief complies with the 14,000-word limitation of Second Circuit Local Rule 32.1(a)(4), in that the brief is calculated by the word processing program to contain approximately 4,340 words, excluding the items listed in Federal Rule of Appellate Procedure 32(f).

J. BRIAN MESKILL
ASSISTANT U.S. ATTORNEY