25-149
*Rivera-Perez v. Stover*

ALISON J. NATHAN, *Circuit Judge*, dissenting:

The provision at issue allows federal prisoners to apply "[t]ime credits . . . toward time in prerelease custody or supervised release." 18 U.S.C. § 3632(d)(4)(C). The majority concludes that credits under this provision do not apply to reduce "time in prerelease custody or supervised release," *id.*, but instead apply to reduce the one thing the provision does not say: time in prison. Because all the textual clues lead me to believe that the statute means what it says— prisoners may apply their First Step Act (FSA) credits to shorten their "time in prerelease custody or supervised release"—I would hold that Rivera-Perez's habeas petition is not moot because he may use his remaining FSA credits toward his term of supervised release.

Begin where the majority and I agree: The ambiguity of the word "toward" in isolation. Petitioner Rivera-Perez contends that "toward" as used here means "[i]n furtherance or partial fulfillment of." AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE (5th ed. 2018). Adopting his definition, the statute would read: "Time credits . . . shall be applied [in partial fulfillment of] time in prerelease custody or supervised release." That is a natural reading of the text; it allows an individual to essentially "cash in" his FSA credits to shorten time spent in

1

prerelease custody or supervised release. On the other hand, Warden Stover argues that "toward" in this context means "[i]n the direction of," *Toward*, BLACK'S LAW DICTIONARY (11th ed. 2019), such that "credits . . . shall be applied [in the direction of] time in prerelease custody or supervised release." That definition of "toward" contemplates prisoners applying credits to accelerate the start date of their prerelease custody or supervised release—put differently, to leave prison earlier—and while that reading is less natural, it is at least plausible.[1] "When words have several plausible definitions, context differentiates among them." *United States v. Hansen*, 599 U.S. 762, 775 (2023). I thus begin with the closest context clues, which are the neighboring words in the first sentence of the statute. *See id.* at 776 ("[A] word capable of many meanings is refined by its neighbors[.]").

The words surrounding "toward" favor Rivera-Perez's reading of the statute. The first sentence, in full, reads: "Time credits earned under this paragraph by prisoners who successfully participate in recidivism reduction programs or productive activities shall be applied toward time in prerelease

---

[1] That this understanding is less natural is made apparent by the concurrence: In order to make Stover's proposed reading of "toward" sensible, the concurrence must use the word itself in its definition. *See ante* at 1 (the word toward "can mean either to approach or to abate: either to shorten the time *toward* the beginning of a period or to shorten the time of the period itself") (emphasis altered).

custody or supervised release." 18 U.S.C. § 3632(d)(4)(C). The most conspicuous clue in that sentence is "time in." Congress could have omitted "time in" and simply wrote that FSA credits apply "toward" supervised release. Stover appears to overlook "time in" altogether; his interpretation would remain the same regardless of its existence. But Congress indicated that credits specifically apply toward the *time in* supervised release. Giving credence to that choice, FSA credits appear to apply to the time one spends *during* supervised release, not, as Stover argues, to the time one spends in prison *before* reaching supervised release. *See Gonzalez v. Herrera*, 151 F.4th 1076, 1083 (9th Cir. 2025) (the statute "does not mention the period of time preceding supervised release, it identifies only time *in* prerelease custody or supervised release." (quotation marks omitted)).[2] If Congress intended for FSA credits to shorten time in prison only, identifying the

---

[2] The majority claims that Stover's interpretation of the statute aligns with most circuits to consider the issue. But only two circuits have published opinions addressing this question of statutory interpretation: the Ninth Circuit and the Sixth Circuit (over dissent). *See Gonzalez*, 151 F.4th 1076; *Hargrove v. Healy*, 155 F.4th 530 (6th Cir. 2025). Those circuits came to opposite conclusions. The majority's citations to cases from the Eleventh, Fourth, and Fifth Circuits are unavailing—all are unpublished, non-precedential dispositions, and two of those cases addressed the issue in single paragraphs devoid of analysis. *See Guerriero v. Miami RRM*, No. 24-10337, 2024 WL 2017730 (11th Cir. May 7, 2024) (per curiam); *United States v. Malik*, No. 24-7073, 2025 WL 973003 (4th Cir. Apr. 1, 2025) (per curiam); *Stinson v. Martinez*, No. 24-30793, 2025 WL 2017872 (5th Cir. July 18, 2025) (per curiam).

object of those credits as "time in prerelease custody or supervised release" is an odd way to do so.

