25-149
*Rivera-Perez v. Stover*

# United States Court of Appeals
## for the Second Circuit

————————————————————

August Term 2025

Argued: November 25, 2025     Decided: March 26, 2026

No. 25-149

————————————————————

RAUL RIVERA-PEREZ,

*Petitioner-Appellee,*

— v. —

RICK STOVER, WARDEN,

*Respondent-Appellant.*[*]

————————————————————

Before:     JACOBS, BIANCO, AND NATHAN, *Circuit Judges.*

Respondent-Appellant Rick Stover, the Warden of the Federal Correctional Institution in Danbury, Connecticut, appeals from a judgment of the United States District Court for the District of Connecticut (Stefan R. Underhill, *Judge*), entered on November 19, 2024, granting Petitioner-Appellee Raul Rivera-Perez's *pro se* petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2241. Rivera-Perez's petition alleged that the Bureau of Prisons miscalculated the time credits he had earned under the First Step Act ("FSA"), 18 U.S.C. § 3632(d)(4)(C), and thereby

———————————

[*] The Clerk of Court is directed to amend the caption as set forth above.

illegally prevented his transfer from prison to prerelease custody. However, after Rivera-Perez filed the petition, he was transferred from prison into a residential reentry center ("RRC"), a form of prerelease custody, and Stover argued that the petition was moot. The district court then *sua sponte* construed the petition as seeking to apply Rivera-Perez's remaining FSA time credits to reduce the length of his term of supervised release, and granted the petition, concluding that the FSA enables—and, in fact, *requires*—application of earned-time credits to reduce a prisoner's term of supervised release pursuant to Section 3632(d)(4)(C).

On appeal, Stover argues that FSA time credits allow a prisoner to begin prerelease custody or supervised release early, but cannot be used to reduce a prisoner's term of supervised release. Therefore, according to Stover, once Rivera-Perez was transferred to prerelease custody, his case became moot.

We conclude that Section 3632(d)(4)(C) does not allow earned-time credits to be used to reduce a prisoner's term of supervised release. As such, Rivera-Perez's petition became moot once he was transferred to an RRC. Accordingly, we **VACATE** the judgment of the district court and **REMAND** with instructions to dismiss this case as moot.

Judge Jacobs concurs in a separate opinion.

Judge Nathan dissents in a separate opinion.

> J. BRIAN MESKILL, (Sandra S. Glover, *on the brief*), Assistant United States Attorneys, for Marc H. Silverman, Acting United States Attorney for the District of Connecticut, New Haven, Connecticut, *for Respondent-Appellant*.

> CHARLES F. WILLSON, Assistant Federal Defender, for Terence S. Ward, Federal Defender, District of Connecticut, Hartford, Connecticut, *for Petitioner-Appellee*.

2

JOSEPH F. BIANCO, *Circuit Judge*:

Respondent-Appellant Rick Stover, the Warden of the Federal Correctional Institution in Danbury, Connecticut ("FCI Danbury"), appeals from a judgment of the United States District Court for the District of Connecticut (Stefan R. Underhill, *Judge*), entered on November 19, 2024, granting Petitioner-Appellee Raul Rivera-Perez's *pro se* petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2241. Rivera-Perez's petition alleged that the Bureau of Prisons ("BOP") miscalculated the time credits he had earned under the First Step Act ("FSA"), 18 U.S.C. § 3632(d)(4)(C), and thereby illegally prevented his transfer from prison to prerelease custody. However, after Rivera-Perez filed the petition, he was transferred from prison into a residential reentry center ("RRC"), a form of prerelease custody,[1] and Stover argued that the petition was moot. The district court then *sua sponte* construed the petition as seeking to apply Rivera-Perez's remaining FSA time credits to reduce the length of his term of supervised release, and granted the petition, concluding that the FSA enables—and, in fact, *requires*—

---

[1] "Prerelease custody" includes placement in home confinement or an RRC. *See* 18 U.S.C. § 3624(g)(2). Prerelease custody is part of a prisoner's term of imprisonment because, "[w]hile assigned to [home confinement or] an RRC, inmates remain in BOP custody." *United States v. Rasheed*, 981 F.3d 187, 190 (2d Cir. 2020).

application of earned-time credits to reduce a prisoner's term of supervised release pursuant to Section 3632(d)(4)(C).

On appeal, Stover argues that FSA time credits allow a prisoner to begin prerelease custody or supervised release early, but cannot be used to reduce a prisoner's term of supervised release. Therefore, according to Stover, once Rivera-Perez was transferred to prerelease custody, his case became moot.

We conclude that Section 3632(d)(4)(C) does not allow earned-time credits to be used to reduce a prisoner's term of supervised release. As such, Rivera-Perez's petition became moot once he was transferred to an RRC. Accordingly, we **VACATE** the judgment of the district court and **REMAND** with instructions to dismiss this case as moot.

