# 25-149-cr

## 𝔘𝔫𝔦𝔱𝔢𝔡 𝔖𝔱𝔞𝔱𝔢𝔰 𝔠𝔬𝔲𝔯𝔱 𝔬𝔣 𝔄𝔭𝔭𝔢𝔞𝔩𝔰

### FOR THE SECOND CIRCUIT

RAUL RIVERA-PEREZ,
*Petitioner-Appellee,*

-vs-

R. STOVER, WARDEN,
*Respondent-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT
COURT FOR THE DISTRICT OF CONNECTICUT

## PETITION FOR REHEARING *EN BANC*

CHARLES F. WILLSON
*Federal Defender, District of Connecticut*
10 Columbus Boulevard, 6th Floor
Hartford, CT 06106
(860) 493-6260

# TABLE OF CONTENTS

INTRODUCTION .................................................................................................1

STATEMENT OF THE CASE....................................................................................2

    I.     The First Step Act.........................................................................2

    II.    Factual background. ....................................................................4

    III.   District court opinion..................................................................5

    IV.   Panel opinions. ...........................................................................7

REASONS FOR GRANTING *EN BANC* REVIEW.................................................10

    I.     The majority's decision is inconsistent with the First Step Act's text and purpose....................................................................10

    II.    The panel's decision deepens a circuit split on a question of "exceptional importance," stripping liberty rights from thousands of individuals on federal supervised release in the Second Circuit. .......15

CONCLUSION.....................................................................................................17

CERTIFICATIONS

ADDENDUM (Opinion, Mar. 26, 2026)......................................................ADD 1

## TABLE OF AUTHORITIES

**Cases**

*Azar v. Allina Health Servs.*, 587 U.S. 566 (2019)......................................13

*Barber v. Thomas*, 560 U.S. 474 (2010)...................................................12

*Gonzalez v. Herrera*, 151 F.4th 1076 (9th Cir. 2025) .................................... *passim*

*Gustafson v. Alloyd Co.*, 513 U.S. 561 (1995)...........................................14

*Hargrove v. Healey*, petition for cert. pending, No. 25-818 (filed Jan. 8, 2026) ...............................................................................15

*Hargrove v. Healy*, 155 F.4th 530 (6th Cir. 2025) ...................................... 1, 10, 15

*Hewitt v. United States*, 606 U.S. 419 (2025).............................................2

*Pepper v. United States*, 562 U.S. 476 (2011)...........................................12

*Polselli v. Internal Revenue Serv.*, 598 U.S. 432 (2023) .........................................12

*Pulsifer v. United States*, 601 U.S. 124 (2024)...........................................2

*Reno v. Koray*, 515 U.S. 50 (1995).......................................................13

*Rivera-Perez v. Stover*, 757 F. Supp. 3d 204 (D. Conn. 2024)........................ 5, 6, 7

*Rivera-Perez v. Stover*, No. 25-149, 2026 WL 828530 (2d Cir. Mar. 26, 2026) ................................................................................ *passim*

*Scanio v. United States*, 37 F.3d 858 (2d Cir. 1994) ...............................................16

*United States v. Peguero*, 34 F.4th 143 (2d Cir. 2022) ...........................................16

**Statutes**

18 U.S.C. § 3585(b) ........................................................... 12, 13

18 U.S.C. § 3624(b)(1).........................................................12

18 U.S.C. § 3624(g) ...........................................................8, 9

18 U.S.C. § 3624(g)(1)..............................................................................3

18 U.S.C. § 3624(g)(3)..............................................................................3

18 U.S.C. § 3632(d) .................................................................................2

18 U.S.C. § 3632(d)(4)(A).........................................................................2

18 U.S.C. § 3632(d)(4)(A)(i) .....................................................................3

18 U.S.C. § 3632(d)(4)(A)(ii) ..................................................................3, 4

18 U.S.C. § 3632(d)(4)(C) ................................................................ *passim*

18 U.S.C. § 3635(3)(A)..............................................................................2

18 U.S.C. § 3635(3)(B)..............................................................................2

**Other Authorities**

OFF. OF THE ATT'Y GEN., DEP'T OF JUST., *First Step Act: Annual Report*
(Jun. 2024) ........................................................................................16

Oversight of the Fed. Bureau of Prisons: Hearing Before the Subcomm.
on Crime and Fed. Gov't Surveillance of the H. Comm. on the
Judiciary (Jul. 23, 2024) ....................................................................16

U.S. COURTS, *Federal Probation System -- Post-Conviction
Supervision Cases Closed with and without Revocation*
(accessed Apr. 14, 2026) ....................................................................17

U.S. SENT'G COMM'N, *Supervised Release* (accessed Apr. 7, 2026).......................16

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

RAUL RIVERA-PEREZ,

*Petitioner-Appellee,*

-vs-

R. STOVER, WARDEN,

*Respondent-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT
COURT FOR THE DISTRICT OF CONNECTICUT

## **<u>INTRODUCTION</u>**

With the passage of the First Step Act, Congress introduced a slate of evidence-based, recidivism reduction programs to assist federal prisoners in their rehabilitation. Congress then built a system of time credits to maximize participation. Individuals may apply these credits "toward time in … supervised release." 18 U.S.C. § 3632(d)(4)(C). A panel of this Court, however, effectively interpreted this text to read, "toward time in … [prison]," thus nullifying unused credits for individuals currently on supervised release.

The panel's decision, issued over dissent, deepens a circuit split between the Sixth and Ninth Circuits. *See Hargrove v. Healy*, 155 F.4th 530, 536 (6th Cir. 2025) (credits cannot reduce time in supervised release); *Gonzalez v. Herrera*, 151 F.4th 1076, 1085 (9th Cir. 2025) (credits can reduce time in supervised release). The decision also involves a question of "exceptional importance," as it threatens the liberty interests of tens of thousands of individuals who would otherwise use credits to shorten their time on supervision. Because Congress directed that credits reduce "time in … supervised release," not just "time in … [prison]," this Court should grant rehearing *en banc* to make clear that earned credits apply at "every step in the carceral process." *Rivera-Perez v. Stover*, No. 25-149, 2026 WL 828530, at \*12 (2d Cir. Mar. 26, 2026) (Nathan, J., dissenting).

1

## STATEMENT OF THE CASE

### I.  The First Step Act.

The First Step Act is considered "the most significant criminal justice reform bill in a generation." *Pulsifer v. United States*, 601 U.S. 124, 155 (2024) (Gorsuch, J., dissenting) (citation omitted). This bipartisan, "landmark piece of legislation … changed the federal criminal-sentencing system in numerous respects." *Hewitt v. United States*, 606 U.S. 419, 424 (2025).

At issue here is the system of time credits Congress included in the Act to "provide incentives and rewards for [federal] prisoners to participate in and complete evidence-based recidivism reduction programs." 18 U.S.C. § 3632(d). These "evidence-based recidivism reduction program[s]" are "shown by empirical evidence to reduce recidivism" or "based on research indicating [a likelihood of effectiveness] in reducing recidivism." *Id.* § 3635(3)(A). These programs are "designed to help prisoners succeed in their communities upon release from prison." *Id.* § 3635(3)(B).

Congress designed rewards to encourage prisoners to participate in as much programming as possible. The main reward Congress crafted is the ability for an eligible individual to "earn time credits" upon completing a program. *Id.* § 3632(d)(4)(A). An eligible individual "shall earn 10 days of time credits for every

2

30 days of successful participation" in recidivism programming. *Id.* § 3632(d)(4)(A)(i). If BOP deems an individual to pose a "minimum" or "low" risk of recidivism, that individual "shall earn an additional 5 days of time credits for every 30 days of successful participation." *Id.* § 3632(d)(4)(A)(ii).

Congress also created a system for applying these credits. A prisoner who "has earned time credits … in an amount that is equal to the remainder of the prisoner's imposed term of imprisonment" may benefit from those credits by "being placed in prerelease custody" or "in supervised release." *Id.* § 3624(g)(1). BOP "may transfer the prisoner to begin any such term of supervised release at an earlier date, not to exceed 12 months, based on the application of time credits under section 3632." *Id.* § 3624(g)(1), (3). Transfer to prerelease custody or supervised release is mandatory, as § 3632(d)(4)(C) directs that the Bureau of Prisons ("BOP") "shall transfer eligible prisoners, as determined under section 3624(g), into prerelease custody or supervised release."

This appeal concerns any time credits that remain after BOP initiates an early transfer to supervised release. Mr. Rivera-Perez contends unused credits are applied to reduce "time in" supervised release under § 3632(d)(4)(C):

> Time credits earned under this paragraph by prisoners who successfully participate in recidivism reduction programs or productive activities shall be applied toward time in prerelease custody or supervised release. The Director of the Bureau of Prisons shall transfer eligible prisoners,

3

as determined under section 3624(g), into prerelease custody or supervised release.

## II. Factual background.

Now 69 years old, Mr. Rivera-Perez is living in the community after serving a prison sentence for his role in a drug trafficking conspiracy. AA2 (ECF 9-2 at 1). In prison, Mr. Rivera-Perez participated in 1636 days of First Step Act programming. *See id.* (ECF 9-3 at 1). He accrued earned time credits at a rate of ten credits per 30 programming days. *See id.* (ECF 9-3 at 2). BOP later credited Mr. Rivera-Perez at a rate of 15 credits per 30 programming days based on his low risk of recidivism. *See ibid. See also* 18 U.S.C. § 3632(d)(4)(A)(ii).

As of December 2, 2023, Mr. Rivera-Perez had accrued 780 FSA time credits. *See id.* (ECF 9-1 at 2). BOP applied 365 of his 780 FSA credits to initiate early transfer to supervised release, which changed his projected release from December 3, 2025, to December 3, 2024. *See ibid.* Mr. Rivera-Perez also met with BOP to discuss his reentry plans. *See id.* (ECF 9-1 at 3). Based on his credits, BOP targeted July 13, 2023 to transfer him to prerelease custody. *See ibid.* BOP planned to transfer Mr. Rivera-Perez to a halfway house in North Carolina. *See id.* (ECF 9-7 at 3).

But the halfway house ended its contract with BOP in November 2023 and lacked bedspace to accept a transfer. *See ibid.* No bedspace opened until January 2024, when Mr. Rivera-Perez was ultimately transferred to prerelease custody. *See*

4

*ibid.* BOP calculated that Mr. Rivera-Perez had retained FSA credits based on his delayed transfer. *See ibid.*

Prior to his transfer, Mr. Rivera-Perez filed a *pro se* petition for a writ of habeas corpus against Warden Stover of FCI Danbury, arguing BOP had failed to properly calculate his FSA credits and timely release him to home confinement. *See Rivera-Perez v. Stover*, 757 F. Supp. 3d 204, 205–06 (D. Conn. 2024). In response, Stover conceded that BOP had not applied the balance of Mr. Rivera-Perez's credits because it did not have bedspace to accommodate his transfer. *See, e.g.,* AA2 (ECF 9-7 at 3). Stover moved to dismiss the petition as moot when BOP transferred Mr. Rivera-Perez to a halfway house. *See Rivera-Perez*, 757 F. Supp. 3d at 206.

### III.   District court opinion.

The district court "read[ ] the habeas petition ... as raising the issue [of] whether Rivera-Perez's unused FSA time credits should be applied to reduce his term of supervised release." AA2–3 (ECF 16). The district court granted Mr. Rivera-Perez's so-construed petition. *See Rivera-Perez*, 757 F. Supp. 3d at 215.

The district court held that unused FSA time credits can be applied to reduce a prisoner's time in supervised release. *See id.* at 212. The district court addressed the first sentence in § 3632(d)(4)(C): "Time credits … shall be applied … toward time in prerelease custody or supervised release." *See id.* at 211–12. Taking the

5

example of a store credit applied toward the cost of an item, the court reasoned that the word "toward" meant to "reduce" its object. *Ibid.* The court interpreted the phrase "toward … time in supervised release" to mean "FSA credits are to be applied to *reduce* a term of supervised release," not merely to "accelerat[e] the beginning of supervised release." *Ibid.* (emphasis added).