Indeed, Stover's understanding of the statute is further undercut by the words Congress chose *not* to use. At least twice before enacting the FSA, Congress created crediting schemes that expressly allow for the use of credits to shorten time spent in prison. *See* 18 U.S.C. § 3624(b)(1) ("[A] prisoner who is serving a term of imprisonment of more than 1 year . . . may receive credit toward the service of the prisoner's sentence[.]"); *id.* § 3585(b) ("A defendant shall be given credit toward the service of a term of imprisonment for any time he has spent in official detention prior to the date the sentence commences[.]"). There, Congress made it clear to what end credits apply: "the service of the prisoner's sentence" or his "term of imprisonment." It is telling, then, that Congress took a different tack here: FSA credits apply "toward time in" supervised release. *Id.* § 3632(d)(4)(C). "That Congress used different language in these two provisions strongly suggests that it meant for them to work differently." *Stanley v. City of Sanford*, 606 U.S. 46, 53 (2025).

The other words neighboring "toward" in the first sentence also cut in favor of Rivera-Perez's position. The provision speaks of credits "earned" under the

4

FSA that "shall be applied" toward time in supervised release. Both of those choices suggest a system by which FSA credits are "earned" and then "spent" (via application) to offset the total time spent in supervised release, not to bring the beginning of that time closer. In the good-time credit context, in which prisoners earn credits for good behavior while incarcerated, *see* 18 U.S.C. § 3624(b)(1), courts have long adopted this common-sense understanding of "earning" and "spending" credits to shorten time incarcerated. There, we say that the use of credits "toward the service of the prisoner's sentence," *id.*, means that prisoners may essentially cash in those credits to shorten the duration of their sentence, not to bring the end of their incarceration closer. *See, e.g., Barber v. Thomas*, 560 U.S. 474, 478, 483 (2010) (describing good-time credits as an "offset[]" to and "credit against" a sentence); *see also Hargrove v. Healy*, 155 F.4th 530, 539 (6th Cir. 2025) (Moore, J., dissenting) ("[C]ourts, most notably the Supreme Court, have interpreted the word 'toward' in the sentencing-credit context to mean that the credit should *reduce* or count *against* the prisoner's sentence.").

There is no reason why FSA credits applied "toward" time in supervised release would not work the same way. And considering the word's ordinary usage, that reading makes sense. One applies store credit *toward* the cost of an

item "in partial fulfillment" of its cost, not to bring its cost closer. And one applies earned-time credits *toward* time in supervised release in the same way: "in partial fulfillment" of that time, not to bring that time closer. Considered in context with the rest of the sentence in which we find it, I would conclude that the only reasonable understanding of the word "toward" is that proposed by Rivera-Perez.

Turn now to the second sentence of the provision: "The Director of the Bureau of Prisons shall transfer eligible prisoners, as determined under section 3624(g), into prerelease custody or supervised release." 18 U.S.C. § 3632(d)(4)(C). The majority believes "this second sentence confirms Stover's reading of the statute" because it cross-references Section 3624(g), which itself allows prisoners to apply FSA credits to shorten their time in prison. *Ante* at 13. In my view, however, that is precisely why Stover's interpretation is wrong. "[W]e must normally seek to construe Congress's work so that effect is given to all provisions[.]" *Ysleta Del Sur Pueblo v. Texas*, 596 U.S. 685, 698–99 (2022) (quotation marks omitted). But under Stover's interpretation, our statute and the cross-referenced Section 3624(g) both allow for the same act: the application of FSA credits to leave prison earlier.

6

When Congress created the FSA credit system in Section 3632, it also added the cross-referenced provision, Section 3624(g). *See* Pub. L. No. 115-391, 132 Stat. 5194 (2018). One section of that added provision reads: "If the sentencing court included as a part of the prisoner's sentence a requirement that the prisoner be placed on a term of supervised release after imprisonment . . . the Director of the Bureau of Prisons may transfer the prisoner to begin any such term of supervised release at an earlier date, not to exceed 12 months, based on the application of time credits under section 3632." 18 U.S.C. § 3624(g)(3). That provision plainly allows prisoners to "spend" their FSA credits to reduce their time spent incarcerated (or, as the statute puts it, "to begin any such term of supervised release at an earlier date"). According to the majority, that is also what our statute does. But it is hard to imagine that Congress created two different mechanisms—enacted at the same time—to allow the same use of credits. Indeed, "the canon against surplusage is strongest when an interpretation would render superfluous another part of the same statutory scheme." *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 386 (2013).