## BACKGROUND

### I. The First Step Act

The First Step Act of 2018, Pub. L. No. 115-391, 132 Stat. 5194 (2018), directed the BOP to develop a "risk and needs assessment system" to, *inter alia*, "provide incentives and rewards for successful participation in evidence-based recidivism reduction programs or productive activities." 18 U.S.C. § 3632(a)(6). To do so, the FSA created a system of "time credits" which allows certain prisoners to earn ten

days of time credits for every thirty days of successful participation in recidivism reduction programming or certain productive activities.  *Id.* § 3632(d)(4)(A)(i).[2] The application of earned-time credits is governed by Section 3632(d)(4)(C), which reads as follows:

> **(C) Application of time credits toward prerelease custody or supervised release.**  Time credits earned under this paragraph by prisoners who successfully participate in recidivism reduction programs or productive activities shall be applied toward time in prerelease custody or supervised release.  The Director of the Bureau of Prisons shall transfer eligible prisoners, as determined under section 3624(g), into prerelease custody or supervised release.

*Id.* § 3632(d)(4)(C).

## II.    Facts and Procedural History

In 2001, Rivera-Perez was sentenced in the District of Puerto Rico to life imprisonment, to be followed by a five-year term of supervised release, for conspiring to distribute cocaine, in violation of 21 U.S.C. §§ 846, 841(a)(1).  The district court later reduced that sentence to 360 months' imprisonment, but

---

[2] Prisoners who the BOP determines "to be at a minimum or low risk for recidivating" and who "ha[ve] not increased their risk of recidivism" in their last two assessments "earn an additional 5 days of time credits for every 30 days of successful participation in evidence-based recidivism reduction programming or productive activities."  18 U.S.C. § 3632(d)(4)(A)(ii).

retained the five-year term of supervised release.

On October 13, 2023, while Rivera-Perez was serving his sentence of imprisonment at FCI Danbury, he filed a *pro se* petition for a writ of habeas corpus, pursuant to 28 U.S.C. § 2241, which challenged the execution of his sentence. In particular, Rivera-Perez asserted that the BOP "failed to properly calculate [his] earned First Step Act time credits" and has "refused to release [him] on home confinement although he is eligible." App'x at 11. Accordingly, the petition sought "immediate release to home confinement." *Id.* at 18.

By the time Rivera-Perez filed his habeas petition, he had accrued over 700 credits under the FSA. The BOP applied 365 of those credits to advance the date on which Rivera-Perez would start supervised release, but the remaining 415 credits were "unused," *i.e.*, not being applied for Rivera-Perez's benefit. According to Stover, some of the unused credits could have been used to place Rivera-Perez in prerelease custody earlier, but there was no bedspace available in an RRC until January 2024. On January 17, 2024, Rivera-Perez was transferred to an RRC, and Stover then moved to dismiss the petition, arguing that it was moot because Rivera-Perez had received the relief that his petition sought.

Ten months after Stover moved to dismiss, the district court entered a text-

only order which acknowledged that Rivera-Perez's request for release to prerelease custody was moot. However, "[l]iberally constru[ing]" Rivera-Perez's petition, the district court informed the parties that it "read[] the habeas petition . . . as raising the issue [of] whether Rivera-Perez's unused FSA time credits should be applied to reduce his term of supervised release." *Rivera-Perez v. Stover*, No. 23-cv-1348, (D. Conn. Oct. 17, 2024), Dkt. No. 16.

Over Stover's objection, the district court granted the petition (so construed). *See generally Rivera-Perez v. Stover*, 757 F. Supp. 3d 204 (D. Conn. 2024). The district court held that "[b]ased on the plain language of the statute, read in context . . . FSA credits *can*—and in fact *must*, according to the mandatory language of section 3632(d)(4)(C)—be applied to reduce a term of supervised release." *Id.* at 214 (emphasis in original). The district court thus directed the BOP "to calculate the number of Rivera-Perez's unused FSA time credits and inform the U.S. Probation Office for the Middle District of North Carolina of that calculation so that it can apply those credits toward Rivera-Perez's term of supervised release."[3] *Id.* at 215. Stover timely appealed from the district court's judgment. Between entry of the

---

[3] By the time of the district court's order, Rivera-Perez resided at an RRC in the Middle District of North Carolina. *See Rivera-Perez*, 757 F. Supp. 3d at 209 & n.6.

7

district court's judgment, and Stover filing the notice of appeal, Rivera-Perez was released from the RRC (and thus released from the custody of the BOP) and began his term of supervised release. *See* BOP Inmate Locator, https://www.bop.gov/inmateloc/ [https://perma.cc/FVJ8-4DAN] (last visited Mar. 19, 2026) (indicating that Rivera-Perez is not in BOP custody as of December 3, 2024).

## DISCUSSION

### I. Standard of Review

Habeas petitions filed under 28 U.S.C. § 2241—like Rivera-Perez's—"challenge[] the *execution* of a federal prisoner's sentence, including such matters as the administration of parole, computation of a prisoner's sentence by prison officials, prison disciplinary actions, prison transfers, type of detention[,] and prison conditions." *Jiminian v. Nash*, 245 F.3d 144, 146 (2d Cir. 2001) (emphasis in original). We review a district court's grant or denial of a Section 2241 petition *de novo*. *Jordan v. Lamanna*, 33 F.4th 144, 150 (2d Cir. 2022). In addition, our review of statutory interpretation questions is *de novo*. *See United States v. Holloway*, 956 F.3d 660, 664 (2d Cir. 2020).

### II. Mootness

A federal court's jurisdiction is limited to "actual cases or controversies."