The court then turned to the second sentence of § 3632(d)(4)(C): "The Director of the Bureau of Prisons shall transfer eligible prisoners, as determined under section 3624(g), into prerelease custody or supervised release." *See id.* at 212–13. The court rejected Stover's argument that the second sentence confirms that the first sentence only allows BOP to accelerate the start of supervised release. *See id.* at 212. Instead, the court concluded that "the more natural reading" is to read "toward" in the first sentence to permit reduction of "time in" supervised release. *Id.* Meanwhile, the second sentence directs BOP to apply credits to initiate an early transfer to prerelease custody or supervision. *See id.* Put together, the two sentences play different roles: the first reduces "time in" supervision, and the second reduces time in prison (via early transfer to supervision). *See id.*

The district court concluded that Mr. Rivera-Perez's petition was not moot because his unused time credits could be applied to reduce his term of supervised release. *See id.* at 214–15. The court ordered BOP to calculate Mr. Rivera-Perez's

6

unused credits and inform the U.S. Probation Office for the Middle District of North Carolina of that calculation so it could apply the unused credits toward Mr. Rivera-Perez's remaining time in supervised release. *See id.* at 215.

## IV.     Panel opinions.

The government appealed. AA74. A divided panel of this Court dismissed Mr. Rivera-Perez's appeal as moot. *See Rivera-Perez v. Stover*, No. 25-149, 2026 WL 828530, at \*9 (2d Cir. Mar. 26, 2026).

The majority held that FSA time credits cannot be applied to reduce "time in" supervised release. *See id.* at \*4. The majority first conceded that the phrase "applied toward time in … supervised release" was susceptible to two plausible meanings, rendering the phrase ambiguous. *Id.* On the one hand, the phrase could mean to "reduce" "time in" supervised release, and on the other hand, the phrase could mean to move a prisoner "in the direction of" the start of supervised release. *Id.* The majority concluded the latter was a more natural reading. *See id.*

To reach its conclusion, the majority relied on the second sentence of § 3632(d)(4)(C). *See id.* at \*5. The plain text of the second sentence, observed the majority, speaks of "*transferring*" prisoners into supervised release, not "*reducing*" the term of that release. *Id.* (emphasis in original). The majority added that the reference to "eligible prisoners" and the cross-reference to eligibility criteria in §

7

3624(g) confirmed that only those *in prison* could receive a transfer. *See id.* Because the second sentence addressed early transfer from imprisonment to the start of supervised release (and not a reduction of time *in* supervised release), the Court reasoned that the "best reading" of the first sentence must be precisely the same as the second sentence: when earned time credits are "'applied toward time in … supervised release[,]' they bring the beginning of the term of supervised release closer in time." *Id.* In effect, the majority concluded that credits "applied toward *time in* … supervised release" cannot affect "time in" supervised release. *See id.* (emphasis added). To the extent credits remain after a prisoner's transfer to supervised release, those credits go unused.

The concurrence agreed with the majority's reasoning. *See id.* at *9 (Jacobs, J., concurring). The concurrence suggested BOP is powerless to adjust the length of a term of supervised release. *See id.* at *9–10. The concurrence then touted the positive benefits of recidivism programming in and of itself. *See id.* at *10.

Judge Nathan dissented. *See id.* at 10. The dissent took § 3624(d)(4)(C) to mean "what it says": prisoners may apply their FSA credits to reduce their "time in" supervised release. *See id.* Although the dissent agreed with the majority that "toward" was susceptible to competing plausible definitions, the dissent looked to the object the credits are applied "toward" in the first sentence. *See id.* at *11. This

8

object, "time in" supervised release, is unnecessary if "toward" means to accelerate the start of supervised release. *See id.* On the majority's view, Congress could have simply omitted "time in" and just said that credits apply "toward" supervised release. *See id.* "If Congress intended for FSA credits to shorten time in prison only," the dissent stated, "identifying the object of those credits as 'time in prerelease custody or supervised release' is an odd way to do so." *Id.* Instead, the dissent gave "credence" to Congress's choice to include "time in," interpreting the first sentence to apply credits to "the time one spends *during* supervised release, not, as Stover argues, to the time one spends in prison *before* reaching supervised release." *Id.* (emphasis in original).

The dissent also found that the majority's interpretation rendered the second sentence superfluous. *See id.* at *12. The majority noted that the first sentence directed application of FSA credits to initiate early transfer to supervision, but the majority also suggested the second sentence and § 3624(g) do the exact same thing. *See id.* This superfluity is "precisely why" the majority's view "is wrong." *Id.* The dissent's approach, by contrast, avoided this surplusage by allowing prisoners to spend credits at every step in the carceral process: first to initiate early transfer to supervised release, and then to reduce "time in" supervised release. *See id.* The dissent's approach thus vindicates Congress's judgment that more participation in

9

evidence-based, recidivism programming ought to be incentivized because more participation drives down recidivism, saves money, and keeps communities safer. *See id.* at *14.

## REASONS FOR GRANTING *EN BANC* REVIEW

This case satisfies the Court's criteria for rehearing *en banc*. Prior to the panel's decision, the Sixth and Ninth Circuits differed as to whether earned time credits can be applied to shorten time in supervised release. *See Hargrove v. Healy*, 155 F.4th 530, 536 (6th Cir. 2025) (credits cannot be applied to reduce time in supervised release); *Gonzalez v. Herrera*, 151 F.4th 1076, 1085 (9th Cir. 2025) (credits can be applied to reduce time in supervised release). With two votes, the panel deepened the split and joined the Sixth Circuit. This conflict is significant because individuals on supervised release who reside in the Ninth Circuit can wield earned time credits to shorten their time in supervised release; individuals who live here cannot. This result ignores the plain text of § 3632(d)(4)(C) and undermines Congress's reward system for driving participation in programming. The petition should be granted to correct the majority's error.

I.  **The majority's decision is inconsistent with the First Step Act's text and purpose.**

The plain text confirms that Congress intended application of earned time credits to reduce an individual's time in supervised release. The first sentence of §

3632(d)(4)(C) provides that time credits "shall be applied" "toward" something: "time in" supervised release. In ordinary parlance, when a credit is "applied" "toward" an object, the credit reduces the object. *See Rivera-Perez*, 2026 WL 828530, at *12 (Nathan, J., dissenting). Like store credits that reduce the cost of an item, *see id.*, or a "bank account balance" that reduces a "car loan, mortgage, or other debt obligation," *Gonzalez*, 151 F.4th at 1082, earned credits are applied toward "time in" supervised release, thus reducing that time, *see id.* at 1082–83.

The majority's interpretation turns an otherwise straightforward text into "gobbledygook." *Id.* at 1083. According to the majority, time credits are applied "in the direction of" "time in" supervised release. *Rivera-Perez*, 2026 WL 828530, at *4–5. But "[h]ow does one apply credits 'in the direction of' time—are we meant to wave them towards the future?" *Gonzalez*, 151 F.4th at 1083. The majority answers by applying time credits to reduce the time *preceding* supervised release: "time in" prison. *See Rivera-Perez*, 2026 WL 828530, at *5. That answer, however, is found nowhere in the text. *See id.* at *10 (Nathan, J., dissenting).

Straying further from the plain language, the majority's interpretation creates surplusage in the first sentence. *See id.* at *11 (Nathan, J., dissenting). Adopting the majority's interpretation, the words "time in" become unnecessary. *See id.* The statute could read "toward … supervised release," and it would make no difference.

11

*See id.* But if "toward" means "against" or "in partial payment," the phrase "time in" has meaning: it identifies the duration that the credits reduce, *see Gonzalez*, 151 F.4th at 1083. *See also Polselli v. Internal Revenue Serv.*, 598 U.S. 432, 441 (2023) ("We ordinarily aim to give effect to every clause and word of a statute." (internal alterations and quotations omitted)). And that duration is "time in" supervised release, not time in prison. *See Gonzalez*, 151 F.4th at 1082–83.

The dissent's reading of § 3632(d)(4)(C) finds support in other statutory provisions that address time credits. *See Rivera-Perez*, 2026 WL 828530, at *11 (Nathan, J., dissenting). For good time credits, "a prisoner who is serving a term of imprisonment of more than 1 year … may receive *credit toward* the service of the prisoner's sentence of up to 54 days for each year of the prisoner's sentence imposed by the court." 18 U.S.C. § 3624(b)(1) (emphasis added). The Supreme Court has interpreted "toward" to mean § 3624(b) "permits federal prison authorities to award prisoners credit *against* prison time as a reward for good behavior." *Barber v. Thomas*, 560 U.S. 474, 476 (2010) (emphasis added). In other words, good time credits "reduc[e] the time to be served" in prison. *Pepper v. United States*, 562 U.S. 476, 501 (2011).

"Toward" also means "against," not "in the direction of," when applying prior custody credits under 18 U.S.C. § 3585(b). *See Rivera-Perez*, 2026 WL 828530, at

12

*11 (Nathan, J., dissenting). In part, § 3585(b) states, "A defendant shall be given credit *toward* the service of a term of imprisonment for any time he has spent in official detention prior to the date the sentence commences." 18 U.S.C. § 3585(b) (emphasis added). The Supreme Court has explained that § 3585(b) determines "whether credit *against* [an individual's] sentence must be granted for time spent in 'official detention' before the sentence began" and, if so, "reduces a defendant's 'imprisonment' by the amount of time spent in 'official detention' before his sentence." *Reno v. Koray*, 515 U.S. 50, 59 (1995) (emphasis added). Like good time credits, prior custody credits reduce prison time for a prisoner who is currently serving prison time. They do not accelerate the start of the prison term. The same language appears in § 3632(d)(4)(C), and thus the logic holds: earned credits reduce "time in" supervised release for individuals currently on supervised release. *See, e.g., Azar v. Allina Health Servs.*, 587 U.S. 566, 574 (2019) (explaining that the court "does not lightly assume that Congress silently attaches different meanings to the same term in the same or related statutes").

The second sentence of § 3632(d)(4)(C) does not save the majority's flawed approach to the first. See *Rivera-Perez*, 2026 WL 828530, at *12 (Nathan, J., dissenting). The majority interprets § 3632(d)(4)(C) to repeat the same directive: the first sentence mandates that credits reduce time in prison, and the second sentence

13

mandates that BOP (the sole entity "in charge of … releasing [prisoners]" from federal prison) initiate early transfers out of prison. *Gonzalez*, 151 F.4th at 1085. Put differently, both sentences shorten prison time based on earned credits. Under this view, the first sentence performs no independent work. *See Gustafson v. Alloyd Co.*, 513 U.S. 561, 574 (1995) (directing courts to avoid "a reading [of statute] which renders some words altogether redundant").

The dissent is not mired with this problem. For the dissent, the first sentence assigns time credits to reduce "time in" supervised release, regardless of if the individual is in BOP custody. *See Rivera-Perez*, 2026 WL 828530, at *12 (Nathan, J., dissenting). And the second sentence directs BOP to reduce time in prison via early transfer. *See id.*

The dissent's reading aligns with Congress's intent to create a comprehensive system of incentives. *See id.* at *15. Whereas the majority and concurrence focus on the benefits derived for prisoners who *complete* programming, *see id.* at *9–10, the dissent's reading preserves the benefits that Congress created to drive prisoners into programming in the first place, *see id.* at *15 (Nathan, J., dissenting). The positive benefits of programming depend on maximizing participation, but the majority's reading "encourages prisoners to participate only to the extent that their credits can

14

apply toward early release from prison." *See ibid*. Contrary to the majority's reading, earned time credits should apply at "every step in the carceral process." *Id.* at *12.

## II. The panel's decision deepens a circuit split on a question of "exceptional importance," stripping liberty rights from thousands of individuals on federal supervised release in the Second Circuit.

Rehearing *en banc* is necessary to reconsider the merits of siding with the Sixth Circuit in its split with the Ninth Circuit. On one side, the Sixth Circuit held that "toward" means "in the direction of," and thus it concluded that time credits apply to accelerate the start of supervised release (not shorten time in supervised release). *Hargrove v. Healy*, 155 F.4th 530, 536 (6th Cir. 2025). On the other side, the Ninth Circuit held that "toward" means "for the partial payment of," meaning time credits can reduce time in supervised release. *Gonzalez v. Herrera*, 151 F.4th 1076, 1083 (9th Cir. 2025).