There is a more harmonious way to fit these two provisions together. I would read the first and second sentences of our statute to address two different situations in which FSA credits apply. The first sentence allows prisoners to apply

FSA credits "toward time in prerelease custody or supervised release," thereby reducing time spent on those statuses, while the second sentence allows "eligible prisoners" to apply FSA credits to transfer early from prison "into prerelease custody or supervised release" in accordance with Section 3624(g), thereby reducing time spent in prison. This reading avoids surplusage between our statute and Section 3624(g) and, sensibly, allows prisoners to "spend" their FSA credits at every step in the carceral process.[3]

The majority disagrees with this reading of Section 3632(d)(4)(C) largely because of its heading: "Application of time credits toward prerelease custody or supervised release." On the majority's telling, this heading outlines only one situation in which FSA credits apply, and thus it concludes that Congress did not intend the first and second sentences of our statute to direct different uses of credits. *See ante* at 19–20. Setting aside that the heading of a subsection cannot "override the plain words of a statute," *Dubin v. United States*, 599 U.S. 110, 121

---

[3] The majority claims that adopting Rivera-Perez's reading would allow prisoners to reduce time spent in prerelease custody in favor of *more* time in prison—which "defies logic and common sense because prisoners (presumably) want *more* time in prerelease custody (rather than prison), not less." *Ante* at 25. I agree with that conclusion; it would be irrational for the statute to allow prisoners to spend FSA credits to sit in prison longer. But that is not what Rivera-Perez's interpretation does. Instead, it allows prisoners to "spend" credits to reduce their time spent in prerelease custody in favor of *more* time spent on supervised release, a less restrictive step in the carceral process.

(2023) (quotation marks omitted), Congress often uses concise, yet imperfect headings when drafting statutes—in fact, it did so in the very same section of the FSA. Consider 18 U.S.C. § 3632(b), entitled "[a]ssignment of evidence-based recidivism reduction programs." A reader of that heading might reasonably conclude that its text applies only to the "[a]ssignment of evidence-based recidivism reduction programs." *Id.* Read further, however, and the text of that statute clearly governs the assignment of *both* "evidence-based recidivism reduction programming *and* productive activities," *id.* (emphasis added), which are two distinct types of courses for which prisoners may earn FSA credits, *see id.* §§ 3635(3), (5). Relying on Section 3632(b)'s heading to narrow its application to only "evidence-based recidivism reduction programs" would be inappropriate. *See U.S. ex rel. Thistlethwaite v. Dowty Woodville Polymer, Ltd.*, 110 F.3d 861, 866 (2d Cir. 1997) ("Headings and titles are not meant to take the place of the detailed provisions of the statutory text[.]" (cleaned up)). So too here. Narrowing the reach of our statute based on its heading would not comport with its text.

The majority raises just one more textual argument against Rivera-Perez's interpretation, relying now on a general directive to the Attorney General to promulgate a "risk and needs assessment system" in accordance with the FSA. *See*

*ante* at 15 n.5 (citing 18 U.S.C. § 3632(a)).  That section, 3632(a), contemplates the BOP using that "risk and needs assessment system" to "determine when a prisoner is ready to transfer into prerelease custody or supervised release in accordance with section 3624."  18 U.S.C. § 3632(a)(7).  The majority claims that this language indicates Congress's intent to allow *only* early transfers into supervised release.  But the language of Section 3632(a)(7) is entirely consistent with Rivera-Perez's reading of the statute.  That is because the subsection speaks of "transfer[s] into . . . supervised release *in accordance with section 3624*," *id.* (emphasis added), and Section 3624, unsurprisingly, allows the use of FSA credits to transfer early into supervised release, *see id.* § 3624(g)(3).  If anything, Congress's wording in Section 3632(a)(7) reaffirms that Section 3624 is designed to allow the use of credits to shorten a term of imprisonment (via an early transfer), while the first sentence of our statute is designed to provide for a different use of credits.

Beyond those two points, much of the majority's concern with Rivera-Perez's reading of the statute springs not from the statutory text, but from perceived negative policy consequences.  First, the majority has safety concerns; it fears that long-term prisoners with more time to earn FSA credits will eventually be able to wipe out large chunks (or even all) of their terms of supervised release.

10

The majority also has administrability concerns, worrying that district courts will be left to craft "unusual . . . remed[ies]" in order to effectuate the application of FSA credits to terms of supervised release. *Ante* at 24 n.12.