*Simon v. E. Kentucky Welfare Rts. Org.*, 426 U.S. 26, 37 (1976). The case-or-controversy requirement "manifests in three distinct legal inquiries: standing, mootness, and ripeness." *Klein ex rel. Qlik Techs., Inc. v. Qlik Techs., Inc.*, 906 F.3d 215, 221 (2d Cir. 2018). At issue here is mootness. Under the mootness doctrine, "[i]f an intervening circumstance deprives the plaintiff [or petitioner] of a personal stake in the outcome of the lawsuit, at any point during litigation, the action can no longer proceed and must be dismissed as moot." *Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66, 72 (2013) (internal quotation marks and citation omitted).

Stover argues that Rivera-Perez's petition was mooted the moment he was transferred to prerelease custody. According to Stover, because the BOP had already applied twelve-months' worth of FSA time credits to move up the start of Rivera-Perez's term of supervised release, and because the FSA does not authorize use of earned-time credits to reduce a term of supervised release, Rivera-Perez had received all of the benefits he could have received from his petition prior to entry of the district court's judgment granting his petition. Rivera-Perez counters that the case was not moot because, as the district court held, FSA time credits can be applied to reduce the amount of time he will spend on supervised release and, therefore, his transfer to prerelease custody did not give him the complete relief

9

that is required to moot his case.

The mootness determination therefore depends entirely on a question of statutory interpretation that presents an issue of first impression in this court: Can time credits earned under the FSA be used to reduce a federal inmate's term of supervised release? As set forth below, we conclude that the answer is no.

## III. Whether FSA Time Credits Can Reduce a Term of Supervised Release

"When interpreting a statute, we begin with the plain language of the statute, giving the statutory terms their ordinary or natural meaning." *Spadaro v. U.S. Customs & Border Prot.*, 978 F.3d 34, 46 (2d Cir. 2020) (internal quotation marks and citation omitted). Thus, we must examine the two critical sentences of Section 3632(d)(4)(C): "Time credits earned . . . by prisoners . . . shall be applied toward time in prerelease custody or supervised release. The Director of the Bureau of Prisons shall transfer eligible prisoners, as determined under section 3624(g), into prerelease custody or supervised release." 18 U.S.C. § 3632(d)(4)(C).

The district court's analysis focused on the word "toward" in the first sentence. Looking at the word's ordinary meaning, the district court concluded that

[a]pplying credits toward something ordinarily means reducing that

10

> thing. For example, applying a store credit toward the cost of an item means that the cost of that item is reduced by the amount of the credit. Similarly, applying a credit toward one's account balance means that the balance will be reduced by the amount of the credit.

*Rivera-Perez*, 757 F. Supp. 3d at 211–12. Under this reading, when time credits are "applied toward time in . . . supervised release," 18 U.S.C. § 3632(d)(4)(C), they reduce the amount of time a prisoner must spend in supervised release. *Rivera-Perez*, 757 F. Supp. 3d at 212.

Rivera-Perez agrees with, and urges us to adopt, this reading. In support, he points to a dictionary definition defining "toward" as "with a view to obtaining or having" or "as a help or contribution to."[4] *See* Appellee's Br. at 9 (quoting *Toward*, DICTIONARY.COM, https://www.dictionary.com/browse/toward [https://perma.cc/3ZAX-6W4Z] (last visited Mar. 19, 2026)); *see also Toward*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE 2417 (2002) (providing many definitions of "toward," including "for the partial payment of").

---

[4] Although dictionary definitions are one source of evidence as to plain meaning and "bear consideration," they are not necessarily dispositive of the meaning of "toward" in Section 3632(d)(4)(C). *Yates v. United States*, 574 U.S. 528, 538 (2015); *see also In re Soussis*, 136 F.4th 415, 427 (2d Cir. 2025) ("Plain meaning is informed by, but does not depend solely on, dictionary definitions.").

However, Stover points to other dictionary definitions that support his proposed interpretation of the statutory provision. For example, Black's Law Dictionary defines "toward" as "in the direction of; on a course or line leading to (some place or something)." *Toward*, BLACK'S LAW DICTIONARY (12th ed. 2024). Under this reading, when time credits are "applied toward time in . . . supervised release," 18 U.S.C. § 3632(d)(4)(C), they move the prisoner "in the direction of" starting their term of supervised release.

At least when viewed in isolation, we think that both readings of the phrase "applied toward time in . . . supervised release" are plausible, thereby rendering the phrase ambiguous. *See In re Med Diversified, Inc.*, 461 F.3d 251, 255 (2d Cir. 2006) (explaining that when a statutory phrase is "reasonably susceptible" to two readings, it is ambiguous). However, we cannot read the statutory phrase in isolation because "it is a cardinal rule of statutory construction that statutory language must be read in context since a phrase gathers meaning from the words around it." *L.S. v. Webloyalty.com, Inc.*, 954 F.3d 110, 115 (2d Cir. 2020) (internal quotation marks and citation omitted); *see also Yates*, 574 U.S. at 537 ("Ordinarily, a word's usage accords with its dictionary definition. In law as in life, however, the same words, placed in different contexts, sometimes mean different things.");

12

*Soussis*, 136 F.4th at 427 ("[T]o ascertain a text's plain meaning, we draw on the specific context in which that language is used, and the broader context of the statute as a whole." (internal quotation marks and citation omitted)). As the Supreme Court has emphasized, we must read statutory phrases in context because "[o]ur duty, after all, is to construe statutes, not isolated provisions." *King v. Burwell*, 576 U.S. 473, 486 (2015) (internal quotation marks and citation omitted).