A petition for a writ of certiorari to the Sixth Circuit is now fully briefed before the Supreme Court. *See Hargrove v. Healey*, petition for cert. pending, No. 25-818 (filed Jan. 8, 2026). But this Court should not wait for the Supreme Court to pick a side. If the Supreme Court grants certiorari, several months will elapse before it reaches a decision. Now is the time to correct the panel's error.

As the Supreme Court weighs the *Hargrove* petition, individuals on supervised release in this Circuit stand to lose their accrued credits as they are

15

wrongfully kept on supervised release longer than Congress intended. This is not an abstract hypothetical. About 90.1% of federal sentences imposed in fiscal year 2024 included a term of supervised release,[1] and nearly two-thirds of the prison population is eligible to earn time credits.[2] Balanced against this volume of FSA time credit earners and prospective supervisees is the lack of bedspace available for prerelease custody.[3] As a result, many prisoners will be transferred to prerelease custody later than their time credits would otherwise allow. In turn, delayed placement in prerelease custody means prisoners will start supervised release with unused credits.

In the Second Circuit, these individuals cannot deploy their unused credits to shorten their time in supervised release. Supervised release affords restricted liberty based on a "defendant's promise to follow" strict conditions of release, *United States v. Peguero*, 34 F.4th 143, 161 (2d Cir. 2022), like curfew, location monitoring, drug tests, or search conditions. Indeed, supervised release is a form of "custody" for habeas purposes because it imposes limitations not imposed on society at large. *See Scanio v. United States*, 37 F.3d 858, 860 (2d Cir. 1994). Individuals on supervised

---

[1] *See* U.S. SENT'G COMM'N, *Supervised Release* (accessed Apr. 7, 2026), available at https://www.ussc.gov/research/quick-facts/supervised-release.

[2] *See* OFF. OF THE ATT'Y GEN., DEP'T OF JUST., *First Step Act: Annual Report* 18–19 (June 2024), available at https://www.bop.gov/inmates/fsa/docs/first-step-act-annual-report-june-2024.pdf.

[3] *See, e.g.,* Oversight of the Fed. Bureau of Prisons: Hearing Before the Subcomm. on Crime and Fed. Gov't Surveillance of the H. Comm. on the Judiciary 42–43 (July 23, 2024), available at https://www.govinfo.gov/content/pkg/CHRG-118hhrg56426/pdf/CHRG-118hhrg56426.pdf (testimony of BOP Director Colette Peters).

16

release face the constant threat of reimprisonment, even for technical violations of release.[4] Individuals on supervised release thus hold a substantial interest in shortening their time in supervised release. Yet unless this Court changes course, these individuals will bear the cost of the majority's decision and lose out on the opportunity to use earned credits to shorten their time in supervision.

## CONCLUSION

This Court should grant this petition for rehearing *en banc*.

Dated: April 9, 2026

Respectfully submitted,

CHARLES F. WILLSON
FEDERAL DEFENDER
DISTRICT OF CONNECTICUT

*/s/ Charles F. Willson*
Federal Defender

*/s/ Robert H. Hendricks*
Research & Writing Attorney

*Attorneys for Petitioner-Appellee,*
*Raul Rivera-Perez*

---

[4] About 25% of supervised release cases closed in fiscal year 2024 were closed based on a revocation for a technical violation of release. *See* U.S. COURTS, *Federal Probation System -- Post-Conviction Supervision Cases Closed with and without Revocation* at Tbl. E-7A (accessed Apr. 14, 2026), available at
https://www.uscourts.gov/sites/default/files/2024-12/jb_e7a_0930.2024.pdf.

## CERTIFICATIONS

The undersigned counsel certifies that this petition complies with the type-volume limitations set forth by Fed. R. App. 40(d)(3)(A), in that there are 3,891 words in this brief. The undersigned counsel further certifies that the foregoing has been served on counsel for all parties via the Court's CM/ECF system on the date reflected on the case docket.

*/s/ Charles F. Willson*
Federal Defender

<u>Rivera-Perez v. Stover</u>, No. 25-149

DENNIS JACOBS, *Circuit Judge*, concurring:

I concur entirely in the reasoning of the Court. I write separately to underline two points: (1) the one-word ambiguity in the statute is dispelled by designation of the Bureau of Prisons as the implementing authority; and (2) there is no such thing as wasted or unused time credits.

I.

As explained in the Opinion of the Court, the first sentence of 18 U.S.C. § 3632(d)(4)(C) contains an ambiguity that is sorted out in the second.

The application of time credits "toward time in prerelease custody or supervised release" is ambiguous because "toward," like "to," is a protean word and, as used here, it can mean either to *approach* or to *abate*: either to shorten the time toward the beginning of a period or to shorten the time of the period itself. The second sentence resolves the ambiguity: "The Director of the Bureau of Prisons shall transfer eligible prisoners, as determined under section 3624(g), into prerelease custody or supervised release." 18 U.S.C. § 3632(d)(4)(C). The ambiguity is resolved by placing implementation in the hands of the Bureau of Prisons, which can do only what it can do. The BOP can reduce the time toward prerelease custody, *id.* §§ 3624(g)(1), 3624(g)(10), and it can reduce the time

ADD 1

CERTIFIED COPY ISSUED ON 03/26/2026

toward supervised release (by shortening a term of imprisonment for up to 12 months), *id.* § 3624(g)(3). The BOP can also abate a term of prerelease custody. *Id.* §§ 3624(c)(1), 3624(g)(1). But the BOP most assuredly has no power to shorten the time imposed by a judge for supervised release. Designation of the BOP to implement Section 3632(d)(4)(C) definitionally limits that process to the power that the Bureau of Prisons can exert.

Supervised release is a sentence imposed by a court, never by the BOP. It is administered by Probation, not the BOP. *See id.* § 3624(e) (providing that "supervised release commences on the day the person is released from imprisonment" to "the supervision of a probation officer"). And determining the length of a term of supervised release requires, *inter alia*, considering the factors in 18 U.S.C. § 3553(a), which courts apply, and which the Bureau of Prisons does not. *See id.* § 3583(c).

The district court's order acknowledges this disconnect between means and ends. That is why the court had to order implementation by an extra-statutory contraption, directing the BOP to "calculate the number of Rivera-Perez's unused FSA time credits and inform the U.S. Probation Office for the Middle District of North Carolina of that calculation so that it can apply those

2

ADD 2

credits toward Rivera-Perez's term of supervised release." *Rivera-Perez v. Stover*, 757 F. Supp. 3d 204, 215 (D. Conn. 2024). The power that the BOP lacks is thus assigned to somebody else – Probation (in another district) – which, not incidentally, also lacks the judicial power that alone can shorten a court-ordered term of supervised release. Courts can indeed reduce (or eliminate) a term of supervised release, but only after considering the Section 3553(a) factors and only after the defendant has spent at least one year on supervised release. 18 U.S.C. § 3583(e)(1). It is telling that the district court's circuitous remedy is found nowhere in the statute.

II.

The overarching error of the district court is to treat time credit as if it was (in the district court's inapt example) a store credit – which is lost unless it is applied. That error drives the felt need to find a use for credits that the district court deemed wasted otherwise. But a time credit is a benefit in itself.

It must be supposed that persons in prison benefit from drug treatment, counseling in anger management, cognitive behavioral treatment, mentoring, trauma counseling, and vocational training. *See* 28 C.F.R. § 523.41(a). Such self-help measures are often undertaken by people who are at liberty. So time credits

3

ADD 3

are not wasted if they exceed the number used to advance the date of prerelease custody or supervised release, or to advance the length of time in prerelease custody. Credits remain useful for what lies beyond custody: life outside prison. The idea that time credits can be a waste or surplusage is a misunderstanding of the whole system.

A True Copy
Catherine O'Hagan Wolfe, Clerk
United States Court of Appeals, Second Circuit

ADD 4

25-149
*Rivera-Perez v. Stover*

ALISON J. NATHAN, *Circuit Judge*, dissenting:

The provision at issue allows federal prisoners to apply "[t]ime credits . . . toward time in prerelease custody or supervised release." 18 U.S.C. § 3632(d)(4)(C). The majority concludes that credits under this provision do not apply to reduce "time in prerelease custody or supervised release," *id.*, but instead apply to reduce the one thing the provision does not say: time in prison. Because all the textual clues lead me to believe that the statute means what it says— prisoners may apply their First Step Act (FSA) credits to shorten their "time in prerelease custody or supervised release"—I would hold that Rivera-Perez's habeas petition is not moot because he may use his remaining FSA credits toward his term of supervised release.

Begin where the majority and I agree: The ambiguity of the word "toward" in isolation. Petitioner Rivera-Perez contends that "toward" as used here means "[i]n furtherance or partial fulfillment of." AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE (5th ed. 2018). Adopting his definition, the statute would read: "Time credits . . . shall be applied [in partial fulfillment of] time in prerelease custody or supervised release." That is a natural reading of the text; it allows an individual to essentially "cash in" his FSA credits to shorten time spent in

1

CERTIFIED COPY ISSUED ON 03/26/2026

ADD 5

prerelease custody or supervised release.  On the other hand, Warden Stover argues that "toward" in this context means "[i]n the direction of," *Toward*, BLACK'S LAW DICTIONARY (11th ed. 2019), such that "credits . . . shall be applied [in the direction of] time in prerelease custody or supervised release."  That definition of "toward" contemplates prisoners applying credits to accelerate the start date of their prerelease custody or supervised release—put differently, to leave prison earlier—and while that reading is less natural, it is at least plausible.[1]  "When words have several plausible definitions, context differentiates among them." *United States v. Hansen*, 599 U.S. 762, 775 (2023).  I thus begin with the closest context clues, which are the neighboring words in the first sentence of the statute. *See id.* at 776 ("[A] word capable of many meanings is refined by its neighbors[.]").

The words surrounding "toward" favor Rivera-Perez's reading of the statute.  The first sentence, in full, reads: "Time credits earned under this paragraph by prisoners who successfully participate in recidivism reduction programs or productive activities shall be applied toward time in prerelease

---

[1] That this understanding is less natural is made apparent by the concurrence:  In order to make Stover's proposed reading of "toward" sensible, the concurrence must use the word itself in its definition. *See ante* at 1 (the word toward "can mean either to approach or to abate:  either to shorten the time *toward* the beginning of a period or to shorten the time of the period itself") (emphasis altered).

2

custody or supervised release." 18 U.S.C. § 3632(d)(4)(C). The most conspicuous clue in that sentence is "time in." Congress could have omitted "time in" and simply wrote that FSA credits apply "toward" supervised release. Stover appears to overlook "time in" altogether; his interpretation would remain the same regardless of its existence. But Congress indicated that credits specifically apply toward the *time in* supervised release. Giving credence to that choice, FSA credits appear to apply to the time one spends *during* supervised release, not, as Stover argues, to the time one spends in prison *before* reaching supervised release. *See Gonzalez v. Herrera*, 151 F.4th 1076, 1083 (9th Cir. 2025) (the statute "does not mention the period of time preceding supervised release, it identifies only time *in* prerelease custody or supervised release." (quotation marks omitted)).[2] If Congress intended for FSA credits to shorten time in prison only, identifying the

---

[2] The majority claims that Stover's interpretation of the statute aligns with most circuits to consider the issue. But only two circuits have published opinions addressing this question of statutory interpretation: the Ninth Circuit and the Sixth Circuit (over dissent). *See Gonzalez*, 151 F.4th 1076; *Hargrove v. Healy*, 155 F.4th 530 (6th Cir. 2025). Those circuits came to opposite conclusions. The majority's citations to cases from the Eleventh, Fourth, and Fifth Circuits are unavailing—all are unpublished, non-precedential dispositions, and two of those cases addressed the issue in single paragraphs devoid of analysis. *See Guerriero v. Miami RRM*, No. 24-10337, 2024 WL 2017730 (11th Cir. May 7, 2024) (per curiam); *United States v. Malik*, No. 24-7073, 2025 WL 973003 (4th Cir. Apr. 1, 2025) (per curiam); *Stinson v. Martinez*, No. 24-30793, 2025 WL 2017872 (5th Cir. July 18, 2025) (per curiam).

object of those credits as "time in prerelease custody or supervised release" is an odd way to do so.