There are simple answers to both concerns. Take administrability first. In my view, the use of FSA credits to shorten a term of supervised release can follow the well-trodden path of the good-time credit system. There, prisoners who have earned credits for good behavior may put them "toward the service of [their] sentence." 18 U.S.C. § 3624(b)(1). But that crediting process has never involved the courts. Instead, the Bureau of Prisons (BOP) merely recalculates the end date of the prisoner's sentence based on an application of his good-time credits. The FSA crediting system can operate in much the same way. When an individual transitions from prison onto supervised release, he is "released by the [BOP] to the supervision of a probation officer[.]" *Id.* § 3624(e). During that transition, BOP can communicate the individual's remaining FSA credits to Probation, who will then take account of those credits when calculating the appropriate end date of supervised release. This administration fits neatly into the way federal crediting systems have long operated—no specific textual direction or unusual remedy needed.

11

As to the majority's concern that dangerous prisoners will use FSA credits to greatly reduce their terms of supervised release, that fear is largely unfounded. Indeed, Congress created the FSA crediting scheme with safety nets designed to guard against that precise issue; it is not our place to question their efficacy. First, the FSA excludes many individuals convicted of the most serious crimes from earning credits at all. *See* 18 U.S.C. § 3632(d)(4)(D); *see also* 164 Cong. Rec. S7642 (Dec. 17, 2018) (statement of Sen. Cornyn) (the FSA "specifically lists 48 offenses that disqualify offenders from earning time credits," a list created with "the most modern social science evaluation tools to find out who is at low risk of reoffending"). That list of excluded convictions includes dozens of violent offenses, from homicide and sexual abuse to the use of a firearm during any crime of violence or drug trafficking crime.[4] *See* 18 U.S.C. § 3632(d)(4)(D). Next, for those prisoners who are not immediately disqualified from earning credits, Congress

---

[4] The majority appears unconvinced that this list of excluded offenses is comprehensive enough to stop dangerous individuals from benefitting from FSA credits. It gives the example of "an individual convicted of participating in a large narcotics operation, involving hundreds of kilograms of cocaine," who is not eligible to use his FSA credits for early transfer out of prison, and who therefore may "use those earned-time credits to substantially reduce (or even potentially eliminate entirely) his term of supervised release." *Ante* 22 n.10. But that situation is exceedingly unlikely: Such an offender would also have a mandatory minimum 5-year term of supervised release, requiring nearly 2,000 FSA credits to eliminate entirely. *See* 21 U.S.C. § 841(b)(1)(A).

12

created other safeguards. For instance, the number of credits a prisoner can earn varies based on his BOP-designated risk of recidivism, *id.* § 3632(d)(4)(A); BOP may take away credits for bad behavior in prison, *id.* § 3632(e); and BOP's "decision to award earned time credit is discretionary" in the first place because "'[s]uccessful completion' of qualifying programs is 'determin[ed] by [BOP] staff,'" *United States v. James*, 151 F.4th 28, 42 (2d Cir. 2025) (quoting 28 C.F.R. § 523.41(c)(2)). All of these guardrails are designed to ensure that only prisoners who are prepared to safely return to their communities may accumulate FSA credits.

The majority also expresses concern that Congress delineated eligibility requirements for individuals using credits to transfer early out of prison, *see* 18 U.S.C. § 3624(g), but did not do so for those using credits to transfer early out of supervised release. That is true: Section 3624(g) does require, for example, a prisoner to demonstrate a "low risk to recidivate" before he is eligible to leave prison early; Congress did not impose such a requirement on early transferees out of supervised release. *Id.* § 3624(g)(1)(D)(ii). But that difference is unsurprising. It makes sense that Congress would impose strict requirements on individuals leaving prison early but not impose those same requirements on individuals like

13

Rivera-Perez, who are already back in their communities and simply using their credits to shorten time spent on supervised release. This disparity in eligibility requirements does not persuade me that Congress meant something different when it wrote that prisoners may apply credits "toward time in . . . supervised release." *Id.* § 3632(d)(4)(C).