Here, the context of the phrase "applied toward time in . . . supervised release" resolves the ambiguity in favor of Stover's reading of the statute. Recall that the contested phrase immediately precedes the following sentence: "The Director of the Bureau of Prisons shall transfer eligible prisoners, as determined under section 3624(g), into prerelease custody or supervised release." 18 U.S.C. § 3632(d)(4)(C). We conclude that this second sentence confirms Stover's reading of the statute because it unquestionably contemplates a transfer from prison to prerelease custody or supervised release, not a reduction of time spent in prerelease custody or a term of supervised release.

As an initial matter, the plain text of the second sentence does not refer to *reducing* a term of prerelease custody or supervised release, and instead only refers to *transferring* "eligible prisoners" into one of those statuses. *See* 18 U.S.C.

13

§ 3632(d)(4)(C). Furthermore, the definition of "eligible prisoners" suggests that only those in prison (who have completed programs or productive activities) are eligible for such a transfer. *See id.* § 3624(g)(1)(A) (defining an eligible prisoner as "a prisoner . . . who . . . has earned time credits under the risk and needs assessment system"); *see also id.* § 3635(4) (defining prisoner as a "person who has been sentenced to a term of imprisonment pursuant to a conviction for a Federal criminal offense, or a person in the custody of the Bureau of Prisons"); *id.* § 3635(3)(B) (defining the relevant "evidence-based recidivism reduction programs" as those that "help prisoners succeed in their communities upon release from prison").

Moreover, the second sentence conditions transfer on eligibility "as determined under section 3624(g)." *Id.* § 3632(d)(4)(C). We must therefore look to the meaning of Section 3624(g) because "[a] court must . . . interpret [a] statute as a symmetrical and coherent regulatory scheme[] and fit, if possible, all parts into an harmonious whole." *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) (internal quotation marks and citations omitted). Section 3624(g)(3) explicitly provides that a "transfer" to supervised release "based on the application of time credits under section 3632" (the contested provision containing

14

"toward") is a transfer "to begin [a] term of supervised release *at an earlier date*."

18 U.S.C. § 3624(g)(3) (emphasis added). Section 3624(g)(3) thus makes clear that

the "transfer" referenced in Section 3632(d)(4)(C) is a transfer to supervised release

at an earlier date, *i.e.*, a transfer that accelerates the start of supervised release or a

transfer that moves the prisoner "toward" supervised release. Similarly, Section

3624(g)(1)(A) defines an "[e]ligible prisoner[]" as, *inter alia*, someone who has

earned time credits "in an amount that is equal to the remainder of the prisoner's

imposed term of imprisonment." This provision confirms that those who are

eligible for a "transfer" pursuant to the second sentence of Section 3632(d)(4)(C)

are individuals who are still serving a term of imprisonment, not those already on

supervised release.[5]

Accordingly, we conclude that the second sentence of Section 3632(d)(4)(C)

clearly addresses an early transfer from imprisonment to the start of prerelease

---

[5] Indeed, another related provision in the same section provides additional contextual support for Stover's reading of Section 3632(d)(4)(C). Section 3632(a) directs the Attorney General to develop the risk and needs assessment system (of which time credits are a part) which "shall be used to," *inter alia*, "determine when a prisoner is ready to *transfer* into prerelease custody or supervised release in accordance with section 3624." 18 U.S.C. § 3632(a)(7) (emphasis added). Therefore, according to the text that Congress enacted, the entire risk and needs assessment system is designed to facilitate a *transfer* into prerelease custody or supervised release, not a *reduction* of those terms.

15

custody or supervised release, not a reduction in those terms. Moreover, reading the first sentence in context—that is, in light of the second sentence—the best reading of the contested provision is that, when time credits are "applied toward time in . . . supervised release[,]" they bring the beginning of the term of supervised release closer in time. Those credits do not partially fulfill (and thus shorten) an individual's time in supervised release.

Our interpretation of the statute is in accord with the majority of circuits that have addressed this issue in both published and unpublished opinions. For example, in *Hargrove v. Healy*, 155 F.4th 530 (6th Cir. 2025), the Sixth Circuit held that "First Step Act time credits under § 3632(d)(4)(C) can be used to reduce a prison term but not a supervised-release term." *Id.* at 536. Critical to the court's analysis was the context of the contested provision. *See id.* at 533–34. In particular, the court noted that, by tying eligibility for transfer to Section 3624(g)—which allows a prisoner to "begin [his] term of supervised release at an earlier date" once he "has earned time credits . . . in an amount that is equal to the remainder of [his] term of imprisonment"—the statute "makes clear that when a prisoner earns time credits 'toward' supervised release, he is moving 'in the direction' of supervised release; the credits are not in partial fulfillment of his supervised-release term." *Id.*

16

at 534 (quoting 18 U.S.C. § 3624(g)(1)(A)).