Indeed, Stover's understanding of the statute is further undercut by the words Congress chose *not* to use. At least twice before enacting the FSA, Congress created crediting schemes that expressly allow for the use of credits to shorten time spent in prison. *See* 18 U.S.C. § 3624(b)(1) ("[A] prisoner who is serving a term of imprisonment of more than 1 year . . . may receive credit toward the service of the prisoner's sentence[.]"); *id.* § 3585(b) ("A defendant shall be given credit toward the service of a term of imprisonment for any time he has spent in official detention prior to the date the sentence commences[.]"). There, Congress made it clear to what end credits apply: "the service of the prisoner's sentence" or his "term of imprisonment." It is telling, then, that Congress took a different tack here: FSA credits apply "toward time in" supervised release. *Id.* § 3632(d)(4)(C). "That Congress used different language in these two provisions strongly suggests that it meant for them to work differently." *Stanley v. City of Sanford*, 606 U.S. 46, 53 (2025).

The other words neighboring "toward" in the first sentence also cut in favor of Rivera-Perez's position. The provision speaks of credits "earned" under the

4

FSA that "shall be applied" toward time in supervised release. Both of those choices suggest a system by which FSA credits are "earned" and then "spent" (via application) to offset the total time spent in supervised release, not to bring the beginning of that time closer. In the good-time credit context, in which prisoners earn credits for good behavior while incarcerated, *see* 18 U.S.C. § 3624(b)(1), courts have long adopted this common-sense understanding of "earning" and "spending" credits to shorten time incarcerated. There, we say that the use of credits "toward the service of the prisoner's sentence," *id.*, means that prisoners may essentially cash in those credits to shorten the duration of their sentence, not to bring the end of their incarceration closer. *See, e.g., Barber v. Thomas*, 560 U.S. 474, 478, 483 (2010) (describing good-time credits as an "offset[]" to and "credit against" a sentence); *see also Hargrove v. Healy*, 155 F.4th 530, 539 (6th Cir. 2025) (Moore, J., dissenting) ("[C]ourts, most notably the Supreme Court, have interpreted the word 'toward' in the sentencing-credit context to mean that the credit should *reduce* or count *against* the prisoner's sentence.").

There is no reason why FSA credits applied "toward" time in supervised release would not work the same way. And considering the word's ordinary usage, that reading makes sense. One applies store credit *toward* the cost of an

5

item "in partial fulfillment" of its cost, not to bring its cost closer. And one applies earned-time credits *toward* time in supervised release in the same way: "in partial fulfillment" of that time, not to bring that time closer. Considered in context with the rest of the sentence in which we find it, I would conclude that the only reasonable understanding of the word "toward" is that proposed by Rivera-Perez.

Turn now to the second sentence of the provision: "The Director of the Bureau of Prisons shall transfer eligible prisoners, as determined under section 3624(g), into prerelease custody or supervised release." 18 U.S.C. § 3632(d)(4)(C). The majority believes "this second sentence confirms Stover's reading of the statute" because it cross-references Section 3624(g), which itself allows prisoners to apply FSA credits to shorten their time in prison. *Ante* at 13. In my view, however, that is precisely why Stover's interpretation is wrong. "[W]e must normally seek to construe Congress's work so that effect is given to all provisions[.]" *Ysleta Del Sur Pueblo v. Texas*, 596 U.S. 685, 698–99 (2022) (quotation marks omitted). But under Stover's interpretation, our statute and the cross-referenced Section 3624(g) both allow for the same act: the application of FSA credits to leave prison earlier.

6

ADD 10

When Congress created the FSA credit system in Section 3632, it also added the cross-referenced provision, Section 3624(g). *See* Pub. L. No. 115-391, 132 Stat. 5194 (2018). One section of that added provision reads: "If the sentencing court included as a part of the prisoner's sentence a requirement that the prisoner be placed on a term of supervised release after imprisonment . . . the Director of the Bureau of Prisons may transfer the prisoner to begin any such term of supervised release at an earlier date, not to exceed 12 months, based on the application of time credits under section 3632." 18 U.S.C. § 3624(g)(3). That provision plainly allows prisoners to "spend" their FSA credits to reduce their time spent incarcerated (or, as the statute puts it, "to begin any such term of supervised release at an earlier date"). According to the majority, that is also what our statute does. But it is hard to imagine that Congress created two different mechanisms—enacted at the same time—to allow the same use of credits. Indeed, "the canon against surplusage is strongest when an interpretation would render superfluous another part of the same statutory scheme." *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 386 (2013).

There is a more harmonious way to fit these two provisions together. I would read the first and second sentences of our statute to address two different situations in which FSA credits apply. The first sentence allows prisoners to apply

7

ADD 11

FSA credits "toward time in prerelease custody or supervised release," thereby reducing time spent on those statuses, while the second sentence allows "eligible prisoners" to apply FSA credits to transfer early from prison "into prerelease custody or supervised release" in accordance with Section 3624(g), thereby reducing time spent in prison. This reading avoids surplusage between our statute and Section 3624(g) and, sensibly, allows prisoners to "spend" their FSA credits at every step in the carceral process.[3]

The majority disagrees with this reading of Section 3632(d)(4)(C) largely because of its heading: "Application of time credits toward prerelease custody or supervised release." On the majority's telling, this heading outlines only one situation in which FSA credits apply, and thus it concludes that Congress did not intend the first and second sentences of our statute to direct different uses of credits. *See ante* at 19–20. Setting aside that the heading of a subsection cannot "override the plain words of a statute," *Dubin v. United States*, 599 U.S. 110, 121

---

[3] The majority claims that adopting Rivera-Perez's reading would allow prisoners to reduce time spent in prerelease custody in favor of *more* time in prison—which "defies logic and common sense because prisoners (presumably) want *more* time in prerelease custody (rather than prison), not less." *Ante* at 25. I agree with that conclusion; it would be irrational for the statute to allow prisoners to spend FSA credits to sit in prison longer. But that is not what Rivera-Perez's interpretation does. Instead, it allows prisoners to "spend" credits to reduce their time spent in prerelease custody in favor of *more* time spent on supervised release, a less restrictive step in the carceral process.

8

ADD 12

(2023) (quotation marks omitted), Congress often uses concise, yet imperfect headings when drafting statutes—in fact, it did so in the very same section of the FSA. Consider 18 U.S.C. § 3632(b), entitled "[a]ssignment of evidence-based recidivism reduction programs." A reader of that heading might reasonably conclude that its text applies only to the "[a]ssignment of evidence-based recidivism reduction programs." *Id.* Read further, however, and the text of that statute clearly governs the assignment of *both* "evidence-based recidivism reduction programming *and* productive activities," *id.* (emphasis added), which are two distinct types of courses for which prisoners may earn FSA credits, *see id.* §§ 3635(3), (5). Relying on Section 3632(b)'s heading to narrow its application to only "evidence-based recidivism reduction programs" would be inappropriate. *See U.S. ex rel. Thistlethwaite v. Dowty Woodville Polymer, Ltd.*, 110 F.3d 861, 866 (2d Cir. 1997) ("Headings and titles are not meant to take the place of the detailed provisions of the statutory text[.]" (cleaned up)). So too here. Narrowing the reach of our statute based on its heading would not comport with its text.

The majority raises just one more textual argument against Rivera-Perez's interpretation, relying now on a general directive to the Attorney General to promulgate a "risk and needs assessment system" in accordance with the FSA. *See*

9

*ante* at 15 n.5 (citing 18 U.S.C. § 3632(a)). That section, 3632(a), contemplates the BOP using that "risk and needs assessment system" to "determine when a prisoner is ready to transfer into prerelease custody or supervised release in accordance with section 3624." 18 U.S.C. § 3632(a)(7). The majority claims that this language indicates Congress's intent to allow *only* early transfers into supervised release. But the language of Section 3632(a)(7) is entirely consistent with Rivera-Perez's reading of the statute. That is because the subsection speaks of "transfer[s] into . . . supervised release *in accordance with section 3624*," *id.* (emphasis added), and Section 3624, unsurprisingly, allows the use of FSA credits to transfer early into supervised release, *see id.* § 3624(g)(3). If anything, Congress's wording in Section 3632(a)(7) reaffirms that Section 3624 is designed to allow the use of credits to shorten a term of imprisonment (via an early transfer), while the first sentence of our statute is designed to provide for a different use of credits.

Beyond those two points, much of the majority's concern with Rivera-Perez's reading of the statute springs not from the statutory text, but from perceived negative policy consequences. First, the majority has safety concerns; it fears that long-term prisoners with more time to earn FSA credits will eventually be able to wipe out large chunks (or even all) of their terms of supervised release.

10

ADD 14

The majority also has administrability concerns, worrying that district courts will be left to craft "unusual . . . remed[ies]" in order to effectuate the application of FSA credits to terms of supervised release. *Ante* at 24 n.12.

There are simple answers to both concerns. Take administrability first. In my view, the use of FSA credits to shorten a term of supervised release can follow the well-trodden path of the good-time credit system. There, prisoners who have earned credits for good behavior may put them "toward the service of [their] sentence." 18 U.S.C. § 3624(b)(1). But that crediting process has never involved the courts. Instead, the Bureau of Prisons (BOP) merely recalculates the end date of the prisoner's sentence based on an application of his good-time credits. The FSA crediting system can operate in much the same way. When an individual transitions from prison onto supervised release, he is "released by the [BOP] to the supervision of a probation officer[.]" *Id.* § 3624(e). During that transition, BOP can communicate the individual's remaining FSA credits to Probation, who will then take account of those credits when calculating the appropriate end date of supervised release. This administration fits neatly into the way federal crediting systems have long operated—no specific textual direction or unusual remedy needed.

11

As to the majority's concern that dangerous prisoners will use FSA credits to greatly reduce their terms of supervised release, that fear is largely unfounded. Indeed, Congress created the FSA crediting scheme with safety nets designed to guard against that precise issue; it is not our place to question their efficacy. First, the FSA excludes many individuals convicted of the most serious crimes from earning credits at all. *See* 18 U.S.C. § 3632(d)(4)(D); *see also* 164 Cong. Rec. S7642 (Dec. 17, 2018) (statement of Sen. Cornyn) (the FSA "specifically lists 48 offenses that disqualify offenders from earning time credits," a list created with "the most modern social science evaluation tools to find out who is at low risk of reoffending"). That list of excluded convictions includes dozens of violent offenses, from homicide and sexual abuse to the use of a firearm during any crime of violence or drug trafficking crime.[4] *See* 18 U.S.C. § 3632(d)(4)(D). Next, for those prisoners who are not immediately disqualified from earning credits, Congress

---

[4] The majority appears unconvinced that this list of excluded offenses is comprehensive enough to stop dangerous individuals from benefitting from FSA credits. It gives the example of "an individual convicted of participating in a large narcotics operation, involving hundreds of kilograms of cocaine," who is not eligible to use his FSA credits for early transfer out of prison, and who therefore may "use those earned-time credits to substantially reduce (or even potentially eliminate entirely) his term of supervised release." *Ante* 22 n.10. But that situation is exceedingly unlikely: Such an offender would also have a mandatory minimum 5-year term of supervised release, requiring nearly 2,000 FSA credits to eliminate entirely. *See* 21 U.S.C. § 841(b)(1)(A).

12

created other safeguards. For instance, the number of credits a prisoner can earn varies based on his BOP-designated risk of recidivism, *id.* § 3632(d)(4)(A); BOP may take away credits for bad behavior in prison, *id.* § 3632(e); and BOP's "decision to award earned time credit is discretionary" in the first place because "'[s]uccessful completion' of qualifying programs is 'determin[ed] by [BOP] staff,'" *United States v. James*, 151 F.4th 28, 42 (2d Cir. 2025) (quoting 28 C.F.R. § 523.41(c)(2)). All of these guardrails are designed to ensure that only prisoners who are prepared to safely return to their communities may accumulate FSA credits.