But regardless of my judgment on the matter, the majority's safety concerns have a more fundamental problem: They run headlong into *Congress's* judgment. Under the FSA, prisoners earn credits for participation in evidence-based recidivism reduction programs—programs that are "designed to help prisoners succeed in their communities upon release from prison"—and for productive activities, "designed to allow prisoners . . . to remain productive and thereby maintain a minimum or low risk of recidivating[.]" 18 U.S.C. §§ 3635(3)(B), (5). "Research shows that such programs hold significant promise to reduce recidivism and improve individual outcomes following release," which serves "the fiscal interest of the government to reduce recidivism" and "the public safety interest as well." H.R. Rep. No. 115-699, at 22 (2018). It is clear, then, that Congress structured this system based on one core belief: Prisoners who complete more programs (and thus earn more FSA credits) present empirically lower risks of

14

recidivism upon their return, saving the Government money and keeping communities safer. That is why FSA credits may be redeemed for benefits at all. At bottom, the majority's concerns about the potential consequences of individuals using FSA credits to shorten (even greatly) their terms of supervised release fights that judgment, or at least ignores it. But it is not our job to consider the value of these recidivism-reducing programs or to decide whether they really *do* make communities safer. *Cf. Henson v. Santander Consumer USA Inc.*, 582 U.S. 79, 90 (2017) ("[R]easonable people can disagree with how Congress balanced the various social costs and benefits in this area," but "these are matters for Congress, not this Court, to resolve").

That brings me to the purpose of the FSA. In light of Congress's clear belief that participation in these programs will reduce recidivism, it is equally clear that Congress created FSA credits to incentivize that participation. *See* H.R. Rep. No. 115-699, at 28 (the FSA "[e]stablishes incentives and rewards for prisoners to participate in programming and activities," including "earned time credits"). Unlike the good-time credit system, which caps credit-earning at 54 per year, the FSA contains no such cap. *See* 18 U.S.C. § 3624(b)(1); *id.* § 3632(d)(4)(C). Instead, all signs point to a statutory scheme intended to incentivize as much engagement

15

in recidivism-reducing programs as possible. But by narrowing the situations in which individuals may apply their FSA credits, Stover's interpretation causes those credits to lose their incentivizing value. Rather than encourage engagement in as many programs as possible, Stover's reading encourages prisoners to participate only to the extent that their credits can apply toward early release from prison. But on Rivera-Perez's reading, in which FSA credits can be used at every step of the carceral process, those credits retain their maximum value as incentives. In a scheme self-consciously designed to increase "participa[tion] in programming and activities," H.R. Rep. No. 115-699, at 28, that choice makes much more sense.

The majority responds that prisoners engaged in this programming have "presumably obtained useful benefits" beyond FSA credits—things like vocational training, financial skills, and anger management. *Ante* at 29. I do not doubt that many of those who complete these programs gain valuable skills. But Congress created a scheme in which *credits* are the incentive—not vocational training, financial skills, or anger management. *See James*, 151 F.4th at 41–42. If Congress believed that those valuable byproducts were enough to incentivize participation, there would be no reason to create FSA credits at all. Instead, it created a system— built on credits—designed to drive as much engagement as possible in programs

16

that "help prisoners succeed in their communities upon release from prison[.]" 18 U.S.C. § 3635(3)(B). In my view, Rivera-Perez's reading best comports with that purpose.

Finally, the majority contends that allowing the use of FSA credits to shorten a term of supervised release does not serve the FSA's broader goal of facilitating rehabilitation, "because supervised release itself 'fulfills rehabilitative ends[.]'" *Ante* at 30 (quoting *United States v. Johnson*, 529 U.S. 53, 59 (2000)). But that argument overlooks how the specific purpose of the FSA and the broader purposes of supervised relief are complementary. If Congress determined in enacting the FSA that high credit earners are more likely to be safe and successful upon release from prison, that judgment is entirely consistent with those high earners using their credits to finish supervised release earlier. Put differently, if a prisoner who engages in recidivism-reducing programs (and earns FSA credits for doing so) is rehabilitating, it makes perfect sense for Congress to judge that he has less need for "supervision and training programs after release." *Johnson*, 529 U.S. at 59 (quotation marks omitted). That FSA recidivism-reducing programs and supervised release in general are designed to accomplish the same goal— "provid[ing] rehabilitation to a defendant," *id.* (quotation marks omitted)—only

17

makes Rivera-Perez's interpretation of the FSA more consistent with its purpose, not less.

Rivera-Perez's understanding of the FSA crediting scheme thus comports with Congress's specific purpose in the FSA, with its broader purpose in supervised release, and—most importantly—with the text it chose to write.

\* \* \*

This provision allows federal prisoners to apply "[t]ime credits . . . toward time in prerelease custody or supervised release." 18 U.S.C. § 3632(d)(4)(C). Both Rivera-Perez and Stover propose facially plausible readings. But the statute's text, context, structure, and purpose all point me to Rivera-Perez's understanding: When credits apply "toward time in" supervised release, they shorten that time.

For those reasons, I respectfully dissent.

18