Similarly, in *Guerriero v. Miami RRM*, No. 24-10337, 2024 WL 2017730 (11th Cir. May 7, 2024) (per curiam), the Eleventh Circuit recognized that the effect of the first sentence in Section 3632(d)(4)(C), "read in isolation," is unclear. *Id.* at *2. However, when read in the context of "the entirety of the relevant statutory language"—including the second sentence of Section 3632(d)(4)(C) and the provision it references, Section 3624(g)—the court concluded "that Congress intended the time credits to be used to reduce incarceration time so as to accelerate the beginning of prerelease custody or supervised release." *Id.* at *3. The Fourth and Fifth Circuits have reached the same conclusion in unpublished opinions. *See United States v. Malik*, No. 24-7073, 2025 WL 973003, at *1 (4th Cir. Apr. 1, 2025) (per curiam) ("Time credits earned under the FSA 2018 are to be applied to reduce an incarcerated person's prison term, not the person's term of supervised release.");[6] *Stinson v. Martinez*, No. 24-30793, 2025 WL 2017872, at *1 (5th Cir. July 18, 2025) (per curiam) ("[Earned-time credits] may only be applied towards an early start of

---

[6] A published opinion from the Fourth Circuit has also reached the same conclusion in *dicta*. *See Valladares v. Ray*, 130 F.4th 74, 79 (4th Cir. 2025) (stating that "[u]nder the FSA, . . . time credits can be applied toward earlier placement in pre-release custody or supervised release").

17

supervised release or early transfer to pre-release custody.").

The only circuit court that has concluded otherwise is the Ninth Circuit, which held that "the FSA's time credits may be used to reduce the length of time that a prisoner must spend while on supervised release." *Gonzalez v. Herrera*, 151 F.4th 1076, 1089 (9th Cir. 2025). However, we find the reasoning of both the district court and the Ninth Circuit, which Rivera-Perez asks us to adopt, to be unpersuasive. According to the district court, "the first sentence allows credits to be applied to reduce a term of (*i.e.*, 'time in') prerelease custody or supervised release, and the second sentence allows the BOP to apply credits to transfer an inmate to prerelease custody or to supervised [release] at an earlier date." *Rivera-Perez*, 757 F. Supp. 3d at 212; *see also* Appellee's Br. at 11 (asking us to adopt this interpretation). The dissent also adopts that approach. *See post* at 7–8. Similarly, the Ninth Circuit has held that the first sentence of Section 3632(d)(4)(C) "declares that earned time credits shall reduce time in prerelease custody or supervised release, separate and apart from imprisonment" and the second sentence "directs the BOP to put the prisoner on prerelease custody or place him on supervised release (cashing in earned time credits to do so) when a prisoner becomes eligible." *Gonzalez*, 151 F.4th at 1085 (internal quotation marks and citation omitted). Thus,

18

under this approach, the first sentence enables a reduction of a prisoner's term of prerelease custody or supervised release.

In order for us to adopt this interpretation, however, we would have to accept a series of implausible assumptions about Congress's intent. *First*, the heading of 18 U.S.C. § 3632(d)(4)(C)—"[a]pplication of time credits toward prerelease custody or supervised release"—"does not imply that it is outlining *two* situations when time credits can be applied—it implies only one." *Hargrove*, 155 F.4th at 535 (emphasis in original); *see also Dubin v. United States*, 599 U.S. 110, 120–21 (2023) (looking to the heading of a section to resolve doubt about the meaning of a statute).[7] If we were to adopt the district court's interpretation, we would necessarily need to conclude that Congress enacted the first sentence to direct one process (a reduction of a term of prerelease custody or supervised release by an unnamed entity without specifying how) and then that same Congress abruptly changed tack to give the BOP instructions about how to carry out a completely

---

[7] Although the dissent suggests that our analysis relies "largely" on the heading and notes that "the heading of a subsection cannot override the plain words of a statute," *post* at 8 (internal quotation marks and citation omitted), the heading is the beginning rather than the end of our analysis and, as set forth *infra*, the narrowness of the heading is completely consistent with our analysis of the statutory text.

different process (early transfer of eligible prisoners based on earned credits) in

the second sentence. We can discern no reason why Congress would have created

such an incongruous framework; rather, we conclude it is much more likely that

Congress intended the two sentences under the same heading to address the same

process—a transfer to prerelease custody or supervised release at an earlier date.[8]

*Second*, the second sentence of Section 3632(d)(4)(C) directs the BOP to

follow the detailed processes and requirements of Section 3624(g) before

transferring a prisoner to supervised release. For example, under Section 3624(g),

a prisoner is eligible for transfer to supervised release only if "the prisoner has

been determined [by the BOP] under [the risk and needs assessment system] to be

a minimum or low risk to recidivate pursuant to the last reassessment of the

---

[8] We are thus unpersuaded by the Ninth Circuit's focus on the dictionary definitions of "credit," "earn," "time," and "apply." *See Gonzalez*, 151 F.4th at 1082. Rather than quibbling with the dictionary definitions themselves, we think that giving dispositive weight to the dictionary definition of those words is insufficiently attentive to the critical phrase's context: its placement in a two-sentence subsection that we think is most naturally read as addressing one situation, rather than two. A narrow focus on defining words in the first sentence (to the exclusion of the context supplied by the second) disregards "[o]ur duty . . . to construe statutes, not isolated provisions." *King*, 576 U.S. at 486 (internal quotations marks and citation omitted); *see Gonzalez*, 151 F.4th at 1083–84 (looking to the context of the second sentence of § 3632(d)(4)(C) only "[o]ut of respect for the split in authority" and after already concluding that the first sentence can reduce the length of a term of supervised release).