The majority also expresses concern that Congress delineated eligibility requirements for individuals using credits to transfer early out of prison, *see* 18 U.S.C. § 3624(g), but did not do so for those using credits to transfer early out of supervised release. That is true: Section 3624(g) does require, for example, a prisoner to demonstrate a "low risk to recidivate" before he is eligible to leave prison early; Congress did not impose such a requirement on early transferees out of supervised release. *Id.* § 3624(g)(1)(D)(ii). But that difference is unsurprising. It makes sense that Congress would impose strict requirements on individuals leaving prison early but not impose those same requirements on individuals like

13

Rivera-Perez, who are already back in their communities and simply using their credits to shorten time spent on supervised release. This disparity in eligibility requirements does not persuade me that Congress meant something different when it wrote that prisoners may apply credits "toward time in . . . supervised release." *Id.* § 3632(d)(4)(C).

But regardless of my judgment on the matter, the majority's safety concerns have a more fundamental problem: They run headlong into *Congress's* judgment. Under the FSA, prisoners earn credits for participation in evidence-based recidivism reduction programs—programs that are "designed to help prisoners succeed in their communities upon release from prison"—and for productive activities, "designed to allow prisoners . . . to remain productive and thereby maintain a minimum or low risk of recidivating[.]" 18 U.S.C. §§ 3635(3)(B), (5). "Research shows that such programs hold significant promise to reduce recidivism and improve individual outcomes following release," which serves "the fiscal interest of the government to reduce recidivism" and "the public safety interest as well." H.R. Rep. No. 115-699, at 22 (2018). It is clear, then, that Congress structured this system based on one core belief: Prisoners who complete more programs (and thus earn more FSA credits) present empirically lower risks of

14

ADD 18

recidivism upon their return, saving the Government money and keeping communities safer. That is why FSA credits may be redeemed for benefits at all. At bottom, the majority's concerns about the potential consequences of individuals using FSA credits to shorten (even greatly) their terms of supervised release fights that judgment, or at least ignores it. But it is not our job to consider the value of these recidivism-reducing programs or to decide whether they really *do* make communities safer. *Cf. Henson v. Santander Consumer USA Inc.*, 582 U.S. 79, 90 (2017) ("[R]easonable people can disagree with how Congress balanced the various social costs and benefits in this area," but "these are matters for Congress, not this Court, to resolve").

That brings me to the purpose of the FSA. In light of Congress's clear belief that participation in these programs will reduce recidivism, it is equally clear that Congress created FSA credits to incentivize that participation. *See* H.R. Rep. No. 115-699, at 28 (the FSA "[e]stablishes incentives and rewards for prisoners to participate in programming and activities," including "earned time credits"). Unlike the good-time credit system, which caps credit-earning at 54 per year, the FSA contains no such cap. *See* 18 U.S.C. § 3624(b)(1); *id.* § 3632(d)(4)(C). Instead, all signs point to a statutory scheme intended to incentivize as much engagement

15

ADD 19

in recidivism-reducing programs as possible. But by narrowing the situations in which individuals may apply their FSA credits, Stover's interpretation causes those credits to lose their incentivizing value. Rather than encourage engagement in as many programs as possible, Stover's reading encourages prisoners to participate only to the extent that their credits can apply toward early release from prison. But on Rivera-Perez's reading, in which FSA credits can be used at every step of the carceral process, those credits retain their maximum value as incentives. In a scheme self-consciously designed to increase "participa[tion] in programming and activities," H.R. Rep. No. 115-699, at 28, that choice makes much more sense.

The majority responds that prisoners engaged in this programming have "presumably obtained useful benefits" beyond FSA credits—things like vocational training, financial skills, and anger management. *Ante* at 29. I do not doubt that many of those who complete these programs gain valuable skills. But Congress created a scheme in which *credits* are the incentive—not vocational training, financial skills, or anger management. *See James*, 151 F.4th at 41–42. If Congress believed that those valuable byproducts were enough to incentivize participation, there would be no reason to create FSA credits at all. Instead, it created a system—built on credits—designed to drive as much engagement as possible in programs

16

that "help prisoners succeed in their communities upon release from prison[.]" 18 U.S.C. § 3635(3)(B). In my view, Rivera-Perez's reading best comports with that purpose.

Finally, the majority contends that allowing the use of FSA credits to shorten a term of supervised release does not serve the FSA's broader goal of facilitating rehabilitation, "because supervised release itself 'fulfills rehabilitative ends[.]'" *Ante* at 30 (quoting *United States v. Johnson*, 529 U.S. 53, 59 (2000)). But that argument overlooks how the specific purpose of the FSA and the broader purposes of supervised relief are complementary. If Congress determined in enacting the FSA that high credit earners are more likely to be safe and successful upon release from prison, that judgment is entirely consistent with those high earners using their credits to finish supervised release earlier. Put differently, if a prisoner who engages in recidivism-reducing programs (and earns FSA credits for doing so) is rehabilitating, it makes perfect sense for Congress to judge that he has less need for "supervision and training programs after release." *Johnson*, 529 U.S. at 59 (quotation marks omitted). That FSA recidivism-reducing programs and supervised release in general are designed to accomplish the same goal— "provid[ing] rehabilitation to a defendant," *id.* (quotation marks omitted)—only

17

ADD 21

makes Rivera-Perez's interpretation of the FSA more consistent with its purpose, not less.

Rivera-Perez's understanding of the FSA crediting scheme thus comports with Congress's specific purpose in the FSA, with its broader purpose in supervised release, and—most importantly—with the text it chose to write.

\* \* \*

This provision allows federal prisoners to apply "[t]ime credits . . . toward time in prerelease custody or supervised release."  18 U.S.C. § 3632(d)(4)(C).  Both Rivera-Perez and Stover propose facially plausible readings.  But the statute's text, context, structure, and purpose all point me to Rivera-Perez's understanding: When credits apply "toward time in" supervised release, they shorten that time.

For those reasons, I respectfully dissent.

A True Copy
Catherine O'Hagan Wolfe, Clerk
United States Court of Appeals, Second Circuit

ADD 22

25-149
*Rivera-Perez v. Stover*

# United States Court of Appeals
## for the Second Circuit

_____

August Term 2025

Argued:  November 25, 2025     Decided:  March 26, 2026

No. 25-149

_____

RAUL RIVERA-PEREZ,

*Petitioner-Appellee,*

— v. —

RICK STOVER, WARDEN,

*Respondent-Appellant.*[*]

_____

Before:     JACOBS, BIANCO, AND NATHAN, *Circuit Judges.*

Respondent-Appellant Rick Stover, the Warden of the Federal Correctional Institution in Danbury, Connecticut, appeals from a judgment of the United States District Court for the District of Connecticut (Stefan R. Underhill, *Judge*), entered on November 19, 2024, granting Petitioner-Appellee Raul Rivera-Perez's *pro se* petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2241.  Rivera-Perez's petition alleged that the Bureau of Prisons miscalculated the time credits he had earned under the First Step Act ("FSA"), 18 U.S.C. § 3632(d)(4)(C), and thereby

_____

[*] The Clerk of Court is directed to amend the caption as set forth above.

CERTIFIED COPY ISSUED ON 03/26/2026

ADD 23

illegally prevented his transfer from prison to prerelease custody. However, after Rivera-Perez filed the petition, he was transferred from prison into a residential reentry center ("RRC"), a form of prerelease custody, and Stover argued that the petition was moot. The district court then *sua sponte* construed the petition as seeking to apply Rivera-Perez's remaining FSA time credits to reduce the length of his term of supervised release, and granted the petition, concluding that the FSA enables—and, in fact, *requires*—application of earned-time credits to reduce a prisoner's term of supervised release pursuant to Section 3632(d)(4)(C).

On appeal, Stover argues that FSA time credits allow a prisoner to begin prerelease custody or supervised release early, but cannot be used to reduce a prisoner's term of supervised release. Therefore, according to Stover, once Rivera-Perez was transferred to prerelease custody, his case became moot.

We conclude that Section 3632(d)(4)(C) does not allow earned-time credits to be used to reduce a prisoner's term of supervised release. As such, Rivera-Perez's petition became moot once he was transferred to an RRC. Accordingly, we **VACATE** the judgment of the district court and **REMAND** with instructions to dismiss this case as moot.

Judge Jacobs concurs in a separate opinion.

Judge Nathan dissents in a separate opinion.

> J. BRIAN MESKILL, (Sandra S. Glover, *on the brief*), Assistant United States Attorneys, for Marc H. Silverman, Acting United States Attorney for the District of Connecticut, New Haven, Connecticut, *for Respondent-Appellant*.
>
> CHARLES F. WILLSON, Assistant Federal Defender, for Terence S. Ward, Federal Defender, District of Connecticut, Hartford, Connecticut, *for Petitioner-Appellee*.

2

JOSEPH F. BIANCO, *Circuit Judge*:

Respondent-Appellant Rick Stover, the Warden of the Federal Correctional Institution in Danbury, Connecticut ("FCI Danbury"), appeals from a judgment of the United States District Court for the District of Connecticut (Stefan R. Underhill, *Judge*), entered on November 19, 2024, granting Petitioner-Appellee Raul Rivera-Perez's *pro se* petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2241. Rivera-Perez's petition alleged that the Bureau of Prisons ("BOP") miscalculated the time credits he had earned under the First Step Act ("FSA"), 18 U.S.C. § 3632(d)(4)(C), and thereby illegally prevented his transfer from prison to prerelease custody. However, after Rivera-Perez filed the petition, he was transferred from prison into a residential reentry center ("RRC"), a form of prerelease custody,[1] and Stover argued that the petition was moot. The district court then *sua sponte* construed the petition as seeking to apply Rivera-Perez's remaining FSA time credits to reduce the length of his term of supervised release, and granted the petition, concluding that the FSA enables—and, in fact, *requires*—

---

[1] "Prerelease custody" includes placement in home confinement or an RRC. *See* 18 U.S.C. § 3624(g)(2). Prerelease custody is part of a prisoner's term of imprisonment because, "[w]hile assigned to [home confinement or] an RRC, inmates remain in BOP custody." *United States v. Rasheed*, 981 F.3d 187, 190 (2d Cir. 2020).

ADD 25

application of earned-time credits to reduce a prisoner's term of supervised release pursuant to Section 3632(d)(4)(C).

On appeal, Stover argues that FSA time credits allow a prisoner to begin prerelease custody or supervised release early, but cannot be used to reduce a prisoner's term of supervised release. Therefore, according to Stover, once Rivera-Perez was transferred to prerelease custody, his case became moot.

We conclude that Section 3632(d)(4)(C) does not allow earned-time credits to be used to reduce a prisoner's term of supervised release. As such, Rivera-Perez's petition became moot once he was transferred to an RRC. Accordingly, we **VACATE** the judgment of the district court and **REMAND** with instructions to dismiss this case as moot.

## BACKGROUND

### I.     The First Step Act

The First Step Act of 2018, Pub. L. No. 115-391, 132 Stat. 5194 (2018), directed the BOP to develop a "risk and needs assessment system" to, *inter alia*, "provide incentives and rewards for successful participation in evidence-based recidivism reduction programs or productive activities." 18 U.S.C. § 3632(a)(6). To do so, the FSA created a system of "time credits" which allows certain prisoners to earn ten

4

days of time credits for every thirty days of successful participation in recidivism reduction programming or certain productive activities. *Id.* § 3632(d)(4)(A)(i). [2] The application of earned-time credits is governed by Section 3632(d)(4)(C), which reads as follows:

> **(C) Application of time credits toward prerelease custody or supervised release.** Time credits earned under this paragraph by prisoners who successfully participate in recidivism reduction programs or productive activities shall be applied toward time in prerelease custody or supervised release. The Director of the Bureau of Prisons shall transfer eligible prisoners, as determined under section 3624(g), into prerelease custody or supervised release.

*Id.* § 3632(d)(4)(C).