prisoner." 18 U.S.C. § 3624(g)(1)(D)(ii). Section 3624(g)(3) also caps how early a prisoner can be transferred to supervised release to twelve months, regardless of the number of credits the prisoner has accrued. *See id.* § 3624(g)(3). However, under the district court's reading, none of those processes and requirements apply to a reduction in a term of supervised release pursuant to the first sentence. For example, under the district court's reading, as long as a prisoner who earned credits is not serving a sentence for certain enumerated crimes listed under Section 3632(d)(4)(D), they would be eligible for a reduction of their time on supervised release, even if the BOP had explicitly found that they presented a high risk of recidivism.[9] Indeed, because the twelve-month limit provided for by Section 3624(g)(4) would be—under the district court's reading—inapplicable to

---

[9] The Ninth Circuit suggests that "[t]here is no boogie man here" because, "[t]o start, prisoners convicted of many of the most serious crimes are statutorily excluded from earning FSA time credits." *Gonzalez*, 151 F.4th at 1089 (citing 18 U.S.C. § 3632(d)(4)(D)). However, we note that, notwithstanding the exclusion of prisoners serving sentences for many serious crimes enumerated under Section 3632(d)(4)(D), prisoners who remain eligible to receive time credits are those serving sentences for convictions for numerous other serious crimes, including, *inter alia*, the following: (1) certain narcotics trafficking offenses, in violation of 21 U.S.C. §§ 841, 846; (2) robbery or extortion, in violation 18 U.S.C. § 1951; (3) racketeering, in violation of 18 U.S.C. § 1962; (4) violent crimes in aid of racketeering, in violation of 18 U.S.C. § 1959; (5) firearms trafficking, in violation of 18 U.S.C. § 922(a); (6) possession of a firearm, after having been convicted of a felony, in violation of 18 U.S.C. § 922(g); (7) money laundering, in violation of 18 U.S.C. §§ 1956–57; and (8) fraud offenses, in violation of 18 U.S.C. §§ 1341, 1343, and 1344.

21

reductions via the first sentence, a prisoner that has been found to present a high risk of recidivism could potentially have their entire term of supervised release wiped out. Moreover, this concern would be particularly acute as to prisoners serving lengthy sentences, who—by definition—have more time to accrue time credits.[10] We conclude that it is implausible that Congress would have placed careful limitations on early transfers to prerelease custody or supervised release, but then would wholly omit them if it intended to allow reductions of those terms.[11]

---

[10] For instance, the district court's reading of the statute would allow an individual convicted of participating in a large narcotics operation, involving hundreds of kilograms of cocaine, and whom BOP determined should not be allowed to use his FSA time credits to be released early from prison because his recidivism risk level was not minimal or low, to still use those earned-time credits to substantially reduce (or even potentially eliminate entirely) his term of supervised release once he completes his prison term.

[11] Any suggestion that the minimum or low-risk limitation under Section 3624(g)(1)(B) could also be applied by BOP in determining whether there should be a reduction to the term of supervised release has no basis in the statutory text. In particular, the first sentence of Section 3632(d)(4)(C)—the purported source of authority to reduce a term of supervised release—does not cross-reference Section 3624(g), the source of the minimum or low-risk level limitation. In addition, although Section 3624(g)(1)(B) defines an "eligible prisoner" as one who presents a "minimum or low recidivism risk," 18 U.S.C. § 3624(g)(1)(B), the first sentence of Section 3632(d)(4)(C) does not reference "eligible prisoner[s]." Instead, it states time credits "earned . . . by prisoners . . . shall be applied," and only the second sentence mandates "transfer [of] *eligible* prisoners," *id.* § 3632(d)(4)(C) (emphasis added). Accordingly, if we were to accept that the first

22

*Third*, the first sentence of Section 3632(d)(4)(C) does not specify what agency "shall appl[y]" earned-time credits "toward time in . . . supervised release," or how that should be done. Both the district court and the Ninth Circuit recognized that this first sentence uses the "passive voice" and does not specify the agency responsible for effectuating a reduction of a supervised-release term that the first sentence supposedly requires. *See Rivera-Perez*, 757 F. Supp. 3d at 213; *Gonzalez*, 151 F.4th at 1085. Instead of considering whether such an omission rendered their interpretation incongruous with the statutory plan, they simply noted that, because the BOP is no longer responsible for an individual once they are on supervised release, it makes sense that Congress would not mention the BOP in the sentence that allows for a termination of supervised release. *See Rivera-Perez*, 757 F. Supp. 3d at 213; *Gonzalez*, 151 F.4th at 1085. That response, however,

---

sentence of Section 3632(d)(4)(C) provides authority for a court to reduce a term of supervised release, the guardrails contained in Section 3624(g) would simply not apply. In short, our reading of the statute does not "disagree[] with the policy chosen by Congress," *Gonzalez*, 151 F.4th at 1090; rather, our highlighting of the incongruous limitations on the first and second sentences of Section 3632(d)(4)(C) (under the district court's and the Ninth Circuit's interpretations) provides compelling evidence as to why that understanding of Congress's intent is wrong, *see Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 575 (1982) ("[I]nterpretations of a statute which would produce absurd results are to be avoided if alternative interpretations consistent with the legislative purpose are available.").

does not address the real problem: that is, if the first sentence of Section 3632(d)(4)(C) can reduce a term of supervised release, the statute gives no indication of the agency responsible for applying the credits.[12] We again conclude that it is implausible that Congress intended to create a mechanism to reduce terms of supervised release without specifying the agency responsible for doing so— particularly where the following sentence specifically tasks the BOP with effectuating transfers. *See King*, 576 U.S. at 497 (emphasizing that "Congress does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions" (internal quotation marks and citation omitted)).