## II.  Facts and Procedural History

In 2001, Rivera-Perez was sentenced in the District of Puerto Rico to life imprisonment, to be followed by a five-year term of supervised release, for conspiring to distribute cocaine, in violation of 21 U.S.C. §§ 846, 841(a)(1). The district court later reduced that sentence to 360 months' imprisonment, but

---

[2] Prisoners who the BOP determines "to be at a minimum or low risk for recidivating" and who "ha[ve] not increased their risk of recidivism" in their last two assessments "earn an additional 5 days of time credits for every 30 days of successful participation in evidence-based recidivism reduction programming or productive activities." 18 U.S.C. § 3632(d)(4)(A)(ii).

5

ADD 27

retained the five-year term of supervised release.

On October 13, 2023, while Rivera-Perez was serving his sentence of imprisonment at FCI Danbury, he filed a *pro se* petition for a writ of habeas corpus, pursuant to 28 U.S.C. § 2241, which challenged the execution of his sentence. In particular, Rivera-Perez asserted that the BOP "failed to properly calculate [his] earned First Step Act time credits" and has "refused to release [him] on home confinement although he is eligible." App'x at 11. Accordingly, the petition sought "immediate release to home confinement." *Id.* at 18.

By the time Rivera-Perez filed his habeas petition, he had accrued over 700 credits under the FSA. The BOP applied 365 of those credits to advance the date on which Rivera-Perez would start supervised release, but the remaining 415 credits were "unused," *i.e.*, not being applied for Rivera-Perez's benefit. According to Stover, some of the unused credits could have been used to place Rivera-Perez in prerelease custody earlier, but there was no bedspace available in an RRC until January 2024. On January 17, 2024, Rivera-Perez was transferred to an RRC, and Stover then moved to dismiss the petition, arguing that it was moot because Rivera-Perez had received the relief that his petition sought.

Ten months after Stover moved to dismiss, the district court entered a text-

6

only order which acknowledged that Rivera-Perez's request for release to prerelease custody was moot. However, "[l]iberally constru[ing]" Rivera-Perez's petition, the district court informed the parties that it "read[] the habeas petition . . . as raising the issue [of] whether Rivera-Perez's unused FSA time credits should be applied to reduce his term of supervised release." *Rivera-Perez v. Stover*, No. 23-cv-1348, (D. Conn. Oct. 17, 2024), Dkt. No. 16.

Over Stover's objection, the district court granted the petition (so construed). *See generally Rivera-Perez v. Stover*, 757 F. Supp. 3d 204 (D. Conn. 2024). The district court held that "[b]ased on the plain language of the statute, read in context . . . FSA credits *can*—and in fact *must*, according to the mandatory language of section 3632(d)(4)(C)—be applied to reduce a term of supervised release." *Id.* at 214 (emphasis in original). The district court thus directed the BOP "to calculate the number of Rivera-Perez's unused FSA time credits and inform the U.S. Probation Office for the Middle District of North Carolina of that calculation so that it can apply those credits toward Rivera-Perez's term of supervised release."[3] *Id.* at 215. Stover timely appealed from the district court's judgment. Between entry of the

---

[3] By the time of the district court's order, Rivera-Perez resided at an RRC in the Middle District of North Carolina. *See Rivera-Perez*, 757 F. Supp. 3d at 209 & n.6.

7

district court's judgment, and Stover filing the notice of appeal, Rivera-Perez was released from the RRC (and thus released from the custody of the BOP) and began his term of supervised release. *See* BOP Inmate Locator, https://www.bop.gov/inmateloc/ [https://perma.cc/FVJ8-4DAN] (last visited Mar. 19, 2026) (indicating that Rivera-Perez is not in BOP custody as of December 3, 2024).

## DISCUSSION

### I.       Standard of Review

Habeas petitions filed under 28 U.S.C. § 2241—like Rivera-Perez's—"challenge[] the *execution* of a federal prisoner's sentence, including such matters as the administration of parole, computation of a prisoner's sentence by prison officials, prison disciplinary actions, prison transfers, type of detention[,] and prison conditions." *Jiminian v. Nash*, 245 F.3d 144, 146 (2d Cir. 2001) (emphasis in original). We review a district court's grant or denial of a Section 2241 petition *de novo*. *Jordan v. Lamanna*, 33 F.4th 144, 150 (2d Cir. 2022). In addition, our review of statutory interpretation questions is *de novo*. *See United States v. Holloway*, 956 F.3d 660, 664 (2d Cir. 2020).

### II.      Mootness

A federal court's jurisdiction is limited to "actual cases or controversies."

8

*Simon v. E. Kentucky Welfare Rts. Org.*, 426 U.S. 26, 37 (1976). The case-or-controversy requirement "manifests in three distinct legal inquiries: standing, mootness, and ripeness." *Klein ex rel. Qlik Techs., Inc. v. Qlik Techs., Inc.*, 906 F.3d 215, 221 (2d Cir. 2018). At issue here is mootness. Under the mootness doctrine, "[i]f an intervening circumstance deprives the plaintiff [or petitioner] of a personal stake in the outcome of the lawsuit, at any point during litigation, the action can no longer proceed and must be dismissed as moot." *Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66, 72 (2013) (internal quotation marks and citation omitted).

Stover argues that Rivera-Perez's petition was mooted the moment he was transferred to prerelease custody. According to Stover, because the BOP had already applied twelve-months' worth of FSA time credits to move up the start of Rivera-Perez's term of supervised release, and because the FSA does not authorize use of earned-time credits to reduce a term of supervised release, Rivera-Perez had received all of the benefits he could have received from his petition prior to entry of the district court's judgment granting his petition. Rivera-Perez counters that the case was not moot because, as the district court held, FSA time credits can be applied to reduce the amount of time he will spend on supervised release and, therefore, his transfer to prerelease custody did not give him the complete relief

9

ADD 31

that is required to moot his case.

The mootness determination therefore depends entirely on a question of statutory interpretation that presents an issue of first impression in this court: Can time credits earned under the FSA be used to reduce a federal inmate's term of supervised release?  As set forth below, we conclude that the answer is no.

**III.    Whether FSA Time Credits Can Reduce a Term of Supervised Release**

"When interpreting a statute, we begin with the plain language of the statute, giving the statutory terms their ordinary or natural meaning." *Spadaro v. U.S. Customs & Border Prot.*, 978 F.3d 34, 46 (2d Cir. 2020) (internal quotation marks and citation omitted).  Thus, we must examine the two critical sentences of Section 3632(d)(4)(C):  "Time credits earned . . . by prisoners . . . shall be applied toward time in prerelease custody or supervised release.  The Director of the Bureau of Prisons shall transfer eligible prisoners, as determined under section 3624(g), into prerelease custody or supervised release."  18 U.S.C. § 3632(d)(4)(C).

The district court's analysis focused on the word "toward" in the first sentence.  Looking at the word's ordinary meaning, the district court concluded that

[a]pplying credits toward something ordinarily means reducing that

10

ADD 32

> thing.  For example, applying a store credit toward the cost of an item means that the cost of that item is reduced by the amount of the credit.  Similarly, applying a credit toward one's account balance means that the balance will be reduced by the amount of the credit.

*Rivera-Perez*, 757 F. Supp. 3d at 211–12.  Under this reading, when time credits are "applied toward time in . . . supervised release," 18 U.S.C. § 3632(d)(4)(C), they reduce the amount of time a prisoner must spend in supervised release.  *Rivera-Perez*, 757 F. Supp. 3d at 212.

Rivera-Perez agrees with, and urges us to adopt, this reading.  In support, he points to a dictionary definition defining "toward" as "with a view to obtaining or having" or "as a help or contribution to."[4]  *See* Appellee's Br. at 9 (quoting *Toward*, DICTIONARY.COM, https://www.dictionary.com/browse/toward [https://perma.cc/3ZAX-6W4Z] (last visited Mar. 19, 2026)); *see also Toward*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE 2417 (2002) (providing many definitions of "toward," including "for the partial payment of").

---

[4] Although dictionary definitions are one source of evidence as to plain meaning and "bear consideration," they are not necessarily dispositive of the meaning of "toward" in Section 3632(d)(4)(C).  *Yates v. United States*, 574 U.S. 528, 538 (2015); *see also In re Soussis*, 136 F.4th 415, 427 (2d Cir. 2025) ("Plain meaning is informed by, but does not depend solely on, dictionary definitions.").

11

ADD 33

However, Stover points to other dictionary definitions that support his proposed interpretation of the statutory provision.  For example, Black's Law Dictionary defines "toward" as "in the direction of; on a course or line leading to (some place or something)."  *Toward*, BLACK'S LAW DICTIONARY (12th ed. 2024).  Under this reading, when time credits are "applied toward time in . . . supervised release," 18 U.S.C. § 3632(d)(4)(C), they move the prisoner "in the direction of" starting their term of supervised release.

At least when viewed in isolation, we think that both readings of the phrase "applied toward time in . . . supervised release" are plausible, thereby rendering the phrase ambiguous.  *See In re Med Diversified, Inc.*, 461 F.3d 251, 255 (2d Cir. 2006) (explaining that when a statutory phrase is "reasonably susceptible" to two readings, it is ambiguous).  However, we cannot read the statutory phrase in isolation because "it is a cardinal rule of statutory construction that statutory language must be read in context since a phrase gathers meaning from the words around it."  *L.S. v. Webloyalty.com, Inc.*, 954 F.3d 110, 115 (2d Cir. 2020) (internal quotation marks and citation omitted); *see also Yates*, 574 U.S. at 537 ("Ordinarily, a word's usage accords with its dictionary definition.  In law as in life, however, the same words, placed in different contexts, sometimes mean different things.");

12

*Soussis*, 136 F.4th at 427 ("[T]o ascertain a text's plain meaning, we draw on the specific context in which that language is used, and the broader context of the statute as a whole." (internal quotation marks and citation omitted)). As the Supreme Court has emphasized, we must read statutory phrases in context because "[o]ur duty, after all, is to construe statutes, not isolated provisions." *King v. Burwell*, 576 U.S. 473, 486 (2015) (internal quotation marks and citation omitted).

Here, the context of the phrase "applied toward time in . . . supervised release" resolves the ambiguity in favor of Stover's reading of the statute. Recall that the contested phrase immediately precedes the following sentence: "The Director of the Bureau of Prisons shall transfer eligible prisoners, as determined under section 3624(g), into prerelease custody or supervised release." 18 U.S.C. § 3632(d)(4)(C). We conclude that this second sentence confirms Stover's reading of the statute because it unquestionably contemplates a transfer from prison to prerelease custody or supervised release, not a reduction of time spent in prerelease custody or a term of supervised release.

As an initial matter, the plain text of the second sentence does not refer to *reducing* a term of prerelease custody or supervised release, and instead only refers to *transferring* "eligible prisoners" into one of those statuses. *See* 18 U.S.C.

13

ADD 35

§ 3632(d)(4)(C).  Furthermore, the definition of "eligible prisoners" suggests that only those in prison (who have completed programs or productive activities) are eligible for such a transfer.  *See id.* § 3624(g)(1)(A) (defining an eligible prisoner as "a prisoner . . . who . . . has earned time credits under the risk and needs assessment system"); *see also id.* § 3635(4) (defining prisoner as a "person who has been sentenced to a term of imprisonment pursuant to a conviction for a Federal criminal offense, or a person in the custody of the Bureau of Prisons"); *id.* § 3635(3)(B) (defining the relevant "evidence-based recidivism reduction programs" as those that "help prisoners succeed in their communities upon release from prison").

Moreover, the second sentence conditions transfer on eligibility "as determined under section 3624(g)."  *Id.* § 3632(d)(4)(C).  We must therefore look to the meaning of Section 3624(g) because "[a] court must . . . interpret [a] statute as a symmetrical and coherent regulatory scheme[] and fit, if possible, all parts into an harmonious whole."  *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.,* 529 U.S. 120, 133 (2000) (internal quotation marks and citations omitted).  Section 3624(g)(3) explicitly provides that a "transfer" to supervised release "based on the application of time credits under section 3632" (the contested provision containing

14

ADD 36

"toward") is a transfer "to begin [a] term of supervised release *at an earlier date*."