*Fourth*, the district court's and the dissent's reading of Section 3632(d)(4)(C),

---

[12] Rather than meaningfully grappling with this issue, the district court here forged ahead and ordered the BOP to "calculate the number of Rivera-Perez's unused FSA time credits and inform the U.S. Probation Office for the Middle District of North Carolina of that calculation so that it can apply those credits toward Rivera-Perez's term of supervised release." *Rivera-Perez*, 757 F. Supp. 3d at 215. The dissent endorses this approach. *See post* at 11 ("BOP can communicate the individual's remaining FSA credits to Probation, who will then take account of those credits when calculating the appropriate end date of supervised release."). In doing so, the district court effectively inserted words into the statute, creating a process for implementing its interpretation of the FSA, contrary to the principles governing statutory interpretation. *See Romag Fasteners, Inc. v. Fossil, Inc.*, 590 U.S. 212, 215 (2020) (cautioning courts to avoid the "temptation" to "read into statutes words that aren't there"). We also note that the unusual nature of the remedy granted by the district court—directing the BOP to contact a non-party—highlights the implausibility of the interpretation requiring such a remedy.

with its emphasis on the phrase "toward time in," implies that time credits can also be applied to reduce the amount of time a prisoner spends in prerelease custody. *See* 18 U.S.C. § 3632(d)(4)(C) (time credits "shall be applied toward time in prerelease custody"). However, rewarding prisoners who participate in recidivism reduction programs by reducing the amount of time that a prisoner spends in prerelease custody defies logic and common sense because prisoners (presumably) want *more* time in prerelease custody (rather than prison), not less. In contrast, if "toward time in prerelease custody" means starting prerelease custody at an earlier date, the productive incentives that Congress sought to create are present. [13] Furthermore, because "toward" is a preposition that has one

---

[13] Indeed, focusing on prerelease custody highlights an additional reason to favor Stover's reading of the FSA. The version of the FSA that first passed the House of Representatives authorized application of earned-time credits only "toward time in pre-release custody[,]" with no mention of supervised release. H.R. 5682, 115 Cong. (2018) ("Time credits earned under this paragraph by prisoners who successfully participate in recidivism reduction programs or productive activities and who have been determined to be at minimum risk or low risk for recidivating . . . shall be applied toward time in pre-release custody. The Director of the Bureau of Prisons shall transfer prisoners described in this subparagraph into prerelease custody . . . ."). Again, as noted *supra,* interpreting "toward time in pre-release custody" under this version of the statute as *reducing* the time a prisoner spends in prerelease custody would make no sense because that would increase the amount of time an individual spends in prison, contrary to the plain purpose of the bill. The final version of the FSA added "or supervised release" to the first sentence, *see* FSA § 101, 132 Stat. at 5198, but we do not think adding "or supervised release" somehow transformed the meaning of "applied toward time in."

25

compound object (time in prerelease custody *or* supervised release), it is natural that it would mean the same for both. *See Helix Energy Sols. Grp., Inc. v. Hewitt*, 598 U.S. 39, 57 (2023) (explaining that, where a provision applies to two scenarios, it "must mean the same thing in either context").

*Fifth*, the district court's reading would allow reductions in terms of supervised release without any involvement of the court. That framework runs counter to 18 U.S.C. § 3583(e)(1), which allows a *court* (not an unspecified entity) to terminate a term of supervised release, but only after considering certain enumerated Section 3553(a) factors, and only after one year of time served on supervised release. In contrast, under the district court's reading, the FSA created a mechanism to reduce (or even terminate) a term of supervised release by an unnamed entity, with no required consideration of the factors listed in Section 3583(e), and with no requirement that the prisoner serve at least twelve months of the term. We yet again find it highly unlikely that Congress effected such a consequential change in sentencing law through the "use[] [of the] passive voice" here. *Rivera-Perez*, 757 F. Supp. 3d at 213.

Given these substantial problems with the district court's interpretation of Section 3632(d)(4)(C), when considered in the context of the entire statute and

26

other statutory provisions that are implicated by such an interpretation, we conclude that the more logical and harmonizing reading of that provision is that the first sentence "outlines what the time-credit system is (a way to move toward prerelease custody or supervised release) and the second sentence outlines how it works (through BOP transfer [of eligible prisoners] as determined by § 3624(g))."[14] *Hargrove*, 155 F.4th at 535. Under this interpretation of Section 3632(d)(4)(C), FSA credits cannot be used to reduce a term of supervised release.