18 U.S.C. § 3624(g)(3) (emphasis added). Section 3624(g)(3) thus makes clear that

the "transfer" referenced in Section 3632(d)(4)(C) is a transfer to supervised release

at an earlier date, *i.e.*, a transfer that accelerates the start of supervised release or a

transfer that moves the prisoner "toward" supervised release. Similarly, Section

3624(g)(1)(A) defines an "[e]ligible prisoner[]" as, *inter alia*, someone who has

earned time credits "in an amount that is equal to the remainder of the prisoner's

imposed term of imprisonment." This provision confirms that those who are

eligible for a "transfer" pursuant to the second sentence of Section 3632(d)(4)(C)

are individuals who are still serving a term of imprisonment, not those already on

supervised release.[5]

Accordingly, we conclude that the second sentence of Section 3632(d)(4)(C)

clearly addresses an early transfer from imprisonment to the start of prerelease

---

[5] Indeed, another related provision in the same section provides additional contextual support for Stover's reading of Section 3632(d)(4)(C). Section 3632(a) directs the Attorney General to develop the risk and needs assessment system (of which time credits are a part) which "shall be used to," *inter alia*, "determine when a prisoner is ready to *transfer* into prerelease custody or supervised release in accordance with section 3624." 18 U.S.C. § 3632(a)(7) (emphasis added). Therefore, according to the text that Congress enacted, the entire risk and needs assessment system is designed to facilitate a *transfer* into prerelease custody or supervised release, not a *reduction* of those terms.

15

custody or supervised release, not a reduction in those terms. Moreover, reading the first sentence in context—that is, in light of the second sentence—the best reading of the contested provision is that, when time credits are "applied toward time in . . . supervised release[,]" they bring the beginning of the term of supervised release closer in time. Those credits do not partially fulfill (and thus shorten) an individual's time in supervised release.

Our interpretation of the statute is in accord with the majority of circuits that have addressed this issue in both published and unpublished opinions. For example, in *Hargrove v. Healy*, 155 F.4th 530 (6th Cir. 2025), the Sixth Circuit held that "First Step Act time credits under § 3632(d)(4)(C) can be used to reduce a prison term but not a supervised-release term." *Id.* at 536. Critical to the court's analysis was the context of the contested provision. *See id.* at 533–34. In particular, the court noted that, by tying eligibility for transfer to Section 3624(g)—which allows a prisoner to "begin [his] term of supervised release at an earlier date" once he "has earned time credits . . . in an amount that is equal to the remainder of [his] term of imprisonment"—the statute "makes clear that when a prisoner earns time credits 'toward' supervised release, he is moving 'in the direction' of supervised release; the credits are not in partial fulfillment of his supervised-release term." *Id.*

16

at 534 (quoting 18 U.S.C. § 3624(g)(1)(A)).

Similarly, in *Guerriero v. Miami RRM*, No. 24-10337, 2024 WL 2017730 (11th Cir. May 7, 2024) (per curiam), the Eleventh Circuit recognized that the effect of the first sentence in Section 3632(d)(4)(C), "read in isolation," is unclear. *Id.* at *2. However, when read in the context of "the entirety of the relevant statutory language"—including the second sentence of Section 3632(d)(4)(C) and the provision it references, Section 3624(g)—the court concluded "that Congress intended the time credits to be used to reduce incarceration time so as to accelerate the beginning of prerelease custody or supervised release." *Id.* at *3. The Fourth and Fifth Circuits have reached the same conclusion in unpublished opinions. *See United States v. Malik*, No. 24-7073, 2025 WL 973003, at *1 (4th Cir. Apr. 1, 2025) (per curiam) ("Time credits earned under the FSA 2018 are to be applied to reduce an incarcerated person's prison term, not the person's term of supervised release.");[6] *Stinson v. Martinez*, No. 24-30793, 2025 WL 2017872, at *1 (5th Cir. July 18, 2025) (per curiam) ("[Earned-time credits] may only be applied towards an early start of

---

[6] A published opinion from the Fourth Circuit has also reached the same conclusion in *dicta*. *See Valladares v. Ray*, 130 F.4th 74, 79 (4th Cir. 2025) (stating that "[u]nder the FSA, . . . time credits can be applied toward earlier placement in pre-release custody or supervised release").

17

ADD 39

supervised release or early transfer to pre-release custody.").

The only circuit court that has concluded otherwise is the Ninth Circuit, which held that "the FSA's time credits may be used to reduce the length of time that a prisoner must spend while on supervised release." *Gonzalez v. Herrera*, 151 F.4th 1076, 1089 (9th Cir. 2025). However, we find the reasoning of both the district court and the Ninth Circuit, which Rivera-Perez asks us to adopt, to be unpersuasive. According to the district court, "the first sentence allows credits to be applied to reduce a term of (*i.e.,* 'time in') prerelease custody or supervised release, and the second sentence allows the BOP to apply credits to transfer an inmate to prerelease custody or to supervised [release] at an earlier date." *Rivera-Perez*, 757 F. Supp. 3d at 212; *see also* Appellee's Br. at 11 (asking us to adopt this interpretation). The dissent also adopts that approach. *See post* at 7–8. Similarly, the Ninth Circuit has held that the first sentence of Section 3632(d)(4)(C) "declares that earned time credits shall reduce time in prerelease custody or supervised release, separate and apart from imprisonment" and the second sentence "directs the BOP to put the prisoner on prerelease custody or place him on supervised release (cashing in earned time credits to do so) when a prisoner becomes eligible." *Gonzalez*, 151 F.4th at 1085 (internal quotation marks and citation omitted). Thus,

18

ADD 40

under this approach, the first sentence enables a reduction of a prisoner's term of prerelease custody or supervised release.

In order for us to adopt this interpretation, however, we would have to accept a series of implausible assumptions about Congress's intent. *First*, the heading of 18 U.S.C. § 3632(d)(4)(C)—"[a]pplication of time credits toward prerelease custody or supervised release"—"does not imply that it is outlining *two* situations when time credits can be applied—it implies only one." *Hargrove*, 155 F.4th at 535 (emphasis in original); *see also Dubin v. United States*, 599 U.S. 110, 120–21 (2023) (looking to the heading of a section to resolve doubt about the meaning of a statute).[7] If we were to adopt the district court's interpretation, we would necessarily need to conclude that Congress enacted the first sentence to direct one process (a reduction of a term of prerelease custody or supervised release by an unnamed entity without specifying how) and then that same Congress abruptly changed tack to give the BOP instructions about how to carry out a completely

---

[7] Although the dissent suggests that our analysis relies "largely" on the heading and notes that "the heading of a subsection cannot override the plain words of a statute," *post* at 8 (internal quotation marks and citation omitted), the heading is the beginning rather than the end of our analysis and, as set forth *infra*, the narrowness of the heading is completely consistent with our analysis of the statutory text.

19

ADD 41

different process (early transfer of eligible prisoners based on earned credits) in the second sentence. We can discern no reason why Congress would have created such an incongruous framework; rather, we conclude it is much more likely that Congress intended the two sentences under the same heading to address the same process—a transfer to prerelease custody or supervised release at an earlier date.[8]

*Second*, the second sentence of Section 3632(d)(4)(C) directs the BOP to follow the detailed processes and requirements of Section 3624(g) before transferring a prisoner to supervised release. For example, under Section 3624(g), a prisoner is eligible for transfer to supervised release only if "the prisoner has been determined [by the BOP] under [the risk and needs assessment system] to be a minimum or low risk to recidivate pursuant to the last reassessment of the

---

[8] We are thus unpersuaded by the Ninth Circuit's focus on the dictionary definitions of "credit," "earn," "time," and "apply." *See Gonzalez*, 151 F.4th at 1082. Rather than quibbling with the dictionary definitions themselves, we think that giving dispositive weight to the dictionary definition of those words is insufficiently attentive to the critical phrase's context: its placement in a two-sentence subsection that we think is most naturally read as addressing one situation, rather than two. A narrow focus on defining words in the first sentence (to the exclusion of the context supplied by the second) disregards "[o]ur duty . . . to construe statutes, not isolated provisions." *King*, 576 U.S. at 486 (internal quotations marks and citation omitted); *see Gonzalez*, 151 F.4th at 1083–84 (looking to the context of the second sentence of § 3632(d)(4)(C) only "[o]ut of respect for the split in authority" and after already concluding that the first sentence can reduce the length of a term of supervised release).

prisoner." 18 U.S.C. § 3624(g)(1)(D)(ii). Section 3624(g)(3) also caps how early a prisoner can be transferred to supervised release to twelve months, regardless of the number of credits the prisoner has accrued. *See id.* § 3624(g)(3). However, under the district court's reading, none of those processes and requirements apply to a reduction in a term of supervised release pursuant to the first sentence. For example, under the district court's reading, as long as a prisoner who earned credits is not serving a sentence for certain enumerated crimes listed under Section 3632(d)(4)(D), they would be eligible for a reduction of their time on supervised release, even if the BOP had explicitly found that they presented a high risk of recidivism.[9] Indeed, because the twelve-month limit provided for by Section 3624(g)(4) would be—under the district court's reading—inapplicable to

---

[9] The Ninth Circuit suggests that "[t]here is no boogie man here" because, "[t]o start, prisoners convicted of many of the most serious crimes are statutorily excluded from earning FSA time credits." *Gonzalez*, 151 F.4th at 1089 (citing 18 U.S.C. § 3632(d)(4)(D)). However, we note that, notwithstanding the exclusion of prisoners serving sentences for many serious crimes enumerated under Section 3632(d)(4)(D), prisoners who remain eligible to receive time credits are those serving sentences for convictions for numerous other serious crimes, including, *inter alia*, the following: (1) certain narcotics trafficking offenses, in violation of 21 U.S.C. §§ 841, 846; (2) robbery or extortion, in violation 18 U.S.C. § 1951; (3) racketeering, in violation of 18 U.S.C. § 1962; (4) violent crimes in aid of racketeering, in violation of 18 U.S.C. § 1959; (5) firearms trafficking, in violation of 18 U.S.C. § 922(a); (6) possession of a firearm, after having been convicted of a felony, in violation of 18 U.S.C. § 922(g); (7) money laundering, in violation of 18 U.S.C. §§ 1956–57; and (8) fraud offenses, in violation of 18 U.S.C. §§ 1341, 1343, and 1344.

reductions via the first sentence, a prisoner that has been found to present a high

risk of recidivism could potentially have their entire term of supervised release

wiped out. Moreover, this concern would be particularly acute as to prisoners

serving lengthy sentences, who—by definition—have more time to accrue time

credits.[10] We conclude that it is implausible that Congress would have placed

careful limitations on early transfers to prerelease custody or supervised release,

but then would wholly omit them if it intended to allow reductions of those

terms.[11]

---

[10] For instance, the district court's reading of the statute would allow an individual convicted of participating in a large narcotics operation, involving hundreds of kilograms of cocaine, and whom BOP determined should not be allowed to use his FSA time credits to be released early from prison because his recidivism risk level was not minimal or low, to still use those earned-time credits to substantially reduce (or even potentially eliminate entirely) his term of supervised release once he completes his prison term.