The dissent contends that "much of the majority's concern with Rivera-Perez's reading of the statute springs not from the statutory text, but from perceived negative policy consequences." *Post* at 10. But we discuss the consequences of the dissent's approach mainly to highlight why its incongruous reading of the statutory text is implausible, and to perform our obligation to "interpret the statute as a symmetrical and coherent regulatory scheme and fit, if possible, all parts into an harmonious whole." *Brown & Williamson Tobacco Corp*.,

---

[14] Because our reading gives each sentence independent meaning, we disagree with the district court, *Rivera-Perez*, 757 F. Supp. 3d at 212, the Ninth Circuit, *Gonzalez*, 151 F.4th at 1085, and the dissent, *post* at 7, that our reading renders the second sentence superfluous. *See Freeman v. Quicken Loans, Inc.*, 566 U.S. 624, 635–36 (2012) (discussing the canon against surplusage).

27

529 U.S. at 133 (internal quotation marks and citations omitted). In any event, it is not a policy argument to demonstrate that the dissent's reading is unworkable. It is implausible *from a textual standpoint* that Congress would, *inter alia*, have detailed processes and requirements for BOP to perform before allowing an early transfer of a prisoner to supervised release, yet delineate no process or requirements under the same statute for prisoners to obtain a reduction in their supervised release term (which the dissent supposes would be done) by an unidentified entity. *See King*, 576 U.S. at 494–95 (rejecting an interpretation of a statute where "[i]t is implausible that Congress meant the Act to operate in this manner").

Finally, a few words about the FSA's purpose. As we have explained, "[i]n providing for time credits, Congress clearly aimed to offer 'an incentive for prisoners to attend the recidivism reduction programs Congress was devising, and the obvious incentive was that the time credits would reduce a prisoner's incarceration time.'" *United States v. James*, 151 F.4th 28, 41–42 (2d Cir. 2025) (quoting *Guerriero*, 2024 WL 2017730, at *3)). Rivera-Perez contends that "[a] system that encourages rehabilitation with concrete rewards, *i.e.*, earning credits, should likewise facilitate application of those rewards," and that our reading of the statute would reduce the incentive for prisoners to participate in these

28

programs. Appellee's Br. at 16. Similarly, the Ninth Circuit has highlighted the concern that, unless time credits can be used to reduce a term of supervised release, "any credits earned in excess of 365 days are worthless because they may only be applied to end custody one year early." *Gonzalez*, 151 F.4th at 1088.

On our reading, however, excess credits are by no means wasted. Individuals who complete recidivism reduction programming have presumably obtained useful benefits: vocational training, substance abuse treatment, academic coursework, training in life skills, etc. *See* 28 C.F.R. § 523.41(a); *see also* FEDERAL BUREAU OF PRISONS, FIRST STEP ACT APPROVED PROGRAMS GUIDE (Sep. 2023) https://www.bop.gov/inmates/fsa/docs/fsa_guide_eng_2023.pdf [https://perma.cc /VH52-E4NR] (providing a list of over fifty approved evidence-based recidivism reduction programs and productive activities including "anger management," "cognitive processing therapy," and "money smart for adults"). A prisoner with excess unused credits has benefited from those credits in much the same way a college student who completes more coursework than is necessary to graduate has still obtained a benefit: an education. Moreover, prisoners can benefit from taking courses or participating in productive activities in more immediately concrete ways too. For example, prisoners can receive phone or video conferencing

privileges, additional time for visitation at the prison, transfer to a BOP facility closer to the prisoner's release residence, increased commissary spending limits and product offerings, extended opportunities to access email, or consideration of transfer to preferred housing units. *See* 18 U.S.C. § 3632(d)(1)–(3). Individuals can also cite the coursework and productive activities they completed when making an application to the district judge for early termination of their term of supervised release, and the district judge is free to consider them. *See* 18 U.S.C. § 3583(e).

Meanwhile, Rivera-Perez's reading—which could allow for wholesale elimination of supervised release for certain prisoners—does not necessarily serve the FSA's goal of facilitating rehabilitation because supervised release itself "fulfills rehabilitative ends," *United States v. Johnson*, 529 U.S. 53, 59 (2000), and "facilitate[s] a transition to community life," *Mont v. United States*, 587 U.S. 514, 523 (2019) (internal quotation marks and citation omitted). Accordingly, in our view, interpreting the FSA to allow prisoners to use time credits to begin a term of supervised release up to twelve months early (but not to reduce the term of supervised release itself) fully accords with the FSA's goal of reducing recidivism.

\*      \*      \*

In sum, we hold that when FSA time credits are "applied toward time in . . .

30

supervised release" pursuant to 18 U.S.C. § 3632(d)(4)(C), they reduce a prisoner's time in incarceration by starting a term of supervised release early. They do not reduce a post-incarceration term of supervised release.

## IV.   Rivera-Perez's Case

Based upon our interpretation of the statute, Rivera-Perez's case was moot before the district court entered judgment on November 19, 2024. He was transferred from prison to an RRC on January 24, 2024, and the maximum twelve-months' worth of credits were applied to accelerate the beginning of his term of supervised release. A ruling in his favor could not give him any more than that because Section 3632(d)(4)(C) cannot reduce his term of supervised release. It was therefore "impossible for a court to grant any effectual relief whatever to the prevailing party," and the case was moot before the district court entered judgment. *Knox v. Serv. Emps. Int'l Union, Loc. 1000*, 567 U.S. 298, 307 (2012) (internal quotation marks and citation omitted).

## CONCLUSION

For the foregoing reasons, we **VACATE** the judgment of the district court and **REMAND** with instructions to dismiss this case as moot.