[11] Any suggestion that the minimum or low-risk limitation under Section 3624(g)(1)(B) could also be applied by BOP in determining whether there should be a reduction to the term of supervised release has no basis in the statutory text. In particular, the first sentence of Section 3632(d)(4)(C)—the purported source of authority to reduce a term of supervised release—does not cross-reference Section 3624(g), the source of the minimum or low-risk level limitation. In addition, although Section 3624(g)(1)(B) defines an "eligible prisoner" as one who presents a "minimum or low recidivism risk," 18 U.S.C. § 3624(g)(1)(B), the first sentence of Section 3632(d)(4)(C) does not reference "eligible prisoner[s]." Instead, it states time credits "earned . . . by prisoners . . . shall be applied," and only the second sentence mandates "transfer [of] *eligible* prisoners," *id.* § 3632(d)(4)(C) (emphasis added). Accordingly, if we were to accept that the first

22

ADD 44

*Third*, the first sentence of Section 3632(d)(4)(C) does not specify what agency "shall appl[y]" earned-time credits "toward time in . . . supervised release," or how that should be done. Both the district court and the Ninth Circuit recognized that this first sentence uses the "passive voice" and does not specify the agency responsible for effectuating a reduction of a supervised-release term that the first sentence supposedly requires. *See Rivera-Perez*, 757 F. Supp. 3d at 213; *Gonzalez*, 151 F.4th at 1085. Instead of considering whether such an omission rendered their interpretation incongruous with the statutory plan, they simply noted that, because the BOP is no longer responsible for an individual once they are on supervised release, it makes sense that Congress would not mention the BOP in the sentence that allows for a termination of supervised release. *See Rivera-Perez*, 757 F. Supp. 3d at 213; *Gonzalez*, 151 F.4th at 1085. That response, however,

---

sentence of Section 3632(d)(4)(C) provides authority for a court to reduce a term of supervised release, the guardrails contained in Section 3624(g) would simply not apply. In short, our reading of the statute does not "disagree[] with the policy chosen by Congress," *Gonzalez*, 151 F.4th at 1090; rather, our highlighting of the incongruous limitations on the first and second sentences of Section 3632(d)(4)(C) (under the district court's and the Ninth Circuit's interpretations) provides compelling evidence as to why that understanding of Congress's intent is wrong, *see Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 575 (1982) ("[I]nterpretations of a statute which would produce absurd results are to be avoided if alternative interpretations consistent with the legislative purpose are available.").

23

ADD 45

does not address the real problem: that is, if the first sentence of Section 3632(d)(4)(C) can reduce a term of supervised release, the statute gives no indication of the agency responsible for applying the credits.[12] We again conclude that it is implausible that Congress intended to create a mechanism to reduce terms of supervised release without specifying the agency responsible for doing so—particularly where the following sentence specifically tasks the BOP with effectuating transfers. *See King*, 576 U.S. at 497 (emphasizing that "Congress does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions" (internal quotation marks and citation omitted)).

*Fourth*, the district court's and the dissent's reading of Section 3632(d)(4)(C),

---

[12] Rather than meaningfully grappling with this issue, the district court here forged ahead and ordered the BOP to "calculate the number of Rivera-Perez's unused FSA time credits and inform the U.S. Probation Office for the Middle District of North Carolina of that calculation so that it can apply those credits toward Rivera-Perez's term of supervised release." *Rivera-Perez*, 757 F. Supp. 3d at 215. The dissent endorses this approach. *See post* at 11 ("BOP can communicate the individual's remaining FSA credits to Probation, who will then take account of those credits when calculating the appropriate end date of supervised release."). In doing so, the district court effectively inserted words into the statute, creating a process for implementing its interpretation of the FSA, contrary to the principles governing statutory interpretation. *See Romag Fasteners, Inc. v. Fossil, Inc.*, 590 U.S. 212, 215 (2020) (cautioning courts to avoid the "temptation" to "read into statutes words that aren't there"). We also note that the unusual nature of the remedy granted by the district court—directing the BOP to contact a non-party—highlights the implausibility of the interpretation requiring such a remedy.

24

ADD 46

with its emphasis on the phrase "toward time in," implies that time credits can also be applied to reduce the amount of time a prisoner spends in prerelease custody. *See* 18 U.S.C. § 3632(d)(4)(C) (time credits "shall be applied toward time in prerelease custody"). However, rewarding prisoners who participate in recidivism reduction programs by reducing the amount of time that a prisoner spends in prerelease custody defies logic and common sense because prisoners (presumably) want *more* time in prerelease custody (rather than prison), not less. In contrast, if "toward time in prerelease custody" means starting prerelease custody at an earlier date, the productive incentives that Congress sought to create are present. [13] Furthermore, because "toward" is a preposition that has one

---

[13] Indeed, focusing on prerelease custody highlights an additional reason to favor Stover's reading of the FSA. The version of the FSA that first passed the House of Representatives authorized application of earned-time credits only "toward time in prerelease custody[,]" with no mention of supervised release. H.R. 5682, 115 Cong. (2018) ("Time credits earned under this paragraph by prisoners who successfully participate in recidivism reduction programs or productive activities and who have been determined to be at minimum risk or low risk for recidivating . . . shall be applied toward time in prerelease custody. The Director of the Bureau of Prisons shall transfer prisoners described in this subparagraph into prerelease custody . . . ."). Again, as noted *supra,* interpreting "toward time in pre-release custody" under this version of the statute as *reducing* the time a prisoner spends in prerelease custody would make no sense because that would increase the amount of time an individual spends in prison, contrary to the plain purpose of the bill. The final version of the FSA added "or supervised release" to the first sentence, *see* FSA § 101, 132 Stat. at 5198, but we do not think adding "or supervised release" somehow transformed the meaning of "applied toward time in."

25

compound object (time in prerelease custody *or* supervised release), it is natural that it would mean the same for both. *See Helix Energy Sols. Grp., Inc. v. Hewitt*, 598 U.S. 39, 57 (2023) (explaining that, where a provision applies to two scenarios, it "must mean the same thing in either context").

*Fifth*, the district court's reading would allow reductions in terms of supervised release without any involvement of the court. That framework runs counter to 18 U.S.C. § 3583(e)(1), which allows a *court* (not an unspecified entity) to terminate a term of supervised release, but only after considering certain enumerated Section 3553(a) factors, and only after one year of time served on supervised release. In contrast, under the district court's reading, the FSA created a mechanism to reduce (or even terminate) a term of supervised release by an unnamed entity, with no required consideration of the factors listed in Section 3583(e), and with no requirement that the prisoner serve at least twelve months of the term. We yet again find it highly unlikely that Congress effected such a consequential change in sentencing law through the "use[] [of the] passive voice" here. *Rivera-Perez*, 757 F. Supp. 3d at 213.

Given these substantial problems with the district court's interpretation of Section 3632(d)(4)(C), when considered in the context of the entire statute and

26

other statutory provisions that are implicated by such an interpretation, we conclude that the more logical and harmonizing reading of that provision is that the first sentence "outlines what the time-credit system is (a way to move toward prerelease custody or supervised release) and the second sentence outlines how it works (through BOP transfer [of eligible prisoners] as determined by § 3624(g))."[14] *Hargrove*, 155 F.4th at 535. Under this interpretation of Section 3632(d)(4)(C), FSA credits cannot be used to reduce a term of supervised release.

The dissent contends that "much of the majority's concern with Rivera-Perez's reading of the statute springs not from the statutory text, but from perceived negative policy consequences." *Post* at 10. But we discuss the consequences of the dissent's approach mainly to highlight why its incongruous reading of the statutory text is implausible, and to perform our obligation to "interpret the statute as a symmetrical and coherent regulatory scheme and fit, if possible, all parts into an harmonious whole." *Brown & Williamson Tobacco Corp.*,

---

[14] Because our reading gives each sentence independent meaning, we disagree with the district court, *Rivera-Perez*, 757 F. Supp. 3d at 212, the Ninth Circuit, *Gonzalez*, 151 F.4th at 1085, and the dissent, *post* at 7, that our reading renders the second sentence superfluous. *See Freeman v. Quicken Loans, Inc.*, 566 U.S. 624, 635–36 (2012) (discussing the canon against surplusage).

27

529 U.S. at 133 (internal quotation marks and citations omitted). In any event, it is not a policy argument to demonstrate that the dissent's reading is unworkable. It is implausible *from a textual standpoint* that Congress would, *inter alia*, have detailed processes and requirements for BOP to perform before allowing an early transfer of a prisoner to supervised release, yet delineate no process or requirements under the same statute for prisoners to obtain a reduction in their supervised release term (which the dissent supposes would be done) by an unidentified entity. *See King*, 576 U.S. at 494–95 (rejecting an interpretation of a statute where "[i]t is implausible that Congress meant the Act to operate in this manner").

Finally, a few words about the FSA's purpose. As we have explained, "[i]n providing for time credits, Congress clearly aimed to offer 'an incentive for prisoners to attend the recidivism reduction programs Congress was devising, and the obvious incentive was that the time credits would reduce a prisoner's incarceration time.'" *United States v. James*, 151 F.4th 28, 41–42 (2d Cir. 2025) (quoting *Guerriero*, 2024 WL 2017730, at *3)). Rivera-Perez contends that "[a] system that encourages rehabilitation with concrete rewards, *i.e.*, earning credits, should likewise facilitate application of those rewards," and that our reading of the statute would reduce the incentive for prisoners to participate in these

28

programs. Appellee's Br. at 16. Similarly, the Ninth Circuit has highlighted the concern that, unless time credits can be used to reduce a term of supervised release, "any credits earned in excess of 365 days are worthless because they may only be applied to end custody one year early." *Gonzalez*, 151 F.4th at 1088.

On our reading, however, excess credits are by no means wasted. Individuals who complete recidivism reduction programming have presumably obtained useful benefits: vocational training, substance abuse treatment, academic coursework, training in life skills, etc. *See* 28 C.F.R. § 523.41(a); *see also* FEDERAL BUREAU OF PRISONS, FIRST STEP ACT APPROVED PROGRAMS GUIDE (Sep. 2023) https://www.bop.gov/inmates/fsa/docs/fsa_guide_eng_2023.pdf [https://perma.cc /VH52-E4NR] (providing a list of over fifty approved evidence-based recidivism reduction programs and productive activities including "anger management," "cognitive processing therapy," and "money smart for adults"). A prisoner with excess unused credits has benefited from those credits in much the same way a college student who completes more coursework than is necessary to graduate has still obtained a benefit: an education. Moreover, prisoners can benefit from taking courses or participating in productive activities in more immediately concrete ways too. For example, prisoners can receive phone or video conferencing

29

ADD 51

privileges, additional time for visitation at the prison, transfer to a BOP facility closer to the prisoner's release residence, increased commissary spending limits and product offerings, extended opportunities to access email, or consideration of transfer to preferred housing units. *See* 18 U.S.C. § 3632(d)(1)–(3). Individuals can also cite the coursework and productive activities they completed when making an application to the district judge for early termination of their term of supervised release, and the district judge is free to consider them. *See* 18 U.S.C. § 3583(e).

Meanwhile, Rivera-Perez's reading—which could allow for wholesale elimination of supervised release for certain prisoners—does not necessarily serve the FSA's goal of facilitating rehabilitation because supervised release itself "fulfills rehabilitative ends," *United States v. Johnson*, 529 U.S. 53, 59 (2000), and "facilitate[s] a transition to community life," *Mont v. United States*, 587 U.S. 514, 523 (2019) (internal quotation marks and citation omitted). Accordingly, in our view, interpreting the FSA to allow prisoners to use time credits to begin a term of supervised release up to twelve months early (but not to reduce the term of supervised release itself) fully accords with the FSA's goal of reducing recidivism.

\* \* \*

In sum, we hold that when FSA time credits are "applied toward time in . . .

30

ADD 52

supervised release" pursuant to 18 U.S.C. § 3632(d)(4)(C), they reduce a prisoner's time in incarceration by starting a term of supervised release early. They do not reduce a post-incarceration term of supervised release.

## IV. Rivera-Perez's Case

Based upon our interpretation of the statute, Rivera-Perez's case was moot before the district court entered judgment on November 19, 2024. He was transferred from prison to an RRC on January 24, 2024, and the maximum twelve-months' worth of credits were applied to accelerate the beginning of his term of supervised release. A ruling in his favor could not give him any more than that because Section 3632(d)(4)(C) cannot reduce his term of supervised release. It was therefore "impossible for a court to grant any effectual relief whatever to the prevailing party," and the case was moot before the district court entered judgment. *Knox v. Serv. Emps. Int'l Union, Loc. 1000*, 567 U.S. 298, 307 (2012) (internal quotation marks and citation omitted).

## CONCLUSION

For the foregoing reasons, we **VACATE** the judgment of the district court and **REMAND** with instructions to dismiss this case as moot.

A True Copy
Catherine O'Hagan Wolfe, Clerk
United States Court of Appeals, Second Circuit

31

ADD 53